# EXHIBIT 3A

JAMES M. MALONEY (JM-3352)
Attorney for Plaintiffs
33 Bayview Avenue
Port Washington, New York 11050
Telephone: (516) 767-1395

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | | FILED VIA ECF |
| Hughes, Hooker & Co. and | : | |
| Hughes, Hooker (Correspondents) S.A. | : | **First** |
| | : | **Amended** |
| | : | **Complaint** |
| **Plaintiffs,** | : | 04 CV 1859 (SHS) |
| | : | |
| -v- | : | <u>Jury Trial Demanded</u>. |
| | : | |
| American Steamship Owners Mutual | : | |
| Protection and Indemnity Association, Inc., | : | |
| Shipowners Claims Bureau, | : | |
| Joseph E. M. Hughes, | : | |
| Thomas J. McGowan, and | : | |
| Vincent J. Solarino, | : | |
| | : | |
| **Defendants.** | : | |

_____x

Plaintiffs, by their attorney, James M. Maloney, respectfully allege as follows:

1.     This is an action for breach of contract, fraud, tortious interference with contract and an accounting.  This amended complaint is served and filed pursuant to the Court's Order of November 15, 2004. References to page numbers herein are references to the supporting documents exhibited to and served with this First Amended Complaint.

2.     This Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 by virtue of the diversity of the parties, the amount in controversy being more than $75,000 as further described herein.

**The Parties**

3.    Jacek Bielecki ("Bielecki"), the original plaintiff in this action, was the sole equity partner of plaintiff Hughes, Hooker & Co. ("HHC"), a specialist marine law and claims handling firm, with offices in London, England, and Piraeus, Greece, where the company was known as Hughes Hooker (Correspondents) S.A. ("HHCSA"). Bielecki is domiciled in the United Kingdom, with an address at High House Lodge, Doctors Lane, Orford, Suffolk, IP12 2NW, England.

4.    Defendant American Steamship Owners Mutual Protection & Indemnity Association Inc. (the "American Club"), is a marine insurance underwriter offering mutual protection and indemnity insurance to shipowners and charterers, and is incorporated, based and domiciled in the State of New York. Their address is 60 Broad Street, 37th Floor, New York, New York, 10004.

5.    Defendant Shipowners' Claims Bureau Inc. ("SCB"), is the manager of the American Club, and is incorporated, based and domiciled in the State of New York. Their address is 60, Broad Street, 37th Floor, New York, New York, 10004.

6.    Defendants, Joseph E. M. Hughes, the Secretary of the American Club, and the Chairman, Chief Executive Officer, and now, the new owner of SCB, Thomas J. McGowan, the former Secretary of the American Club and President of SCB and Vincent J. Solarino, President and Chief Operating Officer of SCB, whose addresses are unknown to Plaintiffs, are all resident in the United States, and their address for service and employment address is 60 road Street, 37th Floor, New York, New York, 10004.

**Background and History**

7.    P&I or 'Protection and Indemnity' is a specialty marine insurance bought by shipowners and charterers of ships to protect from a range of risks including damage to cargo, wreck removal, pollution, crew injury and death, fines, etc. Usually the business is underwritten on a 'mutual' basis, which means that each ship owner or charterer entered with an insurance company effectively insures the other ship owners and charterers entered with the same insurance company.  This 'mutuality' has certain novel features.  First, the insurance companies are associations, and are therefore referred to as 'clubs', and the ship owners and charterers insured with the 'clubs' are 'members', just like say, in a tennis or golf club. The premium or calls levied on the 'members' are paid as an 'advance', 'supplementary' or 'release' calls, and if in any particular policy year the claims exceed the calls, further 'supplementary' calls may be levied to meet the shortfall.  If a ship owner or charterer wants to leave his club, then 'release calls' are levied by the club on the member to cover his estimated future liability for calls. The combination of advance, supplementary and release calls is known as the ETC or 'estimated total cost' of the cover.

8.    The traditional P&I policy runs for 1 year, from Noon GMT on the 20th February of a particular year, to Noon GMT on 20th February the following year.   The 20th February in any year is referred to as the 'renewal'. Historically, the 20th February was the date when the Baltic Sea was again open to shipping.

9.    There are about 15 P&I Clubs in the world, covering about 95% of world tonnage.  The Clubs were usually regionally or nationally based.  The biggest is the UK Club, with about 100 million tons of shipping.  The American Club made an exclusive contract in 1996 with Plaintiffs to represent them.  At that time the American Club had about 4 million, mainly American flag tons.

3

Defendants wanted to expand internationally and in about 1995 produced a policy document entitled 'Vision 2000', which set out Defendants' ambitions for increasing the membership of the American Club. To that end, Bielecki was appointed in 1996 as the exclusive representative in Greece of Defendants to spearhead the expansion of the American Club in Greece, the country with the highest concentration of ship owners in the world, with almost 20% of world tonnage being owned and operated mainly from the coastal town of Piraeus. Bielecki had extensive P&I experience in Greece which Defendants wanted to utilize to fulfil their expansion plans under 'Vision 2000'.

10.  At that time, 1996, Defendants had no business in Greece, and from the date of their appointment under the 1996 contract, Bielecki worked assiduously to promote the Defendants' business in Greece. The 20th February 1998 renewal saw big gains in tonnage for the American Club, mainly of Greek *"based or domiciled"* vessels. Today, Defendants insure about 10 million tons of Greek shipping, out of a total entry of over 14 million tons, worth about $50 million in premium out of a total premium of about $79 million gross. These figures have been gleaned from the Defendants' website, since Defendants have resolutely refused to disclose individual figures for the Greek fleet to Bielecki or to Plaintiffs.

**The Contract**

11.  On or about 25th March 1996, a 5-year contract was entered into by Bielecki's firm HHC and its Piraeus office, HHCSA, with the American Club and SCB (the contract). Attached to the Complaint is a group of documents that will hereinafter be referred to as **"Exhibit A" (pages numbered 1 to 79), "Exhibit B" (pages numbered 76 to 139), and "Exhibit C" (pages numbered 140 to 146).** Exhibits A and B are identical to those accompanying the original complaint in this action. Exhibit A at pages 1 to 3 shows a document presented and signed by the Defendants by the then-

4

secretary of the American Club and President of SCB, Defendant McGowan, in or about early April 1996.

12.   Exhibit C at pages 140 to 142 shows a draft agreement that was subsequently handmarked (on the first page, page 140) to reflect certain changes desired by the Defendants.  Those changes are reflected on page 143, which consists of a fax from Defendant McGowan to Bielecki dated March 21, 1996.

13.   Exhibit C at pages 144 to 146 shows the final contract as agreed to by Plaintiffs following the fax exchange described above.  Paragraph 4 thereof, which was approved by Defendant McGowan in his fax dated March 21, 1996, indicates that the agreement "may be terminated by 3 months notice in the event of gross negligence or other serious breach by either party."

14.   The "contract" shown at Exhibit A at pages 1 to 3, which is a document presented and signed by the Defendants by the then-secretary of the American Club and President of SCB, Defendant McGowan, in or about early April 1996, differs from the final contract as agreed to by Plaintiffs (Exhibit C at pages 144 to 146) in that it indicates that the agreement "may be terminated by 3 months notice *by either party, or immediately* in the event of gross negligence or other serious breach by either party" (italics added for emphasis).  The additional verbiage, "by either party, or immediately" radically changes the termination provision, but was not contemplated by the parties, and was surreptitiously added by the Defendants to the document that was presented and signed by the Defendants by the then-secretary of the American Club and President of SCB, Defendant McGowan, in or about early April 1996.

