UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HUGHES, HOOKER & CO. AND
HUGHES, HOOKER (CORRESPONDENTS) S.A.,

      Plaintiffs,

        -against-

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION,
INC., SHIPOWNERS CLAIMS BUREAU,
JOSEPH E. M. HUGHES, THOMAS J. MCGOWAN,
AND VINCENT J. SOLARINO,

      Defendants.

---

04 CV 1859 (SHS)

**DECLARATION OF
JACEK BIELECKI
IN OPPOSITION TO
THE DEFENDANTS'
RENEWED MOTIONS FOR
ORDERS STAYING THIS
ACTION PENDING
ARBITRATION IN
LONDON**

JACEK BIELECKI declares pursuant to 28 U.S.C. § 1746 as follows:

1.     I was the sole equity partner of Hughes, Hooker & Co., and was and am a director of Hughes, Hooker (Correspondents) S.A., a Panamanian corporation (hereinafter, collectively, "HH").

2.     I respectfully submit this declaration in opposition to the Renewed Motion made by the defendants, American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("American Club"), Shipowners Claims Bureau ("SCB"), Joseph E. M. Hughes, Thomas J. McGowan and Vincent J. Solarino, asking that this Court order that this action be stayed pending "arbitration in London"[sic] and other relief.

3.     I have personal knowledge of the facts which bear on this Renewed Motion.  I have

read the Affidavit of Lawrence J. Bowles filed in support of the Renewed Motion and take issue with him for the reasons set out in the following paragraphs.  I also refer to my Affidavit filed in this action under the defendants' original Motion dated 30th June 2004.

4.     Mr Bowles makes about fourteen main points in his Affidavit.

## Who Drafted the Agreement?

5.     Mr. Bowles states no less than three times that the Agreement and/or Clause 5, were "drafted" by me alone. (Bowles Aff.,  9,  10 Line 3 and  16, Page 7, Line 1).  This is not the case.  I had about 20 conversations and meetings with both defendants McGowan and Hughes (who is himself an English trained barrister-at-law) during 1995 on March 23, April 6, April 24, June 1, June 7, October 25, November 11, 14, 15, 17 and 28.  Also in 1996 on January 1, January 7, February 28, March 11, 19, 21, 22, and March 25th the date the Agreement was concluded and signed by the plaintiffs.  All the discussions and meetings focused on the terms of the Agreement and how it would work in practice.  A true copy of the Schedule of Meetings, Telephone Conversations and Faxes is attached hereto as Exhibit 1.

6.     The idea that defendants McGowan and Hughes, in particular had no say on important issues like the jurisdiction and the forum clause or the exclusivity of the deal is nonsense.

7.     It is true that most of my discussions were with defendant McGowan and it is also true that he was not keen on any written agreement between us at all.

**U.S. Law**

8.      However, at my third meeting with defendant McGowan on Monday, November 13, 1995, which meeting took place at my office in the City of London, McGowan confirmed for the first time that my company was to be appointed as the Piraeus representative of the American Club.

9.      We discussed a range of issues including the drafting of an agreement and I refer to Exhibit 2, which is a true copy of a memorandum recording what was said at the meeting of November 13, 1995. The memo was produced from the manuscript notes I made at the time of the meeting on the reverse side of the AGENDA NOTE, a true of which is attached hereto as Exhibit 3, a copy of which, to my knowledge, in also in the possession of McGowan.

10.     As I stated at paragraphs 16 and 22 of my Affidavit dated June 30th, 2004, McGowan did agree to American law, and as far as he was concerned he wanted *only* American law and jurisdiction.  At the meeting of 13th November 1995, we discussed whether it should be the courts or arbitration, and McGowan wanted an option, and hence the way the clause is worded.

11.     In fact, he used the word "regular", an American idiom, in the context of arbitration or the courts, and that was the basis on which I then prepared the first draft Agreement.  In England we do not use the word "regular" in this way.  We would use the word "standard" or "usual" or "ordinary", not the word "regular". I am therefore convinced that it was something said by McGowan and not by me or Cedric Harris, my partner who was also in the meeting on November 13, 1995.

12.    It was not intended that the defendant was to choose both jurisdiction and forum.  The choice or "option" was to be between arbitration and the courts in America for him and England for us.

13.    I have always been convinced that I could not have drafted Clause 5 myself without some outside influence.  It is an abomination.  I have been drafting commercial agreements, all of which had law and jurisdiction clauses for most of my professional life.  I would not have drafted a clause like Clause 5, unless I was told what to say or, as in the present case I had a party who had expressed a view.

## "LONDON"?

14.    For example, although Mr. Bowles uses the expression "London arbitration" or "arbitration in London", (See Bowles Aff., 2, 11, line 2; 17 and 18), Clause 5 doesn't actually contain the word "London", and there is no logical reason why "London" is to be read into Clause 5.  I don't live in London.  I no longer have an office in that city.  It could just as well have been Oxford or Cambridge, since there is no nexus with London.

15.    The assumption by Mr. Bowles that arbitration has to be in "London" is deliberately included in his submission to give a definition and meaning to Clause 5 which does not exist.

16.    An arbitration clause in a commercial agreement usually starts with language such as: "All disputes arising out of this contract shall be arbitrated in [New York] [Paris] [London][Beijing]."  See Exhibit 4, attached hereto, which consists of true copies of examples of arbitration agreements from "NYPE 1946", "NYPE 93", "BALTIME 1939" and

"SHELLTIME 4", all of which are standard commercial agreement forms (charter parties) for use in the maritime industry.  Clause 5  does not contain any such phrasing, and the suggestion that "London" is the place to arbitrate in England is illogical and unfounded.

17.     It is also important to understand the context in which my meeting with McGowan of the 13th November 1995 was held.  I had been "chasing the deal" for 8 months and I was very excited at that meeting, because McGowan, coolly, and in his inimitable manner, expressed his approval simply by saying that he "had no problem appointing Hughes Hooker".  I had no inkling before that meeting that he had already made up his mind, and I had expected to be kept on tenterhooks for months more.  The American Club was the only Western P&I Club which didn't have business in Greece.  It was a great opportunity for my firm and it would be a "coup" if we did the deal with McGowan/American Club/SCB.

18.     Accordingly, when at first McGowan said he didn't want a written agreement, then relented and said "keep it short", I was not about argue over the semantics and minutiae of the wording of the agreement, and I was prepared to accept almost anything.  McGowan said he wanted a short agreement, and he said he only wanted US law and jurisdiction, and that's what he got.  He was substantially happy with the draft that I sent to him.  We had to keep English law as well since it was our "home port" so to speak, but the basic idea was that there was a choice of the forum (arbitration or the courts), not a choice of the country in which to litigate.

19.     Any other interpretation is fraught with difficulties which I have already explained in my Affidavit of June 30, 2004 at 17 to 24.

**"Defending Party"**

20.    Mr. Bowles gives his definition of what is meant by the phrase "defending party"(Bowles Aff. ¶¶ 8 and 17), and Exhibit 2A, which is my fax dated 29th March 2000 to defendant Hughes.

21.    Mr. Bowles maintains that defendants became the "defending party" prospectively in 2000, when in reality they became a "defending party" only when I commenced this action against all defendants in this Court in 2004.

22.    Further, since 2000 the defendants have done nothing to ensure that the "London [sic] arbitration" that they claim they opted for was commenced.

23.    I could not have commenced arbitration in the U.K. or the U.S. without the defendants' cooperation, for example, on the identity of the single arbitrator.  By remaining silent, the defendants thwarted any proceedings against them to which they claim they were entitled in 2000 and are entitled to now.

**Laches**

24.    Mr. Bowles complains that I waited four years before filing suit against the defendants. (Bowles Aff. ¶¶ 11, 12 and 18).  I dealt with his criticism of me in Bielecki Aff., dated 30th June 2004 at 47 *et seq*.  The fact is that one of the only ways I could ascertain the level of commissions were being withheld from me by the defendants was by sight of the financial results of the American Club to 2003/2004, the last year to which I was entitled to commission

under Clause 3(b) of the Agreement.   Even so, I still have to guess the amount due to HH since the defendants have resolutely refused to disclose any reliable figures.   Thus, the defendants have obstructed, and are continuing to obstruct, any proper statement of the amount of the claim.

25.    The only other way I guessed the amount due to my firm was by following trade press reports.   For example, at paragraph 82 of the original Complaint dated March 8, 2004, I based the claim on the tonnage and premium income of the American Club, pleading: "Today [the American Club] have about 14.1 million tons" and that their "net premium for 2003, was about $72 million or about $79 million gross".

26.    As it turns out, I had underestimated the tonnage and premium income of the American Club substantially.   In an interview given by defendant Hughes to the weekly shipping newspaper *TradeWinds*, appearing in its issue dated 13th August 2004 (after I had filed the original Complaint), Hughes stated that the American Club's premium was "$120 million of premium from the owners of more than 20 million [gross tons] of shipping".   Further, in the interview it was reported that the American Club "has been transformed during Hughes's nine years at the helm from a mutual covering a four-million-gt fleet with 95% American flag or US-domiciled tonnage to one of more than 50% Greek tonnage".   A true copy of the *TradeWinds* article is attached hereto as Exhibit 5.

27.    The importance of obtaining an accounting cannot be overstated.   It is the only way I can accurately ascertain how much I am owed, and the defendants have certainly not volunteered any accurate information, and have in fact been and continue to be obstructive.