15.   The parties agreed to the contract as shown at Exhibit C at pages 144 to 146 and not as shown at Exhibit A at pages 1 to 3.

16. The contract provided, *inter alia,* that Plaintiffs would represent the American Club in Greece for the purposes of promoting the American Club in that market.

17. The parties agreed that, in the event of a dispute, the defending party would have the option of choosing litigation or arbitration before a single arbitrator, but this did not give the defending party the right to choose the single arbitrator or the venue.   See Exhibit C at page 145 (paragraph 5).

18. The contract provided, in general terms, that in consideration of promoting and representing the American Club in Greece, for 5 years, Defendants agreed that Plaintiffs would receive certain payments including commission.  Clause 3(b) of the contract provided as follows:-

   *"in respect of the entry, after the date of this agreement, of shipowners or charterers based or domiciled in Greece, as members, a commission of 2% (two per cent) on the calls (ETC) payable to the AMERICAN CLUB by the said member, for a period of three policy years after entry or for the actual period of entry of the said member, if less than three policy years . . ."*

### The Breaches of Contract

Defendants have been, and remain guilty of several breaches of contract as follows:-

### Failure to Provide an  Accounting

### PARTICULARS

19.  In breach of the contract,  Defendants  failed  to provide  any  or any proper

accounting of the vessels and/or fleets, *"based or domiciled in Greece"*, so as to enable Plaintiffs to calculate the correct commission due be paid to Plaintiffs by Defendants.    Indeed, Defendants have declined to provide details of the accounting on the basis either, that it is, *"none of your business" (per Defendant McGowan)*, and/or that the information is privileged or confidential. (See defendant Hughes's fax dated September 13, 1999, 3rd paragraph at page 41 of Exhibit A).  Further, the documents that Defendants **have** disclosed are selective and incomplete and deliberately designed to provide a false picture to Plaintiffs of the amount of commission Plaintiffs is entitled to, details of which fraud are set out in the paragraphs that follow herein.

20. As stated earlier, due to Plaintiffs' efforts, over 10 million tons of Greek *"based or domiciled"* tonnage was insured by Defendants following the date of the contract made in March 1996.   The precise number of ships and tonnage is unknown to Plaintiffs, because of defendant's refusal to disclose this information. Defendants' failure and later refusal to provide details of the ships insured was a deliberate attempt by Defendants to conceal the business done in Greece so as to avoid paying commission to Plaintiffs, which was lawfully due to them. Defendants knowingly and fraudulently concealed such business and continue to withhold commissions due to Plaintiffs in an amount thought to be in the region of $2.9 million, details of which sum appear below. See also Pages 15 to 18 of Exhibit A, which illustrate Plaintiffs' unsuccessful attempts in 1997, to obtain data from Defendants.

21. On 28th June 1999, some 3 years after the commencement of the contract between Plaintiffs and Defendants, no commission had been paid by Defendants except in connection with one fleet, namely Good Faith Shipping Company SA (GFS), accordingly, Bielecki wrote to defendant Hughes (pages 22 to 26 of Exhibit A), complaining that commissions and claims handling fees had not been paid to Plaintiffs by Defendants.  Bielecki then estimated that a sum of perhaps, *"$60,000 or $70,000 may be due over the past 2 years"*.   A reminder was sent by Bielecki

to defendant Hughes (page 29 of Exhibit A, and Defendant Hughes replied on 7th July 1999 (page 30 of Exhibit A), advising that he would respond, *"in the near future"*. Despite this promise, no response was received from defendant Hughes.

22. Bielecki then emailed defendant Hughes on 12th August 1999 (pages 31 to 32 of Exhibit A), pointing out that claims handling fees remained unpaid since March 1998, some 15 months earlier, and that commission was being withheld since at least February 1997, some 2½ years earlier. No reply was received to this email from defendant. Bielecki estimated that commission then due amounted to about $100,000 (page 31 of Exhibit A). This estimate is significant, since subsequently, Defendants did agree to pay Plaintiffs $104,000, based on secret data they refused to disclose to Bielecki or to Plaintiffs. Plaintiffs allege that Defendants deliberately and fraudulently manufactured the figures set out in their fax of 2nd September 1999 (pages 35 to 38 of Exhibit A), so as to coincide with Bielecki's stated expectation. Bielecki's estimate was wildly understated as Defendants knew or must have known, and the Defendants' offer to pay $104,000 against Bielecki's estimate of $100,000 was opportunistic, fraudulent and proffered in bad faith, as will be demonstrated below.

23. On 2nd September 1999, defendant Hughes finally responded with what they represented was an accurate and honest analysis of what commission was due to Bielecki. However, no corroborative evidence to support Defendants' figures was disclosed. Defendant McGowan simply said *"trust me"*.

24. On 3rd September 1999, Bielecki replied (pages 39 to 40 of Exhibit A), to defendant Hughes by stating that, *"I do not agree entirely with the position you have set out. For example, I cannot determine which fleets are included, their tonnages and the calls charged"*.

25. On September 13, 1999 (page 41, paragraph 4 of Exhibit A), defendant Hughes stated as follows, *"So far as the disclosure of the premium of individual Members*

8

is concerned with the exception of Good Faith, we have a problem disclosing premium levels in respect of identified fleets where there are formal intermediaries who place the business with the Club and in respect of whom – and whose clients – it owes a duty of confidentiality. However, we can - and will – give you details of the identity of the Greek-based fleets in respect of which commission is due. This will follow shortly"

26. The promised "details of the identity of the Greek-based fleets" were not supplied, and Bielecki wrote to defendant Hughes on 4th February 2000 (pages 50 to 56 of Exhibit A), again demanding a proper accounting of the commissions due, and other details requested from defendant Hughes some 8 months earlier. Defendant Hughes replied (page 58 of Exhibit A), on February 14, 2000 that he would, "be in further contact with you in the near future". Nothing was heard from defendant Hughes despite his promises, and after Bielecki threatened to sue, (see fax dated 20th March 2000 – pages 61 to 66 of Exhibit A), eventually defendant Hughes replied on March 23, 2000 (pages 67 and 68 of Exhibit A), as follows, "We have never resiled from the obligation to pay you commissions for the relevant years of account during the currency of the agreement. __You had an accounting as of early September 1999 in our telefax of September 2, 1999. I also said in that message that "I will ensure that all continuing obligations to Hughes Hooker in terms of the agreement are fulfilled in accordance with its terms. We paid you the $104,185.40 due at that point very promptly. The balance we calculate to be due to you as of February 20, 2000 will also be paid to you very soon".__ (emphasis supplied).

27. Accordingly, on March 23, 2000, defendant Hughes was maintaining that he had complied with all his accounting obligations despite the clear fact that no details of any fleets were disclosed to Bielecki or to Plaintiffs as defendant Hughes had previously promised. Further, the statement of defendant Hughes suggests, falsely, that the payment of $104,185.40 on about 21st September 1999, represented the entirety of the sums due to Plaintiffs from Defendants at that time.

This was untrue and the statement was designed to mislead Bielecki. It was the persistence of Bielecki that defendant Hughes admitted he had to pay more to Bielecki. Defendant did not like doing so. Indeed at one meeting in the Defendants' offices on 30th March 2000, Bielecki was threatened with physical violence by Vince Solarino, an executive of SCB in charge of the finances of Defendants, for having the temerity to claim commission. The incident is recorded in Bielecki's fax to defendant Hughes dated 4th April 2000 (pages 78 to 80 of Exhibit A).