28.    For example, at page 41 of the Complaint/Amended Complaint Exhibit A, is a fax from defendant Hughes dated September 13, 1999.  In the fourth paragraph he refuses to disclose premium paid by members so as to enable HH to calculate the commission due. Hughes states: "So far as the disclosure of the premium of individual Members is concerned, with the exception of Good Faith, we have a problem disclosing premium levels in respect of identified fleets... ."   A true copy of said fax is attached hereto as Exhibit 6.


29.    No premium levels have ever been disclosed by Hughes, even for the Good Faith fleet which Hughes agreed was an exception even for him.  Further, despite my giving Hughes an assurance that the premium levels would be treated in the strictest confidence, nothing meaningful has ever been disclosed.  I was asked to trust the defendants, particularly Hughes and McGowan, but when they did produce figures they were wrong and had to be reworked by the defendants when I challenged them.


30.    Accordingly, the only way for me to proceed was to wait for the policy years that I was interested in to pass and then to assess my claim and start proceedings for recovery.


**Exclusivity**


31.    I agree that the word "exclusive" was removed from draft contract (Bowles Aff. ¶¶ 10, 16), but that did not mean that HH did not have an exclusive right to represent the Club in Piraeus.  There are two facts supporting my assertion.  First, that was the agreement I reached with McGowan.  Second, it was a reciprocal arrangement, except that my firm got permission to represent, in addition to the American Club, a fixed premium underwriter, Southern Seas.

32.    As for the first point, I refer to the memo at Exhibit 2, wherein it is recorded that at the meeting with McGowan on November 13th, 1995, he stated under item 4 that "USCLUB ALREADY HAD A REPRESENTATIVE IN GREECE, LILY KARASKOS, BUT SHE WAS MORE A GENERAL AGENT, AND DID NOT ACTIVELY SUPPORT THE CLUB.  SHE WAS ALSO THE REP FOR THE SKULD".

33.    Despite this discussion, the first draft agreement DID contain the word "exclusive". Therefore, McGowan was not objecting at that time to the "exclusive" appointment of Hughes Hooker as the representative of the Club.

34.    Further, as can be seen from the fax from  McGowan dated March 21, 1996, (Bowles Aff., Exhibit 1C), at paragraph (1), McGowan states: "I would ask that the word 'exclusive' be omitted.  We will show you first in the book, but for the time being, I wish to keep Lily Karaskos's name in the book.  Lily has been very helpful to me in Greece over the years, although she is the exclusive representative of SKULD.  We would certainly direct claims work to you and once our relationship is firmly cemented, her firm could be eliminated from our book."

35.    Lily Karascos's company was United Insurance Services Co., Ltd. ("United").

36.     Thus, what McGowan was effectively saying was that HH *will* be "exclusive" as soon as the relationship between HH and the Club had been "cemented", which I took to mean at the end of our probationary year.  In the meantime HH would be shown first in the "book", which is the American Club's "List of Correspondents and Vessels".

37.    In fact, HH was never shown first in the "book".  I refer to the List of Correspondents and Vessels 1998-1999, a true copy of which is attached hereto as Exhibit 7, where it can be seen that United was shown first and HH second.

38.    Further we were then relegated to third place.  I refer to the List of Correspondents and Vessels 1999-2000, a true copy of which is attached hereto as Exhibit 8, where a new company, Shipserve (International) Inc. were shown first.  United was second, and we were third.  This is obviously at odds with McGowan's promise as shown in Bowles Aff., Exhibit 1C, at paragraph (1).

39.    As for the second point, I refer to the exchanges in connection with my firms' request to be allowed by the Club to represent a fixed-premium P&I underwriter, Southern Seas.  If the relationship between my firm and the defendants were *not* "exclusive," then there would have been no need to obtain permission from Hughes/McGowan to represent Southern Seas.

40.    My request was made by fax to both Hughes and McGowan dated 15th April 1997, as shown at pages 8-9 of the Complaint/Amended Complaint Exhibit A.  On April 17th, 1997, Hughes faxed me asking who it was we wanted to additionally represent. (Complaint/Amended Complaint Exhibit A, page 10).  True copies of the referenced faxes are attached hereto for the Court's ready reference as Exhibit 9.

41.    I then had a conversation with McGowan who said it was not a problem and allowed me to go ahead. (Complaint/Amended Complaint Exhibit A, page 11 and MS note thereon).

42.     Two further points are worth noting.  First, defendant Hughes seems to think that the

exclusivity was one-way only.  He accepts that HH worked for him "exclusively", but he denies that the arrangement was reciprocal.

43.    Second, the reason I gave in my fax of 15th April 1997 for having to seek representation of Southern Seas was because "As you know, the renewal this year did not produce any new business in Greece except for Blue Flag and therefore there is no claims work nor commission payments to be earned…"  In fact, we now know that the Club did secure business at the 1997 renewal, but chose not to disclose the fact to us or to pay us our commission.  The defendants were breaching the Agreement from the outset.

## Commission

44.    Mr. Bowles makes new allegations about HH's entitlement to commission.  He states, for the first time, that HH was not entitled to "commissions for business he did not bring to the American Club".

45.    This is a departure from the defendants' previously stated case.  It was never part of the Agreement that HH should act as a broker, and the defendants knew and accepted this.  As the Memo of the 13th November 1995 (Exhibit 2 hereto) records, under paragraph 8, the defendants' "REQUIREMENTS" were "TWO FOLD: A. TO WAVE THE FLAG FOR THE USCLUB" and "B. THEY NEEDED A "SOUNDING BOARD".

46.    Further, in his fax to me of March 23, 2000, at numbered paragraph 3, Hughes confirmed: "You were entitled (which we have never denied) to receive commission on entries 'based or domiciled in Greece' (Clause 3b) whether or not they entered the Club as a result of

your efforts……the agreement very clearly contemplated efforts by others to seek Greek business for the Club from which you yourself would derive benefit without direct contact with that business … ." A true copy of said fax (Complaint/Amended Complaint Exhibit A, page 67-68) is attached hereto as Exhibit 10.

47.    The radical shift in the defendant's position on this subject is another example of their complete disregard for the Agreement made between us.

### The Actual Agreement

48.    I deny that the actual agreement is that document exhibited by Mr. Bowles at Exhibit 1.

49.    The actual agreement is that signed by HH on 25th March 1996 and referred to at Exhibit C to the Amended Complaint dated December 17, 2004.

50.    The Agreement was finalised on the 25th March 1996 and I wrote to McGowan saying so. A true copy of said correspondence is attached hereto as Exhibit 11.

51.    HH then started work under the final Agreement and on April 3, 1996 I had a telephone conversation with Hughes and recorded what was said in a memorandum on the same day.  I said at paragraph 2 "JO ASKED WHETHER I HAD HEARD FROM TOM.  I SAID I HAD AND HAD ACCEPTED TOM'S AMENDMENTS TO THE AGREEMENT, ENGROSSED IT AND SENT IT BACK SIGNED.  HE SAID HE WILL GET A COPY FROM TOM (NOTE A COPY WAS ALSO SENT SEPERATELY TO JO!!!!!!!!!!) A true copy of said memorandum is attached hereto as Exhibit 12.

52.     Then, a full 5 days later on April 8, 1996, some two weeks after the Agreement had been finalised, McGowan wanted to change it by fundamentally altering Clause 4 to which HH did not agree. Attached hereto as Exhibit 13 is a true copy of McGowan's fax of April 8, 1996, and the HH signed Agreement with the later unlawfully added McGowan manuscript alterations thereon.

53.     Accordingly, the only basis on which the Agreement could be terminated after the first probationary year, was "in the event of gross negligence or other serious breach". There was no 'gross negligence or serious breach' of the Agreement on our side, and therefore the purported termination of the Agreement by Hughes on September 2, 1999 was unlawful, since the Agreement was to run until at least March 25th 2001. In addition HH was entitled to commission in 2002/2003 and 2003/2004.

54.     In paragraph 7 of Mr. Bowles Affidavit he states that the Agreement "was to last for one probationary year, with the option of being extended for a further period of four years"[sic]. This is not correct. Once the "initial" period had been completed without "gross negligence or other serious breach", the Agreement "shall be extended for a further period of 4 years". There was nothing optional about it. It was mandatory.

**Common Subject Matter of the Claims Against Non-party Defendants?**

55.     In paragraphs 8, 14 and 15 of Mr. Bowles's affidavit he is maintaining that the causes of action against all the defendants is the same. That is not the case. The claim against the American Club is contractual. The claims against SCB are contractual and tortious, and the claims against Hughes, McGowan and Solarino are tortious.

56.    Indeed the claims against Hughes, McGowan and Solarino, who are all employees and/or officers of SCB are based on serious acts of fraud and bad faith.  It is unlikely that the American Club will agree to be vicariously liable with these four defendants.

57.    The American Club is a mutual association owned by its ship-owner and chartering members.  It could not be part of the SCB's Hughes, McGowan's and Solarino's terms of employment to commit fraud.  Further, if I establish liability of the non-contractual parties, then there is no guarantee that the Club will foot the bill for their misdeeds.

58.    Knowing Greek shipowners as I do (there are at least two on the Board of Directors of the American Club), they will not take kindly to having to pay additional calls for a liability that is not theirs and had no connection with the objects of the Club, which are to mutually insure the various risks associated with operating ships world-wide.  Further, the Club would not be reinsured for such claims and therefore I doubt very much whether the Club will indemnify the non-contractual parties or give then a hold-harmless. Indeed, I believe there is a potential conflict of interest in all defendants' being represented by a single law office. I believe that the non-contractual defendants should be separately represented, since they face different claims and may not enjoy or continue to enjoy the support of the Club.