28. In paragraph 7, of defendant Hughes fax of March 23, 2000 (page 68 of Exhibit A), Bielecki was invited to a meeting with Defendants in which defendant Hughes stated that, *"we are prepared to meet you next week here in New York to show you in person how the figures have been calculated by reference to all relevant documents. We are not, however, prepared to allow you to keep copies of our internal documents since they are privy to other parties…"*

29. Bielecki travelled to New York for the scheduled meeting with defendant Hughes on 29th March 2000, which was then postponed by defendant Hughes to 30th March 2000, and then defendant Hughes failed to attend the re-scheduled meeting. Bielecki's report dated 4<sup>h</sup> April 2000 of the meeting can be seen at pages 78 to 80 of Exhibit B, which record the abject failure of Defendants to disclose any meaningful accounting. Defendant Hughes reply dated April 6, 2000 is at pages 81 to 82 of Exhibit B, wherein he belatedly and reluctantly admits that the previous 'accounting' was **not** complete. Defendant Hughes says, *"we are again reviewing all accounts and expect within a week to be able to furnish you a* ***more definitive statement with a full explanation of how the commissions are*** ***calculated so that you may follow the figures".****(emphasis added).*

30. Such "definitive statement" was NOT supplied to Bielecki or to Plaintiffs.

31. It is clear therefore that Defendants had not, as they later were forced to admit,

properly accounted to Bielecki or Plaintiffs for commissions. Subsequently, a further sum of $126,882 was admitted by defendant Hughes as being due to Plaintiffs. Once again Defendants falsely insisted that the payment of this commission, which was calculated from data solely held by Defendants and withheld from Plaintiffs, was accurate and complete. No meaningful data or documents were provided by Defendants to Bielecki or Plaintiffs to enable Bielecki or Plaintiffs to verify the Defendants' figures.

32. Defendants only paid commissions under threat of legal proceedings, but still resolutely refused to account properly for the commissions due from them to Plaintiffs. They hid behind the specious argument of confidentiality, despite Bielecki's undertaking to respect that confidentiality. (See page 79 of Exhibit B).

33. The Defendants' strategy was to deliberately conceal the true facts from the Plaintiffs in the hope that Bielecki and Plaintiffs would be exhausted with the effort of chasing for payment of commissions, which Defendants knew were properly due to Plaintiffs. The *modus operendi* of Defendants was to see how hard Bielecki and Plaintiffs would pursue their commission claim, and then make a small payment consistent with Bielecki's expectations, which were conservatively estimated by Bielecki based upon the limited and inaccurate information provided by Defendants. Defendants refused to disclose data to Bielecki or Plaintiffs to allow accurate accounting.

34. In his fax of April 26, 2000 (pages 83 to 85 of Exhibit B), defendant Hughes stated that Defendants' *"complete supporting documentation in regard to the figures attached to this message"* were being sent to Bielecki. Defendant Hughes then declined a meeting with Bielecki that he had previously suggested should take place. The *"complete supporting documentation"* was never provided. So for the third time over a period of some two years, Defendants accepted that the figures they had previously swore were *"complete"* were not complete at all. Even today, Defendants still refuse to provide Bielecki or Plaintiffs with proper

and complete accounting.

35. Defendant Hughes faxed Bielecki on August 10, 2000 (pages 93 to 99 of Exhibit
B) admitting once more that further sums were due to Bielecki, and stating the
following, *"Please advise where you wish the total of $22,055.07 as set out above
to be paid.* ***We consider acceptance of this sum by you to be full and final
settlement of all sums owed by the Club to you"*** *(emphasis added).*

36. Defendant Hughes attempt to use this partial payment of $22,055.07 as a
condition for full and final settlement of all commissions and fees due the
Plaintiffs was rejected by Bielecki and Plaintiffs. The implication was that if the
sum was not accepted by Bielecki and Plaintiffs *"in full and final settlement"*,
then they would never receive the sum admitted by defendant Hughes to be due.

37. By this time, it had taken Bielecki and Plaintiffs over four years to secure at least
some payment of commission. Bielecki insisted that, for example, the total
commission properly payable to Plaintiffs for all years from 1996 to 1999
amounted to $176,965.60 (See fax dated 2nd September 1999, page 36 of Exhibit
A). It can be seen now from Defendants' own published figures at pages 113 to
118 of Exhibit B, that the commission for 1999 **alone** was about $390,000.

38. Further, Defendants, at every stage of the relationship between Plaintiffs and
Defendants, tried to pay less than they knew was properly payable to Plaintiffs.
See fax to defendant Hughes dated 1st September 2000. (Pages 100 to 104 of
Exhibit B).

39. Accordingly, Defendants have failed to account properly or at all to Bielecki and
Plaintiffs over a long period and have systematically, fraudulently, and in bad
faith attempted to avoid their obligations to Bielecki and Plaintiffs. Further, it
was only through Bielecki's persistence in pursuing Plaintiffs' commission
entitlement that Defendants have been forced into a selective and partial

disclosure of data. The reality still is that no proper accounting has been given by Defendants, and such accounting is now sought through this Honorable Court.

### Concealment of Accounts and Fraud

40. Plaintiffs were entitled on all *"shipowners or charterers based or domiciled in Greece, as members, a commission of 2% (two per cent) on the calls (ETC), payable to the American Club by the said member, for a period of 3 policy years after entry…"*. (See Clause 3(b) at page 2 of Exhibit A). The basis of payment was belatedly admitted by Defendants. (See Page 67 at paragraph 3 of Exhibit A).

41. It was not agreed, and the contract did not require that Bielecki/Plaintiffs introduce such, *"shipowners or charterers"* to Defendants, although they did do so. The role of Bielecki/Plaintiffs was as exclusive *"representative and correspondent"* of Defendants, (See Clause 1 of contract, at page 1 of Exhibit A), and not as brokers. If Bielecki/Plaintiffs were brokers, their commission would have been 10% to 15%, not 2% agreed in the contract, consistent with industry practice.

42. When the contract was concluded in March 1996, Defendants had no tonnage in Greece. Today they insure over 14 million tons. In or about 1997/1998, and subsequently, after some 2 years work by Bielecki/Plaintiffs to help establish the Defendants' name in the Greek market, the Defendants began to unlawfully, fraudulently and systematically by-pass Bielecki/Plaintiffs and secure tonnage without disclosing the fact to Bielecki/Plaintiffs with the sole unlawful and dishonest intention of depriving Plaintiffs of commissions on such *"shipowners or charterers"* insured with the Defendants, contrary to the terms and spirit of the contract. (See pages 15 to 20 of Exhibit A). The Greek market owns and operates about 20% of all the world's sea-going ships.

13

**PARTICULARS**

43.  For example, fleets owned by Alkmare, August Marine, CVI Shipping, Desmos
Shipping, Ermoupoli Shipping, Polembros Shipping, Sea Wind Maritime, Trinity
Shipping etc, were insured by Defendants and withheld from Bielecki by
Defendants with the sole purpose of unlawfully depriving Plaintiffs of
commissions rightfully due to them on such fleets.  To take a specific example,
Trinity Shipping had been insured by Defendants since 20th February 1997, but
Defendants kept that fact from Bielecki and Plaintiffs in order to avoid paying
commission on the fleet.  Bielecki discovered the fact in December 1997 (pages
19 and 20 of Exhibit A), and it was not until August 10th, 2000, some 3½ years
later that Defendants agreed to pay the Plaintiffs their commission for Trinity
Shipping.  (See fax dated August 10, 2000 at page 98 of Exhibit B).  Defendant
Hughes failed to include Trinity Shipping in both of his 'complete' reviews dated
2nd September 1999 and April 26th 2000, even though he knew Trinity Shipping
had been insured since 1997.