59.    In my view therefore it is essential to maintain the action against all defendants and not to stay the action against the non-contractual defendants.  The claims are clearly distinct.

60.    For the same reasons I maintain that the suit against the non-contractual parties was not a device or ruse to avoid the arbitration.  As I have said, I am happy with arbitration in New York.

61.    In paragraph 10 of Mr Bowles' affidavit he states that HH "was duly compensated". How do I know that is correct?  The refusal to disclose financial information by the defendants doesn't allow HH to determine that question.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  March 28, 2005
              Orford, Suffolk, England

JACEK BIELECKI

**EXHIBITS TO DECLARATION OF JACEK BIELECKI**

| Number | Description | Paragraph first referenced |
|---|---|---|
| 1 | Schedule of meetings, etc. | 5 |
| 2 | Memorandum re: November 13, 1995, meeting | 9 |
| 3 | Manuscript notes/AGENDA NOTE | 9 |
| 4 | Examples of arbitration agreements | 16 |
| 5 | *TradeWinds* article, August 13, 2004 | 26 |
| 6 | Fax from defendant Hughes, September 13, 1999 | 28 |
| 7 | List of Correspondents and Vessels 1998-1999 | 37 |
| 8 | List of Correspondents and Vessels 1999-2000 | 38 |
| 9 | Faxes exchanged April 15-17, 1997 | 40 |
| 10 | Fax from defendant Hughes, March 23, 2000 | 46 |
| 11 | Letter to defendant McGowan, March 25, 1996 | 50 |
| 12 | Memorandum re: April 3, 1996, conversation | 51 |
| 13 | Fax from defendant McGowan, April 8, 1996 | 52 |

### Schedule of Meetings, Telephone Conversations and Faxes Exchanged between HH and AC leading to Agreement dated March 25, 1996.

#### 1995

| | |
|---|---|
| March 23rd | N.Y. - 1st meeting between JMB and TMcG and Bill Craig of SCB. |
| April 6th | Fax proposal. |
| April 24th | Fax proposal |
| June 1st | Telecon JMB/TMcG |
| June 7th | N.Y. – 2nd Meeting JMB/TMcG |
| October 10th | Telecon JMB/TMcG |
| November 13th and | London – 3rd Meeting JMB/Cedric Harris TMcG. |
| November 14th | Draft agreement sent to TMcG |
| November 15th | Further copies of draft agreement sent to Four Seasons Hotel, London. |
| November 17th | Telecon JMB/TMcG |
| November 28th | Telecon JMB/TMcG |

#### 1996

| | |
|---|---|
| January 1st | Telecon JMB/TMcG |

| | |
|---|---|
| January 17th | N.Y. – 4th meeting JMB/TMcG and JH |
| February 28th | London – Meeting with JMB/TMcG and JH. |
| March 11th | Faxed revised draft agreement to TMcG |
| March 19th | Telecon TMcG/JMB |
| March 21st | Counter proposal from TMcG |
| March 22nd | Fax from TMcG we have a deal – HH starts work. |
| March 25th | Fax confirmation of final deal. Agreement signed and sent to NY |
| April 8th | TMcG unlawfully alters Agreement. |



# MEMORANDUM

**TO:FILE**
**FROM: JACEK BIELECKI**

**DATE:November 28, 1995**

## Re: AMERICAN CLUB MEETING NOVEMBER 13, 1995

---

1.   TOM McGOWAN CAME ALONE. THIS WAS HIS FIRST MEETING AND HE SAID THAT HE HAD NO PROBLEM WITH APPOINTING HH AS CORRESPONDANTS OF THE CLUB IN PIRAEUS.

2.   HE QUERIED WHETHER WE NEEDED A WRITTEN AGREEMENT. JMB SAID WE SHOULD, BUT TOM WAS NOT KEEN.

3.   BECAUSE BILBROUGH`S RE-INSURED USCLUB THEN THEY WERE NOT ACTIVELY GOING TO SEEK OUT BILB`S BUSINESS, ALTHOOUGH LATER HE WAS NOT SO ADAMANT.

4.   USCLUB ALREADY HAD A REPRESENTATIVE IN GREECE, LILY KARASKOS, BUT SHE WAS MORE A GENERAL AGENT, AND DID NOT ACTIVELY SUPPORT THE CLUB. SHE WAS ALSO THE REP FOR THE SKULD.

TONNAGE

5.   USCLUB HAD ABOUT 80% OF IT`S ENTRY UNDER US FLAG AND THE OTHER 20% WAS US OWNED BUT UNDER FOC. THEIR GENERAL COUNSEL IN THE US WERE KIRLIN CAMPBELL & KEATING ( SAME ADDRESS AT 5 HANOVER ).

6.     TONNAGE WAS ABOUT 4 MILLION GRT AND PREMIUM INCOME WAS ABOUT $ 28/29M ANNUAL CALLS. AVERAGE CALLS THEREFORE WERE $7.5 PER GRT.

7.     TOM THOUGHT THE USCLUB WAS COMPETITIVE AND SAID THAT THE US OWNERS WERE PAYING A PREMIUM OVER THE FOREIGN OWNERS IN THE OTHER CLUBS. HE RECOGNISED THAT FOREIGN OWNERS WOULD PAY SIGNIFICANTELY LESS THAN THEIR US COUNTERPARTS.

REQUIREMENTS

8.     THESE WERE TWO FOLD:

    A. TO WAVE THE FLAG FOR THE USCLUB

HE SAID THEY NEEDED A PERMANENT PRESENCE IN PIRAEUS, ALTHOUGH THEY DO VISIT PIRAEUS REGULARLY.

    B. THEY NEEDED A " SOUNDING BOARD "

THEY NEEDED IMPARTIAL ADVICE ON THE BACKGROUND AND PERFORMANCE OF THE OWNERS AND THEIR GENERAL REPUTATION.

THE USCLUB WANTED QUALITY TONNAGE AND WAS WILLING TO WAIT FOR THE RIGHT FLEETS.- NOTE THERE IS STILL A SUSPICION THAT THE GREEKS DO NOT HAVE QUALITY TONNAGE.

DEVELOPMENTS

THEY WERE ADOPTING A **RULE BOOK** , PRESENTELY THE `RULES` WERE CONTAINED IN THE POLICY AND BYE LAWS.

THEY WOULD ALSO OFFER **FD&D** COVER SOON, BUT COULD NOT DO SO YET.

**ADVANCE CALLS** ARE ABOUT 87% OF ETC AND FOR 1996 80% OF ETC. THIS DID PRODUCE A CASH-FLOW ADVANTAGE TO THE MEMBERS.

**RELEASE CALLS** ARE EXPECTED TO BE INTRODUCED IN 1996 OR 1997.

JMB CALLED TOM WHO SAID THAT HE WANTED TO TAKE THE DOCS BACK TO NY AND DISCUSS THEM. ON BEING PRESSED TO COMMENT ON THE AGREEMENT HE SAID THE " MONEY WAS TOO MUCH..."

NOT CLEAR IF HE MEANT RETAINER OR ALSO OTHER ITEMS. JMB SAID ONLY DRAFT AND WILL DISCUSS.

JMB THEN SENT FAX TO TOM ON 17 NOV ADVISING THAT RETAINER IS WAIVED.

T. TOM ON 22 NOV BUT TOM WAS OFF FOR THANKSGIVING TILL MONDAY 27 NOV.

T. TONY PIAZZA WHO WAS DELIGHTED THAT AGREEMENT REACHED. HE WAS TRYING TO PIN USCLUB DOWN ON POOLING ARRANGEMENT WHICH JMB DID NOT UNDERSTAND. WILL CALL HIM NEXT WEEK.

**JMB 23 NOV**

**BEST REGARDS**

**JACEK.**

## AGENDA NOTE
## FOR THE MEETING WITH THE SHIPOWNERS CLAIMS BUREAU INC., THE MANAGERS OF THE AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., AND HUGHES, HOOKER & CO., IN LONDON, ON MONDAY 13th NOVEMBER 1995., AT 4pm.

**PERSONS PRESENT**

SHIPOWNERS CLAIMS BUREAU, INC.

THOMAS J. McGOWAN - PRESIDENT.
JO HUGHES - CHAIRMAN.

HUGHES, HOOKER & CO.

JACEK BIELECKI - SENIOR PARTNER
CEDRIC HARRIS - PARTNER
MORAY HUGHES - SENIOR ASSISTANT SOLICITOR
BRIAN TRAER - PARTNERSHIP SECRETARY + ADMINISTRATOR.

---

1.    INTRODUCTIONS AND WELCOME.

2.    HUGHES, HOOKER'S OFFICE IN PIRAEUS.

3.    PROPOSED REPRESENTATION IN GREECE.

4.    1996/97 P & I RENEWALS.

5.    BASIS OF REPRESENTATION.

6.    DRAFT AGREEMENT.

7.    ANY OTHER BUSINESS.

Swedish Clubs — office representative.

Why Karaskos — stand representative —.

Farrell lines —

London Steamship tonnage verboten!

80% US flag.                    | >.     / KG + K
2% FOC / us owned |

Two

I |Wave the flag| for American clubs". —.

willing to mrn?. —. quality — not quantity.

— 4m cols. ∧ Steady. 28/29. annual earth.

|Competitive|— size / needs _____ →

II |Sounding Board. ▷··

Rule Book =. Policy + Rate Byelaws          | 1988. IGC.
                          % GR              | Cash flow
                         US law only        | advantage
87%
1996  80% |ETC|— ···          [no free contingency
|RESERVES ▷|              / — Correspondents. —
                              list of members
Catts. 96 w 97 /              ?

with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling.