44.  On or about the 9th March 2000, at a lunch-time meeting between Bielecki and
defendant McGowan, the then secretary of the American Club and president of
SCB, at the India House, Hanover Square, New York, defendant McGowan
admitted to Bielecki that he, defendant Hughes and others employed by
Defendants, had deliberately concealed from Bielecki and Plaintiffs fleets and
individual vessels insured in Greece, in order to deprive Plaintiffs of their lawful
commission.  Defendant McGowan then offered Bielecki/Plaintiffs a settlement to
*"go away,"* which settlement offer was rejected by Bielecki.  The incident is
recorded in Bielecki's fax to defendant Hughes dated 20th March 2000 (pages 61
to 66 of Exhibit A). Defendants have never denied the substance of that meeting.

45.  Further, both defendant McGowan and defendant Hughes, and others employed
by the Defendants, secretly visited Greece at various times, necessarily unknown
to Bielecki, to meet with shipowners and charterers, with a view to securing their

business without disclosing the fact to Bielecki, with the sole unlawful and fraudulent purpose of depriving Plaintiffs of their lawful commission.

46. Four instances, of many such instances are illustrative of the systematic, fraudulent and bad faith behaviour of the Defendants. **First**, in about January 1998, Bielecki and HHCSA's office manager Ms Aliki Xedona, in their capacity as the Defendants' exclusive *"representative"*, attended a meeting with Piraeus ship-owner Mr Christodoulatos of Icarus Shipping, to discuss entry of their vessels in the American Club. Unknown to Bielecki, both defendant McGowan and defendant Hughes, had themselves secretly visited Mr Christodoulatos, the day before. Indeed defendant McGowan and defendant Hughes had both left their business cards with Mr Christodoulatos, which he showed Bielecki as they were still on the ship-owners' desk. There was of course some embarrassment on both Bielecki and the ship owner's side, since Bielecki/Plaintiffs were supposed to have been the exclusive representative of the American Club, and clearly Bielecki didn't know what was going on. Furthermore, Icarus Shipping did become members of the American Club, but Defendants did not disclose that fact until August 10, 2000 (Page 95 of Exhibit B).

47. **Secondly**, on the 15th December 1997, Bielecki visited with Ms Aliki Xedona, the office of Trinity Shipping Corporation and there met Capt Grivas, again to persuade him to enter his vessels with the American Club. Unknown to Bielecki, Capt Grivas had already been secretly visited by defendant McGowan and/or defendant Hughes, and had already agreed to enter his vessels with the American Club from **20th February 1997.** This fact was unknown to Bielecki, and when the matter was raised with defendant McGowan by Bielecki in his fax of 15th December 1997 (pages 19 to 20 of Exhibit A), and on the telephone, Bielecki was told by defendant McGowan that if Bielecki had known of the fleet, then Defendants would have had to pay Plaintiffs their commission, and that the Defendants wanted to avoid doing so. Subsequently, after a lot of pressure from Bielecki, Defendants paid all or some of the commission in connection with the

Trinity fleet.  However, no claims work was sanctioned by Defendants, despite the wishes of Trinity.  Defendant Hughes untruthfully stated in his fax of August 10, 2000 that he thought Trinity were American because, *"it is our understanding that the company's principal spends most of his time in New York"* (See paragraph 2, page 95 of Exhibit B).

48. **Thirdly**, on or about December 17th, 1998, defendant Hughes, called Miss Aliki Xedona from his hotel room at the Ledra Marriot, Syngrou Avenue, Athens, and invited her to dinner.  Defendant Hughes had never met Miss Xedona, and had not otherwise disclosed his presence in Greece on that occasion to the American Club's exclusive representatives, Plaintiffs/Bielecki.  It is inconceivable that Defendant Hughes would have visited Greece otherwise than on the Defendants' business.  But for defendant Hughes' invitation to Miss Xedona, Bielecki would not have known of defendant Hughes's presence in Greece at that time.  Miss Xedona was 28 years old and defendant Hughes, about 47 years old at the time.  Miss Xedona refused defendant Hughes invitation to dinner.  Defendant Hughes did not, until recently, call her again.

49. **Fourthly,** defendant Solarino gave Bielecki an ostensibly "complete" accounting showing what he assured Bielecki were all Greek fleets insured by Defendants.  The document is at page 95 of Exhibit B, and was part of defendant Hughes's submission to Bielecki dated August 10, 2000 (pages 93 to 99 of Exhibit B).  The list of Greek fleets was stated by defendant Solarino to be *"**as of March 31, 2000.**"* This was untrue.  The so-called list does not accord or tally with an earlier contemporaneous Greek fleet list reported to the directors of the American Club at its Board meeting of **March 9, 2000**, to whom Defendants Hughes, McGowan and Solarino gave a different picture.

50. Pages 105 to 112 of Exhibit B shows the, **"Minutes of the Regular Meeting of the Board of Directors of the American Steamship Owners Mutual Protection and Indemnity Association, Inc., held at Five Hanover Square,**

**New York City, on March 9, 2000'.**  At pages 106 to 109 of Exhibit B is a section headed, ***"NEW INSURANCES"*,** from which it can be clearly seen that Greek fleets referred to in the minutes are NOT included in the Solarino/Hughes schedule at page 95 of Exhibit B.

51. It is also noteworthy that the Minutes show, at page 105 of Exhibit B, that Defendants McGowan, Hughes and Solarino, the three senior executives of SCB, were all present at the directors' meeting on March 9, 2000, and accordingly, must have known that the list of fleets disclosed to Bielecki via defendant Hughes fax of August 10, 2000, was patently false.

52. The four examples recounted above incontrovertibly prove that Defendants McGowan, Hughes and Solarino conspired to actively and persistently engage in a systematic fraud against Plaintiffs since at least 1997, by withholding and/or concealing fleets on which Plaintiffs were entitled to commission from Defendants, and then to compound the fraud by persistently obstructing Bielecki's and Plaintiffs' access to the data necessary to prove their fraud.

## TORTIOUS INTERFERENCE WITH CONTRACT

53. Clause 3 (c) of the contract provides  *"in respect of claims handling or advice sought by members of the AMERICAN CLUB, the amount of time spent at the special rates set out in schedule AA as attached..."*

54. Bielecki was required to and did provide, *"claims handling or advice"*, in over 76 separate cases referred to Bielecki/Plaintiffs by 'members' of the American Club. In particular, in 1996, Bielecki had introduced Good Faith Shipping Co. SA, and their chartering arm, N.G. Moundreas Shipping, (GFS), to Defendants.  The business relationship between Bielecki/Plaintiffs and GFS went back some 21 years, and Bielecki/Plaintiffs had handled over 100 claims on behalf of GFS, who operated a fleet of some 40 ships.  The Defendants, however, tortiously interfered

with the relationship between the Plaintiffs and GFS, by unlawfully prohibiting any further work to be done by Plaintiffs for GFS.