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel.

12. That the Captain shall use diligence in caring for the ventilation of the cargo.

13. That the Charterers shall have the option of continuing this charter for a further period of ..................................................................................................
.................................................................................................................................................
on giving written notice thereof to the Owners or their Agents ........................................days previous to the expiration of the first-named term, or any declared option.

14. That if required by Charterers, time not to commence before ..............................................................................and should vessel not have given written notice of readiness on or before ........................................................................................ but not later than 4 p.m. Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules 1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.

In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.

**F2**

NYPE 93

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.    479 480 481 482

### 42.   Smuggling    483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.    484 485

### 43   Commissions    486

A commission of ..............................percent is payable by the Vessel and the Owners to..........................    487
.........................................................................................................................................................    488
.........................................................................................................................................................    489
.........................................................................................................................................................    490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.    491

### 44.   Address Commission    492

An address commission of ................................... percent is payable to..................................    493
.........................................................................................................................................................    494
.........................................................................................................................................................    495
..............................................on hire earned and paid under this Charter.    496

### 45.   Arbitration    497

(a)   NEW YORK    498
All disputes arising out of this contract shall be arbitrated at New York in the following manner, and subject to U.S. Law:    499 500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc.    501 502 503 504 505

For disputes where the total amount claimed by either party does not exceed US $ ..............................** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators Inc.    506 507 508

(b)   LONDON    509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his action to be taken before the award is made. Any dispute arising hereunder shall be governed by English Law.    510 511 512 513 514 515 516

For disputes where the total amount claimed by either party does not exceed US $ ..............................** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.    517 518 519

* Delete para (a) or (b) as appropriate    520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions of this clause shall have full force and remain in effect.    521 522

If mutually agreed, clauses .............................. to .............................., both inclusive, as attached hereto are fully incorporated in this Charter Party.    523 524

18





BALTIME FORM       F3

### PART II
### "BALTIME 1939" Uniform Time-Charter (as revised 2001)

it appears that the Vessel, her cargo, crew or other 263
persons on board the Vessel, in the reasonable 264
judgement of the Master and/or the Owners, may be, or 265
are likely to be, exposed to War Risks. Should the Vessel 266
be within any such place as aforesaid, which only 267
becomes dangerous, or is likely to be or to become 268
dangerous, after her entry into it, she shall be at liberty 269
to leave it. 270

(C) The Vessel shall not be required to load contraband 271
cargo, or to pass through any blockade, whether such 272
blockade be imposed on all vessels, or is imposed 273
selectively in any way whatsoever against vessels of 274
certain flags or ownership, or against certain cargoes 275
or crews or otherwise howsoever, or to proceed to an 276
area where she shall be subject, or is likely to be subject 277
to a belligerent's right of search and/or confiscation. 278

(D) (i) The Owners may effect war risks insurance in 279
respect of the Hull and Machinery of the Vessel and their 280
other interests (including, but not limited to, loss of 281
earnings and detention, the crew and their Protection 282
and Indemnity Risks), and the premiums and/or calls 283
therefor shall be for their account. 284

(ii) If the Underwriters of such insurance should require 285 *)
payment of premiums and/or calls because, pursuant 286
to the Charterers' orders, the Vessel is within, or is due 287
to enter and remain within, any area or areas which are 288
specified by such Underwriters as being subject to 289
additional premiums because of War Risks, then such 290
premiums and/or calls shall be reimbursed by the 291
Charterers to the Owners at the same time as the next 292
payment of hire is due. 293

(E) If the Owners become liable under the terms of 294
employment to pay to the crew any bonus or additional 295
wages in respect of sailing into an area which is 296
dangerous in the manner defined by the said terms, 297
then such bonus or additional wages shall be re- 298
imbursed to the Owners by the Charterers at the same 299
time as the next payment of hire is due. 300

(F) The Vessel shall have liberty:- 301
(i) to comply with all orders, directions, recom- 302
mendations or advice as to departure, arrival, routes, 303
sailing in convoy, ports of call, stoppages, destinations, 304
discharge of cargo, delivery, or in any other way 305
whatsoever which are given by the Government of the 306
Nation under whose flag the Vessel sails, or other 307
Government to whose laws the Owners are subject, or 308
any other Government, body or group whatsoever acting 309
with the power to compel compliance with their orders 310
or directions; 311
(ii) to comply with the order, directions or recom- 312
mendations of any war risks underwriters who have the 313
authority to give the same under the terms of the war 314
risks insurance; 315
(iii) to comply with the terms of any resolution of the 316
Security Council of the United Nations, any directives of 317
the European Community, the effective orders of any 318
other Supranational body which has the right to issue 319
and give the same, and with national laws aimed at 320
enforcing the same to which the Owners are subject, 321
and to obey the orders and directions of those who are 322 *)
charged with their enforcement; 323
(iv) to divert and discharge at any other port any cargo or 324
part thereof which may render the Vessel liable to 325
confiscation as a contraband carrier. 326
(v) to divert and call at any other port to change the crew 327
or any part thereof or other persons on board the Vessel 328
when there is reason to believe that they may be subject 329
to internment, imprisonment or other sanctions. 330

(G) If in accordance with their rights under the foregoing 331
provisions of this Clause, the Owners shall refuse to 332
proceed to the loading or discharging ports, or any one 333

or more of them, they shall immediately inform the 334
Charterers. No cargo shall be discharged at any 335
alternative port without first giving the Charterers notice 336
of the Owners' intention to do so and requesting them 337
to nominate a safe port for such discharge. Failing such 338
nomination by the Charterers within 48 hours of the 339
receipt of such notice and request, the Owners may 340
discharge the cargo at any safe port of their own choice. 341

(H) If in compliance with any of the provisions of sub- 342
clauses (B) to (G) of this Clause anything is done or not 343
done, such shall not be deemed a deviation, but shall 344
be considered as due fulfilment of this Charter. 345

**21. Cancelling** 346
Should the Vessel not be delivered by the date indicated 347
in Box 22, the Charterers shall have the option of 348
cancelling. If the Vessel cannot be delivered by the 349
cancelling date, the Charterers, if required, shall declare 350
within 48 hours after receiving notice thereof whether 351
they cancel or will take delivery of the Vessel. 352

**22. Dispute Resolution** 353
(A) This Charter shall be governed by and construed in 354
accordance with English law and any dispute arising 355
out of or in connection with this Charter shall be referred 356
to arbitration in London in accordance with the Arbitration 357
Act 1996 or any statutory modification or re-enactment 358
thereof save to the extent necessary to give effect to the 359
provisions of this Clause. 360
The arbitration shall be conducted in accordance with 361
the London Maritime Arbitrators Association (LMAA) 362
Terms current at the time when the arbitration 363
proceedings are commenced. 364
The reference shall be to three arbitrators. A party 365
wishing to refer a dispute to arbitration shall appoint its 366
arbitrator and send notice of such appointment in writing 367
to the other party requiring the other party to appoint its 368
own arbitrator within 14 calendar days of that notice and 369
stating that it will appoint its arbitrator as sole arbitrator 370
unless the other party appoints its own arbitrator and 371
gives notice that it has done so within the 14 days 372
specified. If the other party does not appoint its own 373
arbitrator and give notice that it has done so within the 374
14 days specified, the party referring a dispute to 375
arbitration may, without the requirement of any further 376
prior notice to the other party, appoint its arbitrator as 377
sole arbitrator and shall advise the other party 378
accordingly. The award of a sole arbitrator shall be 379
binding on both parties as if he had been appointed by 380
agreement. 381
Nothing herein shall prevent the parties agreeing in 382
writing to vary these provisions to provide for the 383
appointment of a sole arbitrator. 384
In cases where neither the claim nor any counterclaim 385
exceeds the sum of US$50,000 (or such other sum as 386
the parties may agree) the arbitration shall be conducted 387
in accordance with the LMAA Small Claims Procedure 388
current at the time when the arbitration proceedings are 389
commenced. 390
(B) This Charter shall be governed by and construed in 391
accordance with Title 9 of the United States Code and the 392
the Maritime Law of the United States and any dispute 393
arising out of or in connection with this Contract shall be 394
referred to three persons at New York, one to be 395
appointed by each of the parties hereto, and the third by 396
the two so chosen; their decision or that of any two of 397
them shall be final, and for the purposes of enforcing 398
any award, judgement may be entered on an award by 399
any court of competent jurisdiction. The proceedings 400
shall be conducted in accordance with the rules of the 401
Society of Maritime Arbitrators, Inc. 402

## Market awaits World-Wide, Bergesen meld

**Jim Mulrenan** London

Moves to consolidate the fleet insurance of World-Wide and Bergesen could lead to major changes in the way two top-ranking shipping companies organise their marine cover.

A review of ways to optimise the insurance of the two companies is underway with the outcome likely to be evident by the time World-Wide renews its hull cover in October.

A year after the Sohmen family added Bergesen to their World-Wide shipping empire, underwriters and brokers are anxiously waiting details of the plans. The review will cover both the underwriting and broking arrangements of the two companies but focus on hull and related covers such as loss of hire rather than protection and indemnity.

So Gard, which has top World-Wide executive Stephen Pan as deputy chairman and Bergesen's Hans Ditlef Martens as a committee member, Britannia with Michael Blakely on the board and the London Club, which numbers Andreas Sohmen-Pao as a director, will probably not be greatly affected. But insurance broking and hull underwriting relationships may well be shaken up.