## **PARTICULARS**

55. In a meeting on 11th May 1999, between GFS, representatives of the Defendants, including defendant McGowan, and Bielecki, at the office of Mr Nicolas Moundreas, of GFS, it was disclosed that Defendants were handling a large cargo claim without the involvement or knowledge of Bielecki/Plaintiffs, contrary to Clause 3(c) of the contract and to the established pattern of business between the Plaintiffs and Defendants.    Such a blatant breach of contract caused Bielecki/Plaintiffs deep embarrassment, loss of prestige and damage.

56. Further, it transpired that Defendants had *ordered* GFS not to use Bielecki/Plaintiffs for claims handling in the future, and in fact, despite the long relationship between Bielecki/Plaintiffs and GFS, despite the fact that Bielecki introduced GFS as the most prestigious of the new fleets to enter the American Club, and despite denials of Defendants that no such prohibition was issued, at least three facts incontrovertibly show that the Defendants did unlawfully and tortiously interfere with the relationship between the Bielecki/Plaintiffs and GFS. **First**, the Defendants in May 1998, opened what they disingenuously called their "liaison" office in London  In fact, the London office of Defendants did and still does the work previously done by the Plaintiffs.   Indeed, defendant Hughes admitted this in his fax to Bielecki dated 2nd September 1999 (page 37, paragraphs 2 to 4 of Exhibit A).

57. Once the Defendants opened their London office in about 1998, they systematically breached the contract by diverting work away from Bielecki/Plaintiffs, causing them loss and damage.   The then secretary of the American Club and President of SCB, defendant McGowan, assured Bielecki at a meeting on 11th May, 1999, that the London office of the Defendants would

18

handle only *"routine matters,"* and that Bielecki/Plaintiffs would continue to handle the substantive claims. Defendant McGowan acknowledged during that meeting that the treatment of Bielecki and Plaintiffs was *"shabby."* No further claims work was permitted by Defendants to be done by Bielecki/Plaintiffs. The matter is recorded in several of the documents attached, in particular pages 31, paragraph 1; page 33; page 37; page 43, paragraph 6; page 51, paragraph CC; page 64, paragraph 10, all of Exhibit A.

58. **Secondly**, despite numerous promises by defendant Hughes that Bielecki/Plaintiffs would have their claims handling restored, it is a fact that since the prohibition, Bielecki/Plaintiffs have not received any new claims at all in connection with GFS or any other member. Prior to the prohibition in May 1999, new cases were referred to Bielecki/Plaintiffs on a daily basis.

59. **Thirdly,** a representative of GFS now sits on the Board of the American Club, demonstrating the respect and esteem with which GFS, whose introduction was effected by Bielecki, is held by the Defendants.

60. Indeed, when assistance was required by defendant Hughes to assist him with GFS, defendant Hughes had no compunction in calling for Bielecki's assistance. For example, on 20th June 1999, defendant Hughes called Bielecki late at night, London time, and asked for his advice and assistance concerning the provision of security for one of GFS ships, M/V 'ARETI', which was under imminent threat of arrest for alleged cargo damage, which alleged cargo damage was insured by Defendants for P&I risks. The security demanded to avoid such arrest was about $2.5 million. Ordinarily the American Club, in line with all other P&I insurers, would only provide such security if all premium was fully paid up. Defendant Hughes explained to Bielecki that at that time GFS had outstanding premium owing to the American Club of over $1,000,000, and that unless it was paid, no security could be provided by the Defendants, and therefore the M/V 'ARETI' would certainly be arrested. Defendant Hughes also knew very well that GFS was

its leading member and any refusal to provide the required security to avoid the arrest of the M/V 'ARETI', would be fatal to the business relationship between GFS and the Defendants, and would seriously damage the Defendants' reputation in Piraeus. GFS were useful to Defendants as a member because they helped to attract smaller fleets to the Defendants.

61. Accordingly, defendant Hughes asked Bielecki to call GFS principal Mr N.G. Moundreas and request payment of the premium as a matter of urgency, so that he, defendant Hughes, could authorize the provision of the required security in connection with the M/V 'ARETI," and thereby avoid a crisis between Defendants and GFS.

62. It was not part of Bielecki's or Plaintiffs' duties to collect premium, but Bielecki/Plaintiffs agreed to assist defendant Hughes and told him that there was no way that GFS would pay the whole of the outstanding premium of about $1 million in one payment. Defendant Hughes had no explanation as to why he had let the outstanding premium reach such huge levels. In any event, defendant Hughes authorized Bielecki/Plaintiffs to try to secure a promise of payment of only $230,000, instead of the full outstanding premium, and if he did so, then defendant Hughes would authorize the provision of security for the 'ARETI' cargo claim. Bielecki/Plaintiffs were authorized by defendant Hughes to explain this to Mr Moundreas.

63. Bielecki then called Mr Moundreas at his home in Athens at about 10pm Athens time on 20th June 1999, and discussed the matter of premium payments with him and secured a promise from Mr Moundreas that the following morning, checks covering about $230,000 would be delivered to the Plaintiffs' Piraeus office. Bielecki relayed the promise of payment made by Mr Moundreas, to defendant Hughes, who then authorised the required $2.5 million security for the M/V 'ARETI', thereby avoiding her arrest, notwithstanding that Defendant Hughes knew he was breaching the American Club rules and/or bye laws and/or

convention, in agreeing to provide security for the 'ARETI' when substantial premium was outstanding.

64. The following day, 21st June 1999, two checks totalling $230,639.38 were issued, as required by defendant Hughes, and as promised and agreed by GFS as follows. Check No 904922-1 drawn on the Royal Bank of Scotland for $115,151.94 issued by Good Faith Shipping Company Limited. Check No 1005 drawn on The Bank of New York for $115,487.44 issued by Areti Shipping Ltd.

65. Bielecki then arranged for the checks to be sent by courier to defendant Hughes in New York following his instructions dated June 24, 1999 (page 21 at Exhibit A). Accordingly, Bielecki's personal intervention in the 'ARETI' matter, at the express request of defendant Hughes, secured the premia payment and got Defendants 'off the hook'.    The documents evidencing this transaction can be seen at pages 27 to 28 of Exhibit A.

66. Pages 27 to 30 of Exhibit A show an exchange between defendant Hughes and Bielecki/Plaintiffs, concerning the premium payments as described, and refer to *"issues"* discussed in New York.    These 'issues' concerned the Defendants prohibition of proper claims handling by the Plaintiffs as agreed to in the contract. (See page 31, Paragraph 1 of Exhibit A).

67. Despite the valuable assistance sought by and provided to Defendant Hughes by Bielecki/Plaintiffs, and despite defendant Hughes's promise to deal with the 'issues,' no such promise was kept, and to this day no new work has been received from GFS or any other member of the Defendants.

68. Instead, when defendant Hughes did eventually respond to Bielecki on 2nd September 1999, it was purportedly to "cancel" the contract. (See pages 35 to 38 of Exhibit A, but compare paragraph 4 of page 145 of Exhibit C (correct termination clause agreed to by the parties)).

21

69. Accordingly, despite the terms of the contract, in particular Clauses 2 and 3, Defendants have unlawfully deprived Plaintiffs and Bielecki of remuneration they would otherwise have earned in connection with claims handling services. The loss sustained by such unlawful acts include not only a loss of revenue, but also permanent damage to Bielecki's and Plaintiffs' business, by *inter alia,* the secret and unlawful appointment of Shipserve Inc., as the Defendants' Piraeus correspondents, sometime in early 1999 in effective substitution of Bielecki and Plaintiffs, contrary to the 'exclusive' nature of Bielecki's and Plaintiffs' appointment.