For broking World-Wide uses Houlder Insurance, part of the China Merchants group, in Hong Kong and Marsh elsewhere while Bergesen has old established relations with Sev Dahl, now part of Willis, in Norway and Jardine Lloyd Thompson in London.

World-Wide is a very prize sensitive buyer of hull insurance with a reputation for driving the hardest of bargains and being prepared to switch carrier if it does not get what it wants. Its last renewal sparked controversy when it emerged that despite an 80% rate hike it was still paying only a $1.8m premium equivalent to a rate of 0.125% to insure its large VLCC fleet.

The Norwegian Hull Club lost out at the renewal with Gerling, which sets the premium benchmark from Oslo and Gard both gaining market share.

Bergesen has been a less volatile buyer of insurance for its gas-carrier-focussed fleet and has long-standing relations with the Norwegian Hull Club, which is its claims leader, although cover is also placed elsewhere in Scandinavia, London, France and the Far East.

The combined World-Wide and Bergesen fleet amounted to some 150 vessels of 19.6 million dwt, including newbuildings on order, at the time the Sohmen family gained control but is now somewhat smaller.

# US club delivers its spin control

The American Club has hit the road with a message because the market thinks something is afoot in the US.

**Jim Mulrenan** London

Silver-tongued Joe Hughes was in London this week to slay a few myths and misconceptions about the troubles of the American Steamship Owners Mutual Protection & Indemnity Association.

He had a predictably plausible explanation of what is going on in his New York-based club — but the jury is still out on whether his account of a freak increase in claims and of problems with old asbestos claims and computer glitches fully adds up.

Hughes says the American Club has a few things to blow its trumpet about and claims recent events need to be put in the wider perspective of a growing club with a positive underwriting result and strengthening finances.

The chief executive of the American Club trained as an English barrister and needs all his eloquence as an advocate to overcome worries about three recent events that have culminated in a downgrade to a marginal BB+ status. These are:

• Cash calls totalling 105% or $25m that have been declared on the 2000, 2001 and 2002 years.

• A decision to walk away from asbestos and other personal injury claims more than 15 years old.

• Failure to publish annual results following serious problems with a new computer system.

Even if those of an "alarmist or conspiratorial disposition" see some linkage in these events, Hughes emphasises they are entirely unconnected.

The club has been transformed during Hughes's nine years at the helm from a mutual covering a four-million-gt fleet with 95% American flag or US-domiciled tonnage to one of more than 50% Greek tonnage, 10% other European, about 15% Asian and from the Indian sub-continent. The US element is now down to 25%.

But Hughes is adamant that the problems of the club do not stem from this transformation or from an influx of lower quality tonnage that has downgraded the profile of the club.

More tonnage and the new members are not having a negative effect on the club, but quite the reverse, Hughes tells Trade-Winds.

The overall loss record of the new members is 39% over the past three years, perhaps half the average for the club.

Hughes also points out that if the American Club is collecting $120m of premium from the owners of the 20 million gt of ship-



STARS AND STRIPES Photo: Scanpix

AMERICAN CLUB: Joe Hughes Photo: Gillian Whittaker

ping in the club, it is hardly buying in business by rating it too cheaply. The amount equates to an average premium of $6 per gross ton, which is about twice the average market rate for P&I cover. But this ignores the membership profile of the American Club, which has at least some owners such as Adam Polemis with a bit of a history.

Hughes says it would be invidious to comment on individual members — and Polembros executive David Gate sits on the American Club shipowner board — but he adds any market perception that the lower quality of new members causes a problem is wide of the mark.

Polembros's tanker casualties may hit the headlines but for every high-profile owner there are many smaller Greek family fleets of maybe five vessels quietly going about their business and performing very respectably, says Hughes. The average size of vessels in the club is only 14,000 gt

so it is not exactly a club full of large, leaky tankers.

Hughes backs up his argument that there is nothing wrong with the current underwriting stance of the club by referring to statistics from rating agency Standard & Poor's that point to the mutual's paid-loss ratio (for net claims to net premium) of 53% in 2003, which is better than all of its mainstream rivals — although the two specialised small-ship P&I clubs do a little better.

The American Club's combined ratio of claims and expenses to premium was also 92.7% for 2003 at a time when the majority of the clubs had ratios of over 100%, indicating red ink on the books.

Hughes says the IT problems that delayed the accounts are now pretty well resolved and auditors Deloitte & Touche are about to sign off figures that show the club has free reserves of some $34m.

Overall assets of the club have

grown 20% through the first half of 2004 and are now in excess of $100m. Premium income in the current year is set to be as much as 30% ahead of the more than $90m of last year. Hughes says the $120m premium of this year compares with a figure of $90m to $95m in 2003.

So if the underwriting is going so well, why has the club been forced to make a big cash call?

Hughes's answer is that there was deterioration in claims on the 2002 year in particular, which turned out to be a great disappointment.

Personal injury, cargo and, in fact, claims of all kind in the $100,000 to $500,000 layer increased in what Hughes describes as a "freak development that took everyone by surprise".

This adverse claims development had a disproportionate impact on the American Club as it is relatively small and, unlike rivals, did not have large accumulated funds generating substantial investment income during the favourable financial market of last year.

The absence of this investment buffer is blamed on directors of the club from 1946 to 1970, who chose to return $16m to members rather than to make adequate provision for incurred but not reported (IBNR) claims.

This lack of IBNR provision is also at the centre of the American Club's move to walk away from old asbestos claims.

The $16m "dividend", if retained, would have put the American Club in a quite different financial position and be worth at least $100m today, notes Hughes.

A further issue is that the American Club charges premiums in dollars and with most of its claims and administrative expenses in the same currency does not have the exchange gains (or losses) of its European or Japanese rivals.

## Club chief Hughes sticks to the course

Joe Hughes's remedy for the troubles that have hit the American Club is not a change of strategy but more of the same.

The club is preparing to open an office on the Akti Miaouli even though some outsiders see an influx of Greek and other newer and lower quality members as one of the root causes of the club's current plight.

American-Greek claims executive George Tsimis is moving from the American Club's New York headquarters to Piraeus to oversee the new office.

He was originally with the New York Greek law firms of Skoufalos, Llorca & Ziccardi as well as Chalos & Brown so is already pretty well-connected with the target market.

The American Club has a sizeable outpost in London and having benefitted from the demise of a number of other clubs — including the Liverpool & London, Newcastle, Ocean Marine Mutual as well as fixed premium facilities such as that run by former Lloyd's underwriter Jonathan Jones — is ready to get even closer to what is now its biggest market.

Hughes — who was a top broker with Jardines and a P&I underwriter with Gard and Steamship Mutual before being recruited as chief executive of the American Club by then chairman Charles Kurz of Keystone Shipping — remains as optimistic as ever about the outlook.

Along the way he picked up UK Club and Jonathan Jones veteran Stuart Todd, who has renowned connections with Greek shipowners, as his underwriting chief.

Although the American Club is currently under more than a little pressure, Hughes insists in a circular to members that the "future is now more promising than ever" although he cautions

that to see the future, members need to understand the past.

The cash calls though bringing unpopularity in the short term will put the club's financial affairs back on a steady course, argues Hughes.

The troubles of the American Club have led to the mutual's downgrade to a marginal BB+ by Standard & Poor's and being castigated for becoming "over-reliant" on cash calls.

Hughes is hoping, however, to persuade the ratings agency to take another look at the financials and reconsider the appropriateness of the European risk capital model for the American Club when the half-year figures are available in mid-September.

Hughes also points to the strong underwriting income and an underlying financial resilience for his belief that the American Club will soon be biggest market.

Even claims like the *Tasman Spirit* are not too significant as the American Club only retains the first $5m of loss, with the balance pooled with other International Group clubs.

A club-specific reinsurance programme written 75% by Munich Re and 25% by syndicates at Lloyd's covers claims in the $2m to $5m band subject to an annual aggregate deductible of $9m.

So the net exposure is only $2m and Polembros is no doubt on a hefty deductible.

The club-specific reinsurance costs the American Club $2m to $3m a year plus about $0.13 per gt, yet the reinsurers are still in pocket on the deal, adds Hughes.

## US presses on as Canada halts its probe into OSG

**Joe Brady** Stamford

Canadian authorities have dropped their investigation into New York-based tanker owner Overseas Shipholding Group without filing charges on suspicions of oily-waste dumping violations.

However, an investigation by the US Department of Justice continues and OSG is co-operating with investigators, OSG chief executive Morten Arntzen said in an interview this week.

"We're very comfortable with our actions," Arntzen said. "We haven't set aside any provision for fines, nor do we think this investigation is going to result in a fine of any significant size. It could happen, but we don't expect it.

"However, this is something we take very seriously. It's ongoing until the US government says it's not. Meanwhile, we'll continue to co-operate and provide information."

TradeWinds reported last October that the 39,000-dwt products tanker *Uranus* (built 1988) had come under scrutiny by provincial authorities in New Brunswick. US regulators later picked up their own investigation of whether oil-water separator screening might have been bypassed and falsely reported in vessel logs.



ARNTZEN Photo: Scanpix

Arntzen says he is not alarmed per se by the practice of large payments to whistle-blowers — even if it raises the prospect of tampering by crew to collect the government bounty.

"OSG was very early in implementing safeguards against anyone bypassing oil-water separator equipment," Arntzen said. "I'm not saying our equipment is tamper-proof, but it's pretty darn close to it."

quiry to other vessels in a company's fleet. Earlier reports had indicated OSG could face fines of up to $912,000 for six alleged violations in Canada. The company also has paid more than $1m in legal fees so far this year in responding to the two probes, OSG says in its second-quarter earnings report.