70. The manner of the appointment of Shipserve Inc, is a further illustration of the underhanded, disloyal and treacherous, as well as unlawful and bad faith behaviour of Defendants' generally, and defendant Hughes in particular, and Defendants' total disregard for their obligations under the contract. During a meeting between Bielecki and defendant Hughes, at 1100 hours on 9th June 1999, at the then offices of the Defendants, Bielecki asked defendant Hughes about the rumour concerning the appointment of Shipserve, Inc, as the Defendants' Greek correspondent. Defendant Hughes denied the fact despite Shipserve Inc already being listed in the published, but undistributed, 'List of Correspondents' of the Defendants. Indeed, Bielecki and Plaintiffs were humiliated, since Shipserve Inc was listed as the lead correspondent subsuming Bielecki and Plaintiffs as third correspondent. (Pages 137 to 138 of Exhibit B).

71. It is worth pointing out that all these unlawful and rather cynical actions of the Defendants were taking place during the currency and operation of the contract, which action by the Defendants would cause maximum damage to the Plaintiffs and their business and maximum advantage to the Defendants.

72. The number of claims Defendants prohibited Plaintiffs from handling amounted to about 1200 claims between 1999 and 2002, on which the average fee charged

by Bielecki would be about $1,600. The lost revenue therefore amounts to some $1,920,000. In addition, the unlawful acts of the Defendants permanently damaged Bielecki's and Plaintiffs' business in Greece, for which damages are sought.

### The Unlawful Termination of the Contract

73. The Preamble to the contract states that it is dated 25th day of March 1996, and Clause 1 provides the duration of the contract is *"for an initial period of 1 year from the date of this agreement.* (Pages 1 and 2 of Exhibit A).

74. Clause 4 of the contract also states that *"This agreement **shall** be extended for a further period of 4 years following the successful completion of the first probationary year referred to in paragraph 1 above…"(emphasis added).*

75. Accordingly, the contract ran and was valid until 24th March 2001. In breach of the contract, Defendants purported to cancel the contract on September 2, 1999, that is to say, some 18 months prematurely, causing Plaintiffs great loss and damages.

76. However, even if Defendants were able to terminate the contract on notice, which is denied, *cf.* paragraph 4 of page 145 of Exhibit C (correct termination clause agreed to by the parties), Defendants were already systematically breaching the contract on a regular and sustained basis and therefore were in fundamental breach as described in the foregoing paragraphs.

77. Defendant Hughes couldn't even wait for the termination notice he unlawfully gave, to expire. In his fax to Miss Xedona of 1st December 1999 (page 49, at paragraph 2 of Exhibit A), defendant Hughes prohibited Bielecki/Plaintiffs from describing themselves as the *"representative"* of Defendants, even though the contract was still in force. This fax of Defendant Hughes was in answer to Ms

Xedona's fax of the same date (pages 47 to 48 of Exhibit A).

78. Further, defendant Hughes stated in his fax at page 49 of Exhibit A that, *"we are not prepared to entertain claims for commission by Hughes Hooker where such entries are in fact made through independent parties"*. Such a refusal is another example of Defendants' complete disregard for the terms of the contract between Plaintiffs and Defendants.

### Defendant Hughes's veto of sale of SCB to Bielecki

79. Defendant SCB was owned by Johnson and Higgins, who in about 1997 were themselves sold to the brokers Marsh Inc. (Marsh), who thereby became the new owners of SCB. In 1997, Bielecki had approached Marsh with a view to purchasing SCB from them. Negotiations commenced and a price was discussed and agreed in principle. However, Defendant Hughes vetoed the sale to Bielecki, took steps to undermine Bielecki's and Plaintiffs' position as the representative of Defendants, and cancelled the Plaintiffs' contract with Defendants. Subsequently defendant Hughes bought SCB for himself and is the new owner of the management company SCB. (See page 134 of Exhibit B).

80. The events detailed in the preceding paragraphs illustrate the systematic, fraudulent and self-serving acts of bad faith and breaches of contract, perpetrated by the Defendants against the Plaintiffs over a long period of time from 1996 to 2001, both during the currency of the contract between the Plaintiffs and Defendants, and after its premature and unlawful termination by the Defendants.

81. The motive of the Defendants for the unlawful and fraudulent action they have taken can be see from the statements made in the faxes sent by defendant Hughes to Bielecki, in particular those dated 2nd September 1999, and 23rd March 2000. For example, in his fax of 2nd September 1999 (Page 37, paragraph 1 of Exhibit A), defendant Hughes, before prematurely terminating the contract, explained

how much money Plaintiffs had earned over the life of the contract, the suggestion being that Plaintiffs had earned enough and were therefore not entitled to more, irrespective of the terms of the contract.

82.    Defendant Hughes stated **_"The Future_**   *The total sums paid to Hughes Hooker over the life of our agreement to date amount on our calculations to $365,639.31or approximately 6% of the total gross E.T.C. emanating from Greece since 1996 – including premiums which have since turned out to be bad debt.  In accordance with the calculations set out above, we owe you a further $104,185.40 which moves the percentage up to nearly 8%.  **_This is in addition to commissions payable to the brokers who actually place the business with us. Moreover under Clause 3.b of the agreement (and as accounted for in the above tables), the annual commissions have a maximum life of three years. Obviously, those were the terms we agreed upon originally and we will observe them without demur. But I think you will agree that they will afford you a comfortable revenue flow for some time to come……………………..As you know, much has changed since our relationship began.   Not only has our business expanded in quantitative terms, but the Club relationship's with the markets in which its largest growth of business has taken place  - notably among London brokers and their clients in Greece – has also undergone a sea change.  …..In these circumstances, we regard it as increasingly inappropriate to have a fixed relationship with any single party seeking to represent the Club in Greece on a commercial basis or otherwise.  We do not believe that this is a healthy state of affairs and has the potential to damage the Club's longer term prospects".(sic)_**

83. Further, in his fax dated March 23, 2000, (Page 67, paragraph 3 of Exhibit A), defendant Hughes tries to justify his breaches of contract and asserts as follows *"You assert in paragraph 7 of your message that the agreement was 'exclusive' in the sense that you were to be the Club's sole marketing representative in Greece. This was never the case, and never agreed.  You were entitled (which we have*

*never denied) to receive a commission on entries, "based or domiciled in Greece" (Clause 3b)* **whether or not they entered the Club as a result of your efforts – most of which never were, hence your inability to identify the vast majority of them!***(emphasis added)*

84. The implication of these statements and the motive behind the Defendants' actions is clear. Once Bielecki/Plaintiffs had successfully established Defendants' name in the Greek market, the Defendants thought that they could go it alone and could dispense with the services of Bielecki/Plaintiffs as their exclusive representative.

85. Defendant Hughes even denied that Bielecki was given permission by defendant McGowan to act for another insurer, Southern Seas. See part 2, paragraph 3, page 67 of Exhibit A. However, the permission granted by defendant McGowan can be clearly seen at pages 10, 11 and 13, paragraph 3 of Exhibit A.

86. Bielecki and Plaintiffs took all the risk, when in 1996 they contracted in good faith with Defendants. Defendants took no risk because Defendants had no business in Greece and would incur obligations to pay commission only if Bielecki/Plaintiffs secured new members. However, it soon became apparent that Bielecki/Plaintiffs in fact generated significant business for Defendants and thereafter Defendants refused to pay Bielecki/Plaintiffs what was rightfully due to them and set about defrauding Bielecki/Plaintiffs and then prematurely purporting to terminate the agreement.