Arntzen says he had taken notice of the $4.2m fine paid by Connecticut neighbour OMI Corp last week to settle its own oil-water separator charges leveled by US prosecutors, half of which went to a former OMI crewman who blew the whistle on violations. The $2.1m put to a third engineer was easily the largest reward ever paid to a shipboard whistleblower.

"That's a big fine — I think everyone in the industry took note of that," Arntzen said. "I'm sure OMI management takes this issue very seriously as well. What it says to me is that the US Justice Department has made this issue a priority and that companies need to have procedures and infrastructure in place to prevent violations."

## Clipper takes up tanker options

The Clipper Group is exercising options for two more 10,600-dwt products/chemical carriers at STX Shipbuilding of Korea, lifting the series so far to six. Representatives of the Korean yard will

be in Denmark next week for the contract signing. Market sources say the IMO-II class tankers are costing around $17m each. Copenhagen-based Clipper has two further options.

## Club works to smooth fears over asbestos claims

Cash calls will no doubt be the main concern of shipowners in the American Club but a bigger issue for the other P&I mutuals and maybe the wider market is the controversial repudiation of old asbestos claims.

The club's move to walk away from pre-1989 claims is causing concern in a number of other clubs in the International Group

P&I cartel, which has taken the rare step of setting up a working party to seek an explanation of what is going on.

Hughes had a meeting with International Group chairman Alistair Groom of the Standard Club during his visit to London following an earlier 90-minute phone discussion with working party members Luke Readman of the UK, David Comer of Gard and Grantley Berkeley of Britannia.

Hughes's message is that the move to deny old asbestos claims was not triggered by fears of a tidal wave of costly asbestos claims but the revival of a conflict with former member Keystone Shipping. This dispute had him dormant for some time while its New York attorney, Seth Schaffer of the Proskauer Rose law firm,

fought major insurance claims relations to the terrorist attack on the World Trade Center that are now resolved.

This conflict essentially centres on whether Keystone — a member for 65 years with three generations of the controlling Kurz family as American Club chairmen — was subject to a single deductible for each seafarer who succeeded in an asbestos claim or would have indemnification cut by a deductible applied to each year of exposure.

According to Hughes, it was this apparently technical issue that brought to the fore the question of the fairness of current members subsidising the historic membership when no provision had been made for IBNR.

Rival clubs fear the American

Club decision indicates it faces large numbers of hugely costly claims but Hughes insists only about 100 claims with a value of up to $6m are involved. But if such a relatively modest amount is involved, the American Club is risking major controversy and condemnation over an amount that is less than life-threatening.

Although the working party has still to prepare its report, it will be hard to overcome other clubs' worries about the reputational risk to the International Group.

This sensitivity is increased by recent noise from governments and official bodies that insurers and the P&I clubs in particular may be giving succour to substandard owners by their willingness to continue to insure them.

C.W.A.
**CLEGHORN, WILTON & ASSOCIATES**
INTERNATIONAL MARINE CONSULTANTS & ENGINEER SURVEYORS
1st FLOOR, No 125 DREC BUILDING SATWA DUBAI
Cargo/Hull Machinery/ P & I /Pre-Purchase/Flaw/Charter/Valuation Condition
Survey, Flag State Inspections, Gas Free/Hot Work Safety Survey, Industrial,
Ship Bunkering & Classification Surveys (N.K.K., ABS (Marine Services), PSB)
Tel: + 971-4-2452541 • Mobile: 9715 0 6093713 (24 hrs)
Fax: + 971-4-3453340 • P.O.Box: 55550, Dubai, UAE
Mail: assistance@emirates.net.ae



ANNUAL CONFERENCE
"WISTA: Innovation & Sustainability, Tomorrow's Assets?"

WISTA
THE NETHERLANDS

6/7/8 September 2004 Rotterdam

For further information, registration or a conference brochure
contact: board@wista.nl or check www.wista.nl

**F4**

### SHELLTIME FORM

Law and
Litigation

41.    (a) This charter shall be construed and the relations between the parties determined in accordance    547
with the laws of England.    548

(b) Any dispute arising under this charter shall be decided by the English Courts to whose    549
jurisdiction the parties hereby agree.    550

(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain    551
the arrest of any maritime property, either party may by giving written notice of election to the other party, elect    552
to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the    553
provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being    554
in force.    555

(i) A party shall lose its right to make such an election only if:    556
(a) it receives from the other party a written notice of dispute which –    557
(1) states expressly that a dispute has arisen out of this charter;    558
(2) specifies the nature of the dispute; and    559
(3) refers expressly to this clause 41(c)    560
and    561
(b) it fails to give notice of election to have the dispute referred to arbitration not later than    562
30 days from the date of receipt of such notice of dispute.    563
(ii) The parties hereby agree that either party may –    564
(a) appeal to the High Court on any question of law arising out of an award;    565
(b) apply to the High Court for an order that the arbitrator state the reasons for his award;    566
(c) give notice to the arbitrator that a reasoned award is required; and    567
(d) apply to the High Court to determine any question of law arising in the course of the    568
reference.    569

(d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in    570
which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that    571
party furnishes to the other party security to which that other party would have been entitled in such legal    572
proceedings in the absence of a stay.    573

Construction

42.    The side headings have been included in this charter for convenience of reference and shall in no way    574
affect the construction hereof.    575

American Steamship Owners Mutual Protection and Indemnity Association, Inc.



| | Shipowners Claims Bureau, Inc., Manager<br>Five Hanover Square - 20th Floor<br>New York, New York 10004-2698<br>U.S.A. | Main<br>Direct Dial<br>Reply Fax<br>Telex<br>E-Mail | +1 212-269-2350 or 908-24<br>+1 212-908-2442<br>+1 212-809-9879 or 825-1?<br>222091 SHIPOCBR<br>jhughes@american-club.ne |

# TELEFAX

| | | | |
|---|---|---|---|
| **To:** | Mr. Jacek M. Bielecki | **From:** | Joseph E.M. Hughes |
| **Company:** | Hughes Hooker & Co. — London | | |
| **Fax:** | +44-171-726 2010 | **Date:** | September 13, 1999 |
| **Re:** | *PRIVATE & CONFIDENTIAL — Agreement dated March 25, 1996* | | |

| | | | |
|---|---|---|---|
| **Pages:** | 1    (in total) | **cc:** | |

*PLEASE NOTE the information contained in this telefax is strictly confidential and for the use of the addressee only.*

Dear Jacek:

Thank you for your message of September 3, 1999. I apologize for the delay in replying to you but we had a Board meeting here in New York last week. These tend to be somewhat preoccupying.

With respect, we do not agree with your interpretation of Clause 4 of the agreement. The wording is plain in its meaning. The language: *"save that this agreement may be terminated by 3 months' notice by either party,"* clearly has the effect of establishing an exception available to either party to withdraw from the arrangement on appropriate notice twithstanding an intention in principle at the outset that the agreement should have a life not exceeding 5 years overall.

We would tend to agree with you if the words *"save that"* were instead to read *"thereafter,"* but they do not. There was never any intention (hence the wording originally agreed) that each party should be locked into the relationship willy-nilly for five years without the possibility of withdrawal on notice, hence the exception contained in the language of the clause. Moreover, if your interpretation of the meaning of the clause were correct it would follow that the additional — conjunctive — exception contained in its concluding words would again only take effect after five years. This, as I am sure you will agree, would be absurd. Accordingly, we must reaffirm the tendering of three months' notice as contained in our message of September 2, 1999 and with effect from that date.

Nevertheless, as also contained in that message, we will of course continue to fulfill our obligations to date under the terms of the agreement. We have noted your bank details and will make an arrangement accordingly. So far as the disclosure of the premium of individual Members is concerned, with the exception of Good Faith, we have a problem disclosing premium levels in respect of identified fleets where there are formal intermediaries who place the business with the Club and in respect of whom — and whose clients - it owes a duty of confidentiality. However, we can — and will — give you details of the identity of the Greek-based fleets in respect of which commission is due. This will follow shortly.

With kind regards,

Yours very truly,

*Joe Hughes.*

Joseph E.M. Hughes

VAPS JEMH/MBIELECKI/FEES-CANCELLATION

41

THE AMERICAN CLUB

# List of Correspondents and Vessels 1998-99



American Steamship Owners Mutual Protection and Indemnity Association, Inc.