87. When the relationship between Bielecki/Plaintiffs and Defendants started in 1996, the Defendants had less than 4 million, mainly American, tons. Today they have about 14.1 million tons of which about 77% are non-American, mainly Greek (Page 139 of Exhibit B). The Defendants' total net premium for **2003**, was about $72 million or about $79 million gross. Plaintiffs' 2% commission for 2003

26

would have been about **$884,000**[1]. The Defendants' total net premium for **2002** was about $57.5 million or about $63 million gross. Plaintiffs' 2% commission for 2002 would have been about **$705,000**, and for **2001** about **$403,000**; for **2000** about **$470,000** and for **1999** about **$390,000**. But for the unlawful and premature termination, the contract would have ended in 2001 and run for a further 2 years, that is to say, till 2003, by which year commissions totalling about $3 million would have been earned by Plaintiffs. Instead, Defendants reluctantly paid commissions to Plaintiffs totalling only about $322,000, when the real sum due to Plaintiffs amounted to over $3 million, a shortfall of about $2.7 million (See pages 113 to 118 of Exhibit B). It is clear therefore why Defendants at first tried to hide fleets and individual vessels and defraud Plaintiffs of their commission and then prematurely and unlawfully ended the contract. Defendants did everything they could to avoid their obligations under the contract.

88. In his Circular No 4/97 dated, March 11, 1997, at the 4th paragraph (Pages 119 to 120 of Exhibit B), defendant Hughes reports that, *"the tonnage growth has been matched by the expansion of Member's services over the past year , specifically in regard to charterers' cover for P&I and damage to hull"*. Clause 3b. of the agreement provides that Plaintiffs is entitled to commission on, *"charterers based or domiciled in Greece"*. Plaintiffs have not received a single cent in connection with chartered tonnage, despite the reference as long ago as 1997, to the entry of chartered tonnage, for which Plaintiffs are entitled to commission. Defendants have remained silent in connection with this business, when they knew that they were liable for such commission.

89. Defendants also only paid commission to Plaintiffs at an undervalue since they did not include the annual increases of premium which went to make up the 'ETC', which formed the basis of the commission due to Plaintiffs. (see pages 119 to 136 of Exhibit B). The device used by Defendants was designed to

---

[1] The commission due is estimated as follows:- Gross premium x 70% where 70% represents non-USA tonnage x 80% being the Greek proportion of non-USA tonnage x 2% being the agreed

defraud Plaintiffs of commission.

## As And For A First Cause Of Action

90. Plaintiffs repeat and reallege paragraphs 1 through 89 herein.

91. Defendants have wilfully refused access to accounting and other necessary information as required so that Plaintiffs can calculate the full amount of commissions and other fees owed by the Defendants to the Plaintiffs.

92. Plaintiffs demand an accounting showing all fleets insured by Defendants since 25th March 1996, together with the names and sizes of all vessels entered, and the rates of advance call, supplementary and release calls changed by Defendants in respect of P&I and FD&D, and Charterers policies of insurance. Plaintiffs also demand an accounting showing all claims arising for the Greek fleet from 1996 to 2003, and the sums paid by way of fees in connection with the handling of those claims.

## As And For A Second Cause Of Action

93. Plaintiff repeat and reallege paragraphs 1 through 92 herein.

94. Defendants have breached and are in continuing breach of the contract dated 25th March 1996, said breaches causing serious losses and/or damages to the Plaintiffs. Plaintiffs have performed their obligations in good faith and in full, and said breaches by Defendants were not in any way caused by Plaintiffs.

## As And For A Third Cause Of Action

95. Plaintiffs repeat and reallege paragraphs 1 through 94 herein.

commission.

96. Defendants knowingly and willingly and in furtherance of their interests and to the complete detriment of Plaintiffs' interests, wrongfully and anticipatorily and prematurely terminated the contract dated March 25, 1996. Said termination has caused and continues to cause losses and damages to the Plaintiffs.

### As And For A Fourth Cause Of Action

97. Plaintiffs repeat and reallege paragraphs 1 through 96 herein.

98. Defendants knowingly and wilfully and tortiously interfered with contracts that existed and that were reasonably expected to be entered into between Bielecki/Plaintiffs and third parties. Said tortuous interference with contract has caused and continues to cause great financial harm to Plaintiffs.

### As And For A Fifth Cause Of Action

99. Plaintiffs repeat and reallege paragraphs 1 through 98 herein.

100.    Defendants have wilfully, knowingly and with great malice exhibited patterns of concealment, duplicity and behavior in bad faith and induced Plaintiffs to perform valuable services at the request of Defendants under fraudulent pretences.

**WHEREFORE,** Plaintiffs prays that this Honorable Court issues a judgment against the Defendants and in favour of the Plaintiffs:

1.    An accounting showing all fleets insured by Defendants since 25th March 1996, together with the names and sizes of all vessels entered, and the rates of advance call, supplementary and release calls changed by Defendants in respect of P&I and FD&D, and Charterers policies of insurance. Plaintiffs also demand an accounting showing all claims arising for the Greek fleet from

29

1996 to 2003, and the sums paid by way of fees in connection with the handling of those claims.

2.    Damages for unpaid commissions, as best as can now be determined in an amount equal to $3,172,000, subject to a full and final accounting as prayed for herein.

3.    Damages for loss of claims handling or advice work amounting to as best now can be determined an amount equal to $1,920,000.

4.    Punitive damages as to be assessed by this Honorable Court.

5.    Interest and all costs associated with this action.

6.    Such further and other relief as this Honorable Court may deem fair and just.

Dated:      December 17, 2004
            Port Washington, New York

_____/s/_____

JAMES M. MALONEY (JM-3352)
Attorney for Plaintiffs
33 Bayview Avenue
Port Washington, NY 11050
(516) 767-1395

EXHIBITS A and B
are those filed with the original complaint
and are on file with the Court.

They have not been filed via ECF.

EXHIBIT C follows

draft

AGREEMENT

BETWEEN

THE SHIPOWNERS CLAIMS BUREAU INC., and THE AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., ( the AMERICAN CLUB ), of the first part and HUGHES, HOOKER & CO., ( HUGHES, HOOKER ), of the second part, dated this .......day of  March 1996.

1.    The AMERICAN CLUB hereby appoints HUGHES, HOOKER as it's ~~exclusive~~ representative and correspondent for Greece for an initial period of 1 year from the date of this agreement.

2.    HUGHES, HOOKER shall use their best endeavours to represent and market the AMERICAN CLUB in Greece in order to facilitate the introduction of shipowners and charterers as potential members of the AMERICAN CLUB, and where necessary to give advice and/or handle claims as required, and to generally promote the AMERICAN CLUB in accordance with the policy and ideals of ` Vision 2000 `, and to act as ~~exclusive~~ general correspondents to the AMERICAN CLUB, and it's managers.

3.    In exchange for the duties set out in paragraph 2, above, HUGHES, HOOKER shall be entitled to the following remuneration, which, in any event may be reviewed from time to time as required by either party :-

    a.    in respect of the day-to-day promotion and marketing of the AMERICAN CLUB, the sum of $...10,000 per annum, payable in equal quarterly instalments in advance, on the first day of each quarter. Special events will be agreed in advance and paid for separately, e.g., Posidonia '96, and,

    b.    in respect of the entry, after the date of this agreement, of shipowners or charterers based or domiciled in Greece, as members, a commission of 2% ( two per cent ) on the calls (ETC) payable to the AMERICAN CLUB by the said member, for a period of three policy years after entry. and,

    c.    in respect of claims handling or advice sought by members of the AMERICAN CLUB, the amount of time spent at the special rates set out in schedule AA as attached.