---

## GIBRALTAR (+350)

### Gibraltar

| Smith, Imossi & Co. Ltd. | phone: | 78644-6 |
| P.O. Box 185 | fax: | 77838 |
| 47 Irish Town | telex: | 2220 JAVA GK |
| Gibraltar | cable: | JAVA |
| | after hours: | **Paul Imossi** 42403 |
| | | **Andrew Arias** 43116 |
| | | **Alex Manasco** 74286 |
| | | **Brian Baglietto** 43262 |

---

## GREECE (+30)

### Piraeus

| United Insurance Services Co. Ltd. | phone: | 1-4225855 or 4225856 |
| 97-99 Filonos Street | fax: | 1-4225856 |
| P.O. Box 80118 | telex: | 211754SCAC |
| GR 185 10 Piraeus, Greece | after hours: | **N. Mariakis** 1-6713944 |
| | | **J. Cratiras** 1-6834737 |
| | | **N. Economou** 1-6878731 |

### Piraeus

| Hughes Hooker Correspondents S.A. | phone: | 1-4293460 |
| 59 Akti Miaouli | fax: | 1-4293748 |
| Piraeus 185 36, Greece | telex: | 240007 MRST GR |
| | e-mail: | hookgr@hol.gr |
| | | jbielecki@easynet.co.uk |
| | after hours: | **Jacek Bielecki** +44-1394-450096 |
| | | +44-385-255284 *mobile* |
| | | **Aliki Xedona** 9-4296798 |

---

THE AMERICAN CLUB

# List of
# Correspondents & Vessels
# 1999-2000



(G) General Correspondence          (L) Legal Correspondent

## GREECE (+30)

### Piraeus

(G) Shipserve (International) Inc.
72, Kolokotroni Street
Piraeus 185 35, Greece
*phone:*    1-4220990/1/2
*fax:*      1-4220997
*telex:*    213089 or 211266 SSRV GR
*e-mail:*   shipserve@hol.gr
*after hours:* **Peter Jones** 1-6233749 / 94-345125 *mobile*
         **James Greene** 1-8081828 *phone/fax* / 94-518241 *mobile*
         **Carlos Castaneda** 1-9316392 *phone/fax* / 94-569657 *mobile*

### Piraeus

(G) United Insurance Services Co. Ltd.
97-99 Filonos Street
P.O. Box 80118
GR 185 10 Piraeus, Greece
*phone:*    1-4225855 or 4225856
*fax:*      1-4225856
*telex:*    211754SCAC
*after hours:* **N. Mariakis** 1-6713944 / 932-228695 *mobile*
         **J. Cratiras** 1-6834737 / 932-260442 *mobile*
         **N. Economou** 1-6778731 / 97-217484 *mobile*

### Piraeus

(L) Hughes Hooker Correspondents S.A.
59, Akti Miaouli
Piraeus 185 36, Greece
*phone:*    1-4293460-3
*fax:*      1-4293748
*telex:*    240007 MRST GR
*e-mail:*   hook@ath.forthnet.gr
         jbielecki@easynet.co.uk
*after hours:* **Jacek Bielecki** +44-1394-450096 / +44-385-255284 *mobile*
         **Aliki Xedona** 3-097-446503

**GUAM** *(see Mariana Islands).*

---

44

---

J M Bielecki
C R Lake



Hughes Hooker & Co.
15 Basinghall Street,
London EC2V 5BR

Tel: 0171 726 2144
Fax: 0171 726 2010

Your reference:                                                    Our reference:    JMB.cg

## FAX TRANSMISSION

### *PLEASE NOTE the information contained in this telefax is strictly confidential and for the use of the addressee only*

To     :     Joseph E M Hughes
             American Steamship Owners Mutual Protection and
             Indemnity Association Inc.
Fax    :     001 212 809 9879

cc     :     Tom McGowan
Fax    :     001 212 825 1391

Date   :     15 April, 1997                    Total pages sent : Two (2)

---------------------------------------------------------------------------

Dear Joe,

I refer to the agreement which we signed just over a year ago and I had hoped to travel to New York on the 2nd May in order to discuss the terms of that agreement with you. However, I understand from Vikki that you will leave on an extended trip on 17th April and will not be returning to New York until about May 19th.

As you know, the renewal this year did not produce any new business in Greece except for Blue Flag and therefore there is no claims work nor commission payments to be earned against the costs of the expense of representing the American Club. Further, the costs of representing the American Club over the past 12 months has been very significant and the effort required will continue to be significant.

8

~ 2 ~

I do not want to renegotiate the financial terms since, although we have provision in our agreement for such renegotiation, I think we have to take the hit especially in the first year.

However, you will appreciate that we must have some income for the maintenance of the office in Piraeus and therefore I would like to have your blessing to be able to accept the representation of a fixed premium P&I underwriter. I would not, of course, accept the representation of a Mutual Club, but the fixed premium P&I market is quite different to the Mutual P&I business and is, I believe, aimed at a wholly differeent segment of the market.

It does cost us over US$100,000 to run the office in Piraeus and a very large proportion of that is directly attributable to the time spent on promoting the American Club. I would not want to reduce the commitment to the American Club and I would therefore be pleased if you could confirm that I may go ahead and accept this additional representation.

As I say, I would like to have discussed this with you in a meeting. Perhaps you would be good enough to call me so that we may discuss this further if you wish it.

Yours sincerely,

J M BIELECKI
*HUGHES HOOKER & CO.*

9

Case 1:04-cv-01859-SHS-GWG    Document 29    Filed 04/11/2005    Page 36 of 46

**American Steamship Owners Mutual Protection and Indemnity Association, Inc.**

Shipowners Claims Bureau, Inc., MANAGER
Five Hanover Square, 20th Floor
New York, New York
10004-2698

MAIN  212-269-2350
DIRECT 212-908- 2442
FAX   212-825-1391
TELEX 222091 SHIPOCBR


THE
AMERICAN
CLUB

# TELEFAX

April 17, 1997

Mr. Jacek Bielecki
Hughes Hooker
London
Fax # 171-726-2010

Dear Jacek:

Many thanks for your message of April 15 and apologies for no earlier reply. The last 48 hours have been unusually hectic.

We have noted your remarks in regard to your proposed representation of a fixed premium underwriter. Would it be possible for you to identify the party in question? We have no desire to pry, but it would be useful for us to know that identity which will, of course, be treated in the strictest confidence.

I look forward to hearing from you soon.

With kind regards and best wishes.

Yours sincerely,

Joseph E.M. Hughes

VAPS JEMH:QUOTES97 .98

10

American Steamship Owners Mutual Protection and Indemnity Association, Inc.



Shipowners Claims Bureau, Inc., Manager
Five Hanover Square - 20th Floor
New York, New York 10004-2698
U.S.A.

| Main | +1 212-269-2350 or 908-24( |
| Direct Dial | +1 212-908-2442 |
| Reply Fax | +1 212-809-9879 or 825-13! |
| Telex | 222091 SHIPOCBR |
| E-Mail | jhughes@american-club.net |

# TELEFAX

| To: | Mr. J.M. Bielecki | From: | Joseph E.M. Hughes |
|---|---|---|---|
| Company: | Hughes Hooker & Co. – London | | |
| Fax: | +44-171-726 2010 | Date: | March 23, 2000 |
| Re: | Agreement dated March 26, 1996 | | |
| Pages: | 2    (in total) | cc: | |

*PLEASE NOTE the information contained in this telefax is strictly confidential and for the use of the addressee only.*

Dear Jacek:

Thank you for your message of March 20, 2000. We reply as follows:

1.  The agreement was lawfully terminated. The Club clearly had the right to terminate on 3 months' notice – as you yourself had. To argue otherwise clearly offends the plain meaning of the language used.

2.  We note that you have taken the advice of New York lawyers (as have we) with a view to the potential commencement of proceedings against the Club here. However, please note that under the terms of Clause 5 of the Agreement it is the defending party which has the right to choose the relevant law and forum. If you were to attempt to sue the Club, we, as defending party, would have the right to choose both items.

3.  You assert in paragraph 7 of your message that the agreement was 'exclusive,' in the sense that you were to be the Club's sole marketing representative in Greece. This was never the case, and never agreed. You were entitled (which we have never denied) to receive a commission on entries "based or domiciled in Greece" (Clause 3b) whether or not they entered the Club as a result of your efforts – most of which never were, hence your inability to identify the vast majority of them! Given this, by way of corollary, the agreement very clearly contemplated efforts by others to seek Greek business for the Club from which you yourself would derive benefit without direct contact with that business and the effort of enlisting it!

    On the other hand, you have been paid remuneration in regard to "day-to-day promotion and marketing" of the Club regardless of results (Clause 3a). In such circumstances it would appear reasonable that you should have been working exclusively for the Club as marketing agent (and not for Southern Seas and, more recently we believe, Intercoastal and the Raetsclub). Tom denies that you were ever given permission to act as a marketing agent for Southern Seas – to have done so would have created an absurd and intolerable conflict. He says that you asked him whether you could act as a *claims* correspondent only for Southern Seas which, not unreasonably, he agreed. .

4.  You suggest that you were entitled to claims work under the agreement. There is absolutely no such entitlement under the agreement. You would obtain such work only "where necessary to give advice and/or handle claims as required" (Clause 2). Clause 3c sets rates "in respect of claims handling or advice sought by Members of the AMERICAN CLUB." These provisions did not guarantee any level of claims work. Nor yet did the requirement in Clause 2 that you "act as general correspondents to the AMERICAN CLUB and its Managers" guarantee claims work. We are unable to understand how you can make this assertion.

67

age 2                        J.M. Bielecki – Agreement dated March 26, 1996  .              March 23, 2000

5.        We continue to adhere absolutely to our position that the agreement was lawfully terminated as of December
          2, 1999 following the 3 months' notice submitted on September 2, 1999.  Accordingly, your and the Club's
          rights and obligations should be determined as of the former date.

6.        We have never resiled from the obligation we have to pay you commissions for relevant years of account
          during the currency of the agreement.  You had an accounting as of early September 1999 in our telefax of
          September 2, 1999.  I also said in that message that "I will ensure that all continuing obligations to Hughes
          Hooker in terms of the agreement are fulfilled in accordance with its terms."  We paid you the $104,185.40
          due at that point very promptly.  The balance we calculate to be due to you as of February 20, 2000 will also
          be paid to you very soon.