4.    This agreement shall be extended for a further period of 4 years, following the successful completion of the first probationary year referred to in paragraph 1 above, save that this agreement may be terminated by 3 months notice in the event of gross negligence or other serious breach by either party.

5.    This agreement is subject to American or English law and jurisdiction either in arbitration, before a single arbitrator, or before the regular courts, at the option of the defending party.

..........................................    Date.................March 1996.

140

2

THE AMERICAN CLUB
..................................................    Date..................March 1996.
SHIPOWNERS CLAIMS BUREAU

.........................................    Date..................March
HUGHES, HOOKER & CO.

SCHEDULE AA

## HUGHES, HOOKER & CO. CHARGE-OUT RATES 1996/97

| PARTNERS | NORMAL RATE | AMERICAN CLUB RATE |
|---|---|---|
| JACEK BIELECKI | 295 | 160 |
| CEDRIC HARRIS | 250 | 150 |
| CHRIS LAKE | 250 | 150 |

### ASSISTANT SOLICITORS

| | | |
|---|---|---|
| MORAY HUGHES | 225 | 140 |
| MICHAEL BOWER | 200 | 140 |
| ALISTAIR RUSTEMEYER | 200 | 140 |
| TONY CHRISTOULIDES | 160 | 130 |

### LEGAL EXECUTIVES/TRAINEES

| | | |
|---|---|---|
| KIRSTY SCOTT | 75 | 50 |
| TIM MARC | 75 | 50 |
| SOFIA KORDEK | 75 | 50 |

**N.B. DISBURSEMENTS ARE CHARGED IN ADDITION**
**BJT/11:3:96**

4

142

03/22/1996  15:17    2128099879                SCB/AMERICAN CLUB-NY                    PAGE  06

American Steamship Owners Mutual Protection and Indemnity Association, Inc.

Shipowners Claims Bureau, Inc. MANAGER    MAIN  212-269-2350
Five Hanover Square, 20th Floor            DIRECT 212-908-3444
New York, New York                        FAX   212-825-1391
10004-2698                                TELEX 222091 SHIPOCBR


THE
AMERICAN
CLUB

# TELEFAX

March 21, 1996

Mr. Jacek Bielecki
Hughes, Hooker & Co.
London, ENGLAND
Fax # 011-44-171-626-1234

Dear Jacek:

I have your fax with the details of your office in Piraeus, which will be included in our 1996 book of correspondents.

We are not particularly in favor of a written agreement. To my knowledge, no club has a written contractual relationship with correspondents. Admittedly, however, you will be doing much more than a normal correspondent and receiving special compensation for it. Thus in balance, I suppose a writing serves to define the relationship. Going through your draft, I have the following comments:

(1)    I would ask that the word "exclusive" be omitted. We will show you first in the book, but for the time being, I wish to keep Lily Karaiscos's name in the book. Lily has been very helpful to me in Greece over the years, although she is the exclusive representative of SKULD. We would certainly direct claims work to you and once our relationship is firmly cemented, her firm could be eliminated from our book.

(2)    O.K.--except "exclusive."

(3a)   This approach is fine with me to the extent we can agree that the money is treated as an advance against billable time for work you do at our request. It will not be a retainer. If that is acceptable, I suggest US$10,000.00.

(3b)   The member must stay with the Club for the three-year period.

(3c)   O.K.

(4)    O.K.

(5)    O.K.

I hope to get back to you shortly about the use of the Empire State.

Regards,

Thomas J. McGowan

bab\wao\tjm\bieloo.var

143

# A G R E E M E N T

**B E T W E E N**

THE SHIPOWNERS CLAIMS BUREAU INC., and THE AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., ( the AMERICAN CLUB ), of the first part and HUGHES, HOOKER & CO., and HUGHES, HOOKER ( CORRESPONDENTS ) S.A., ( HUGHES, HOOKER ), of the second part, dated this .**25th day of March 1996.**

1.    The AMERICAN CLUB hereby appoints HUGHES, HOOKER as it's representative and correspondent for Greece for an initial period of 1 year from the date of this agreement.

2.    HUGHES, HOOKER shall use their best endeavours to represent and market the AMERICAN CLUB in Greece in order to facilitate the introduction of shipowners and charterers as potential members of the AMERICAN CLUB, and where necessary to give advice and/or handle claims as required, and to generally promote the AMERICAN CLUB in accordance with the policy and ideals of ` Vision 2000 `, and to act as general correspondents to the AMERICAN CLUB, and it`s managers.

3.    In exchange for the duties set out in paragraph 2, above, HUGHES, HOOKER shall be entitled to the following remuneration, which, in any event may be reviewed from time to time as required by either party :-

    a.    in respect of the day-to-day promotion and marketing of the AMERICAN CLUB, the sum of $10,000 per annum, payable in equal quarterly instalments in advance, on the first day of each quarter, such sum to be treated as an advance or payment on account against billable time for work done at the request of the AMERICAN CLUB..   Special events will be agreed in advance and paid for separately, e.g., Posidonia `96, and,

    b.    in respect of the entry, after the date of this agreement, of shipowners or charterers based or domiciled in Greece, as members, a

144

commission of 2% ( two per cent ) on the calls (ETC) payable to the AMERICAN CLUB by the said member, for a period of three policy years after entry, or for the actual period of entry of the said member, if less than three policy years,  and,

      c.    in respect of claims handling or advice sought by members of the AMERICAN CLUB, the amount of time spent at the special rates set out in schedule AA as attached.

4.    This agreement shall be extended for a further period of 4 years, following the successful completion of the first probationary year referred to in paragraph 1 above, save that this agreement may be terminated by 3 months notice in the event of gross negligence or other serious breach by either party.

5.    This agreement is subject to American or English law and jurisdiction either in arbitration, before a single arbitrator, or before the regular courts, at the option of the defending party.


.......................................................
**THE** AMERICAN CLUB


.......................................................
**SHIPOWNERS CLAIMS BUREAU**

**HUGHES, HOOKER & CO.**

**HUGHES, HOOKER ( CORRESPONDENTS) S.A.**


145

SCHEDULE AA

## HUGHES, HOOKER & CO. CHARGE-OUT RATES 1996/97

| PARTNERS | NORMAL RATE | AMERICAN CLUB RATE |
|---|---|---|
| JACEK BIELECKI | 295 | 160 |
| CEDRIC HARRIS | 250 | 150 |
| CHRIS LAKE | 250 | 150 |

### ASSISTANT SOLICITORS

| | | |
|---|---|---|
| MORAY HUGHES | 225 | 140 |
| MICHAEL BOWER | 200 | 140 |
| ALISTAIR RUSTEMEYER | 200 | 140 |
| TONY CHRISTOULIDES | 160 | 130 |

### LEGAL EXECUTIVES/TRAINEES

| | | |
|---|---|---|
| KIRSTY SCOTT | 75 | 50 |
| TIM MARC | 75 | 50 |
| SOFIA KORDEK | 75 | 50 |

**N.B. DISBURSEMENTS ARE CHARGED IN ADDITION**
**BJT/11:3:96**
NOTE: PERSONNEL ASSIGNED TO AMERICAN CLUB WORK MAY CHANGE
FROM TIME TO TIME, BUT THE AGREED SPECIAL RATES WILL ALWAYS BE
APPLIED PER GRADE OF PERSONNEL