7.        To that end we are prepared to meet you next week here in New York to show you in person how the figures
          have been calculated by reference to all relevant documents.  We are not, however, prepared to allow you to
          keep copies of our internal documents since they are privy to other parties.  Please indicate your preferred
          time of arrival here and bear in mind that I will not be in the office on Monday, March 27 and will not be
          available during the afternoon of Tuesday, March 28.  At the same time, we will require a full accounting for
          your part of all fees we have paid to you over the past few years including, in particular, the costs of the
          "Faneromeni" case ($44,404.82).

8.        We would hope that such a meeting would lead to the amicable resolution of the differences between us.

Regards,

Joseph E.M. Hughes

VAPS X:\JEMHIJN\BIELECK\FEES-CANCELLATION

68

**Hughes Hooker** SOLICITORS

Hughes, H   r & Co.
3 St Michael's Alley, Cornhill, London EC3V 9DS

Telephone: 0171-283 2424 - Facsimile: 0171-626 1234
Telex: 8811524 HOOKER G

J M Bielecki
C R Lake

B J Traer (Partnership Secretary)

Your reference:              Our reference:

JMB.cg

## BY FAX 001 212 825 1391 - ORIGINAL BY COURIER

Mr Thomas J McGowan
American Steamship Owners Mutual Protection and Indemnity Association Inc.
5 Hanover Square
New York NY 10004
USA                 25 March, 1996

Dear Tom,

Thank you for your fax of March 21st, 1996 which points I am in agreement with and have incorporated into the Agreement which I have sent you.

I have omitted the word "exclusive" in both paragraphs 1 and 2.

In paragraph 3a. I have stated that the US$10,000 will be:-

     "treated as an advance or payment on account against billable time for work done at the request of the AMERICAN CLUB...".

As to paragraph 3b., I have amended this to include the words:-

     "... or for the actual period of entry of the said Member, if less than three policy years ...".

I have also clarified the position if personnel assigned to American Club work change. I have confirmed on the Schedule AA. that the agreed special rates will always be applied per the grade of personnel.

I have signed and dated the Agreement for today and have sent you two originals for signature. Could you perhaps send me back one signed original.

I am very pleased that we have reached agreement and very much look forward to a long, successful and happy association with you both professionally and on a personal level.

I will be in New York on business during April and look forward to meeting up with you then.

Kind regards.

Yours sincerely,

*J M BIELECKI*
*HUGHES HOOKER & CO.*

## MEMORANDUM

**FROM:**    HUGHES, HOOKER & CO., LONDON.
**TO:**    HH LONDON/GREECE
**RE:**    AMERICAN CLUB

DATE: Wednesday, April 03, 1996

1.    TEL TOM McGOWAN, BUT IN A MEETING. TEL JO HUGHES WHO WAS ABOUT TO DEPART FOR UK THEN FAR EAST AND THEN POSIDONIA. HE WILL BE AWAY A MONTH.

2.    JO ASKED WHETHER I HAD HEARD FROM TOM. I SAID I HAD AND HAD ACCEPTED TOM'S AMENDMENTS TO THE AGREEMENT, ENGROSSED IT AND SENT IT BACK, SIGNED. HE SAID HE WILL GET A COPY FROM TOM ( NOTE - A COPY WAS ALSO SENT SEPERATELY TO JO!!!!!!!!!!!!)

3.    POSIDONIA '96 - NO FIRM DECISION YET ON " EMPIRE STATE ", + AGREED THAT CUT-OFF DATE MUST BE MAY 1ST. WE DISCUSSED DATE OF PARTY AND AGREED MONDAY WOULD BE BETTER, ALTHOUGH IF FALL-BACK WAS USED IT WOULD HAVE TO BE MON AND TUES. JMB ASKED FOR THEIR GUEST LIST SO THE INVITATIONS COULD BE PREPARED.

4.    RULE BOOK SHOULD BE ADOPTED AT AGM IN SUMMER '96.

5.    CALLS RECORD EXPLAINED WHAT WE NEEDED AND THIS WILL BE ATTENDED TO.

6    MARAD -   NEEDED TO BE PUT IN A POSITION TO ANSWER THE QUESTION OF WHETHER CLUB, 1. ALLOWED TO PUT UP SECURITY TO CLAIMANTS IN LIBYA/IRAN/IRAQ/CUBA WHICH ARE COUNTRIES NOT APPROVED BY THE US ADMINISTRATION. JO WILL REVERT.

7.    BILBROUGH'S - WANTED TO TREAD SOFTLY BUT RECOGNISED THE NEED TO EXPLAIN TO THEM THAT WE WOULD NOT BE POACHING THEIR BUSINESS, RATHER THAN LETTING

BILBROUGH DISCOVER HH APPOINTMENT THRU GRAPEVINE.  JO
PREFERS TO USE THEIR CHANNELS TO GET POINT ACROSS.  SAID
THAT MARTOWSKI OF TMS NEW YORK KNEW OF HH
APPOINTMENT, BUT DID'NT KNOW HOW.

8       CHARTERERS RISKS - DETAILS SENT TO GREECE AND MAY
HAVE INTEREST.

9.      CORRESPONDENTS BOOK READY NEXT MONTH.


        JMB 1940 WED 3/APRIL

JACEK BIELECKI

American Steamship Owners P    al Protection and Indemnity Association, Inc

Shipowners Claims Bureau, Inc. MANAGER    MAIN · 212-267-2350
Five Hanover Square, 20th Floor    DIRECT 212-908-9444
New York, New York    FAX   212-825-1391
10004-2698    TELEX  222091 SHIPOCBR



**TELEFAX**

April 8, 1996

Mr. Jacek Bielecki
Hughes Hooker
London
Fax #171-626-1234

Re:        <u>Representation</u>

Dear Jacek:

Here are two final revisions to the Agreement, which I trust will meet your approval.

Regards,

T.J. McGowan

Attachment
VAPS TJM\ONESECX

# AGREEMENT

## BETWEEN

THE SHIPOWNERS CLAIMS BUREAU INC., and THE AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., ( the AMERICAN CLUB ), of the first part and HUGHES, HOOKER & CO., and HUGHES, HOOKER ( CORRESPONDENTS ) S.A., ( HUGHES, HOOKER ), of the second part, dated this .25th day of March 1996.

1.    The AMERICAN CLUB hereby appoints HUGHES, HOOKER as it's representative and correspondent for Greece for an initial period of 1 year from the date of this agreement. *subject always to the Club's direction & control*

2.    HUGHES, HOOKER shall use their best endeavours to represent and market the AMERICAN CLUB in Greece^in order to facilitate the introduction of shipowners and charterers as potential members of the AMERICAN CLUB, and where necessary to give advice and/or handle claims as required, and to generally promote the AMERICAN CLUB in accordance with the policy and ideals of ` Vision 2000 `, and to act as general correspondents to the AMERICAN CLUB, and ☒ managers.

3.    In exchange for the duties set out in paragraph 2, above, HUGHES, HOOKER shall be entitled to the following remuneration, which, in any event may be reviewed from time to time as required by either party :-

    a.    in respect of the day-to-day promotion and marketing of the AMERICAN CLUB, the sum of $10,000 per annum, payable in equal quarterly instalments in advance, on the first day of each quarter, such sum to be treated as an advance or payment on account against billable time for work done at the request of the AMERICAN CLUB.. Special events will be agreed in advance and paid for separately, e.g., Posidonia '96, and,

    b.    in respect of the entry, after the date of this agreement, of shipowners or charterers based or domiciled in Greece, as members, a



commission of 2%  ( two per cent ) on the calls (ETC) payable to the AMERICAN CLUB by the said member, for a period of three policy years after entry, or for the actual period of entry of the said member, if less than three policy years, and,

    c.    in respect of claims handling or advice sought by members of the AMERICAN CLUB, the amount of time spent at the special rates set out in schedule AA as attached.

4.    This agreement shall be extended for a further period of 4 years, following the successful completion of the first probationary year referred to in paragraph 1 above, save that this agreement may be terminated by 3 months notice, in the event of gross negligence or other serious breach by either party. *I by either party on immediately*

5.    This agreement is subject to American or English law and jurisdiction either in arbitration, before a single arbitrator, or before the regular courts, at the option of the defending party.

.....................................................

**THE AMERICAN CLUB**

.....................................................

**SHIPOWNERS CLAIMS BUREAU**

*[signature]*
.....................................................

**HUGHES, HOOKER & CO.**

*[signature]*

**HUGHES, HOOKER ( CORRESPONDENTS) S.A.**

## SCHEDULE AA

### HUGHES, HOOKER & CO. CHARGE-OUT RATES 1996/97

| PARTNERS | NORMAL RATE | AMERICAN CLUB RATE |
|---|---|---|
| JACEK BIELECKI | 295 | 160 |
| CEDRIC HARRIS | 250 | 150 |
| CHRIS LAKE | 250 | 150 |

### ASSISTANT SOLICITORS

| | | |
|---|---|---|
| MORAY HUGHES | 225 | 140 |
| MICHAEL BOWER | 200 | 140 |
| ALISTAIR RUSTEMEYER | 200 | 140 |
| TONY CHRISTOULIDES | 160 | 130 |

### LEGAL EXECUTIVES/TRAINEES

| | | |
|---|---|---|
| KIRSTY SCOTT | 75 | 50 |
| TIM MARC | 75 | 50 |
| SOFIA KORDEK | 75 | 50 |

**N.B. DISBURSEMENTS ARE CHARGED IN ADDITION**
**BJT/11:3:96**
NOTE: PERSONNEL ASSIGNED TO AMERICAN CLUB WORK MAY CHANGE
FROM TIME TO TIME, BUT THE AGREED SPECIAL RATES WILL ALWAYS BE
APPLIED PER GRADE OF PERSONNEL.

