UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUGHES, HOOKER & CO. AND
HUGHES, HOOKER (CORRESPONDENTS) S.A.,

      Plaintiffs,

         -against-

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION,
INC.,   SHIPOWNERS CLAIMS BUREAU,
JOSEPH E. M. HUGHES, THOMAS J. MCGOWAN,
AND VINCENT J. SOLARINO,

      Defendants.

04 CV 1859 (SHS)

**DECLARATION OF
JACEK BIELECKI
IN SUPPORT OF MOTION
FOR ENTRY OF PARTIAL
FINAL JUDGMENT
PURSUANT TO RULE 54**

JACEK BIELECKI declares pursuant to 28 U.S.C. § 1746 as follows:

1.      I was the sole equity partner of Hughes, Hooker & Co., and was and am a director of Hughes, Hooker (Correspondents) S.A., a Panamanian corporation (hereinafter, collectively, "HH" or "Plaintiffs").

2.      I respectfully submit this declaration in support of Plaintiffs' motion, to be brought on by Order to Show Cause, seeking entry of partial final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure of that part of this Court's Opinion and Order of June 9, 2005, which denied the imposition of costs and/or attorney's fees against Plaintiffs and in favor of Defendants for their defense of this case up to that date.

3.      Attached hereto as Exhibit 1 is a true copy of this  Court's Opinion and Order of June 9, 2005.

4.      Following this Court's Opinion and Order of June 9, 2005, an arbitration was commenced in the United Kingdom before a sole arbitrator, Robert Gaisford, Esq., seeking arbitration of the claims arising out of the agreement at issue in this case.

-1-

5.    On or about November 7, 2005, Jackson Parton, Solicitors, acting on behalf of American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("American Club") and Shipowners Claims Bureau Inc. ("SCB") submitted Defence Submissions to Robert Gaisford, Esq. in connection with said arbitration.  Attached hereto as Exhibit 2 is a true copy of said Defence Submissions.

6.    The Defence Submissions, at pages 11-12 thereof, set forth a Counterclaim seeking $59,950.79 in fees and expenses for the New York litigation before this Court, which was expressly denied by this Court in its Opinion and Order of June 9, 2005.

7.    On or about February 23, 2006, Jackson Parton, Solicitors, acting on behalf of the American Club, appeared before the High Court of Justice, Queen's Bench Division, Commercial Court (Mr. Justice Aikens) seeking a worldwide injunction against Plaintiffs herein to secure, *inter alia*, the aforementioned Counterclaim.  Said injunction was granted *ex parte* and remains in full force and effect.    Attached hereto as Exhibit 3 is a true copy of the Approved Judgment, wherein, at paragraph 7, the Counterclaim seeking $59,950.79 in fees and expenses for the New York litigation before this Court is enumerated as among the bases for the injunction sought and granted by the High Court of Justice.

8.    In light of the foregoing, there is no just reason for delay in entering a partial judgment of that part of this Court's Opinion and Order of June 9, 2005, which denied the imposition of costs and/or attorney's fees against Plaintiffs and in favor of Defendants for their defense of this case up to that date, and that relief is respectfully sought from this court on an urgent basis.

9.    Notably (see Exhibits 2 and 3), the American Club and SCB also now take the position that the agreement at issue in this case was void *ab initio*, rendering the very arguments made by them before this Court in favor of compelling arbitration disingenuous, but Plaintiffs decline to address the issues related to those arguments in the present motion, since the urgency of addressing is not commensurate with that of the relief sought herein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  March 28, 2006

JACEK BIELECKI

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
HUGHES, HOOKER & CO. AND                          :
HUGHES, HOOKER (CORRESPONDENTS) S.A.,:
                                                  :
                 Plaintiffs,                      :
                                                  :            04 Civ. 1859 (SHS)
        -against-                                 :
                                                  :            OPINION & ORDER
AMERICAN STEAMSHIP OWNERS                          :
MUTUAL PROTECTION AND INDEMNITY                    :
ASSOCIATION, INC., SHIPOWNERS CLAIMS               :
BUREAU, JOSEPH E. M. HUGHES, THOMAS J.             :
McGOWAN, AND VINCENT J. SOLARINO,                  :
                                                  :
                 Defendants.                      :
--------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        Hughes, Hooker & Co. and Hughes, Hooker (Correspondents) S.A. (collectively,

"Hughes Hooker") bring this action against the American Steamship Owners Mutual

Protection and Indemnity Association (the "American Club"); its managing company, the

Shipowners Claims Bureau (the "Claims Bureau"); and its current and former corporate

officers, Joseph E. M. Hughes, Thomas J. McGowan and Vincent J. Solarino, for damages

for breach of contract, fraud, tortious interference with contractual relationship, and for an

accounting.  The gravamen of Hughes Hooker's complaint is that the American Club failed to

compensate Hughes Hooker pursuant to a contract entered into in 1996 between Hughes

Hooker and the American Club, (the "Agreement"), and that the American Club wrongfully

terminated the Agreement in September 1999.

        The American Club moves for a stay of this action pending arbitration in London,

claiming a right to arbitration pursuant to the arbitration clause in the Agreement.  The

remaining defendants claim not to be parties to the Agreement, and also move for a stay of

the action pending arbitration.  While Hughes Hooker concedes the validity of the arbitration

1

clause and the arbitrability of its claims against the American Club, it nonetheless opposes the entry of a stay, arguing that interests of justice and judicial economy require that this litigation not be stayed. Hughes Hooker's primary objections are to the American Club's choice of England as the forum for arbitration, and to the stay of the action against the remaining defendants. Hughes Hooker cross moves for limited pre-arbitration discovery in the event that a stay is granted.

Because this Court finds that the arbitration clause is valid and the claims asserted against the American Club are within the scope of the arbitration clause, this proceeding must be stayed as against the American Club. Also, because the arbitration clause at issue unambiguously gives the American Club the right to select the forum for the arbitration, the Court will enforce the American Club's choice of forum. Moreover, the stay will extend to the remaining defendants in the interests of fairness and judicial economy. Finally, because Hughes Hooker has not demonstrated that the requested pre-arbitration discovery is necessary, Hughes Hooker's cross motion is denied.

## I.    BACKGROUND

Hughes, Hooker & Co was a specialist marine law and claims handling firm based in London and in Piraeus, Greece; in Greece it was known as Hughes, Hooker (Correspondents) S.A. (Am. Compl. ¶ 3). The American Club is a non-profit mutual insurance association, which provides marine indemnity insurance to owners and operators of merchant vessels. [1] (Affidavit of Lawrence J. Bowles in Support of Defs.' Renewed Mots. for Orders Staying this Action Pending Arb. in London, at ¶ 5). The American Club is managed by the Shipowners Claims Bureau. (Id. ¶ 5). Joseph Hughes is the Secretary of the American Club, and the

---

[1] By way of background, marine indemnity insurance is, according to Hughes Hooker, typically purchased by shipowners and charterers of ships to protect against a range of risks, including damage to cargo, wreck removal, and crew injury and death. (Am. Compl. at ¶ 7). The marine indemnity insurance is underwritten on a mutual basis; *i.e.*, purchasers become members of an association, such as the American Club, and pool their premiums to cover any losses incurred by individual members. (Id.)

Chairman and Chief Executive Officer of the Claims Bureau. (Id.). Vincent Solarino serves

as the President and Chief Operating Officer of the Claims Bureau. (Id.). Thomas McGowan

was formerly the Chief Executive of the Claims Bureau and Secretary of the American Club.

(Id.).

       According to Hughes Hooker, in 1995, the American Club sought to expand

internationally by enrolling new members among shipowners in Greece. (Am. Compl. ¶ 9).

To further that goal, the American Club retained Jacek Bielecki, the original plaintiff in this

action, and his firm, Hughes Hooker, as its exclusive representative in Greece. (Id. ¶¶ 3,9).

In March 1996, Hughes Hooker and the American Club entered a written agreement pursuant

to which Hughes Hooker would provide marketing services and act as the American Club's

general correspondent in Greece. (Id. ¶ 11). The written agreement, dated March 25, 1996,

is entitled an "Agreement" between the Claims Bureau and the American Club on one side

and Hughes, Hooker & Co. and Hughes, Hooker (Correspondents) S.A. on the other.

(Agreement, at 2, attached at pp.1-3 of Ex. A to Original Compl., incorporated into Am.

Compl. at ¶ 11). The Agreement is signed only on behalf of the American Club, Hughes,

Hooker & Co., and Hughes, Hooker (Correspondents) S.A. (Id.). The Agreement also sets

forth a formula for calculating Hughes Hooker's compensation, the duration of the

Agreement, and the procedure for its termination. (Id. ¶¶ 1, 3-4). Finally, the clause at issue

here – Clause 5 – sets forth the parties' agreement regarding dispute resolution as follows:

> This Agreement is subject to American or English law and jurisdiction either
> in arbitration, before a single arbitrator, or before the regular courts, at the
> option of the defending party.

(Id. ¶ 5). Pursuant to the Agreement, Hughes Hooker represented the American Club in

Greece from 1996 until late 1999. A number of disputes arose during that period over the

adequacy of the American Club's disclosures on the premiums paid by new members

enrolled through Hughes Hooker's efforts and its commission payments. The disputes

culminated in the American Club's giving notice in September 1999 of its intention to terminate the Agreement as of December 1999. That termination notice did not put an end to the parties' disagreements. Instead, it triggered several rounds of disputes over how to settle disputes relating to the parties' obligations under the Agreement, as well as disputes over the American Club's outstanding obligations to Hughes Hooker. After several unsuccessful endeavors to settle their disputes, Bielecki commenced an action against the American Club and the remaining defendants on March 8, 2004 in this district. Approximately six weeks thereafter, the American Club made its arbitration demand. Hughes Hooker subsequently filed an amended complaint, substituting Hughes, Hooker & Co. and Hughes, Hooker (Correspondents) S.A. as plaintiffs, and the American Club again moved for a stay of the action pending arbitration.

The pending cross motions present this Court with four questions: first, whether the American Club is entitled to a stay of this action; second, whether the Court should enforce the American Club's selection of the forum for arbitration; third, whether such a stay should extend to the other defendants; and finally, whether this Court should grant Hughes Hooker's request for pre-arbitration discovery. The Court addresses each in turn.

## II.    DISCUSSION

### A.    Staying an Action Pending Arbitration Pursuant to the Federal Arbitration Act

In reviewing defendants' motion for a stay pending arbitration, the Court is guided by a "federal policy [that] strongly favors arbitration as an alternative dispute resolution process." David L. Threlkeld & Co. v. Metallgesellschaft, Ltd., 923 F.2d 245, 248 (2d Cir. 1991) (citing Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989) and Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987)). Where there is a question as to whether claims are arbitrable, federal

arbitration policy requires that "any doubts . . . be resolved in favor of arbitration." Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983); see also Louis Dreyfus Negoce, S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 223 (2d Cir. 2001). This policy favoring arbitration "is even stronger in the context of international business transactions." Threlkeld & Co., 923 F.2d at 248 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629-31, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)).

The American Club contends that a stay should be imposed pursuant to section 3 of the Federal Arbitration Act, (the "FAA"), 9 U.S.C. § 3, and alternatively that a stay is warranted and its choice of arbitration forum should be enforced pursuant to section 206 of the FAA, which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201 et seq. (the "Convention").

### 1.    The Agreement Is Subject to the Convention

An agreement is subject to enforcement pursuant to the Convention and the implementing provisions of the FAA if it meets the following four requirements: "(1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope." Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir. 1999); Credit Suisse First Boston, LLC. v. Padilla, 326 F.Supp.2d 508, 511 (S.D.N.Y. 2004); see also 9 U.S.C. § 202. The Agreement at issue here meets each of these four requirements: it is in writing, it provides for arbitration in the territory of England or the United States, both of which are signatories to the Convention, and it involves an international commercial relationship. Where an agreement meets each of these requirements, "a federal court must compel arbitration of any dispute falling within the scope

of the agreement pursuant to the terms of the agreement." U. S. Titan, Inc. v. Guangzhou

Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 146 (2d Cir. 2001).

> ### 2.    A Stay of Hughes Hooker's Claims Against the American Club Is Warranted

As noted, the American Club first contends that a stay pending arbitration must be

granted pursuant to Section 3 of the FAA. [2] Section 3 of the Federal Arbitration Act provides

that where a court is satisfied that "any issue referable to arbitration under an agreement in

writing for such arbitration" is before the court, the court:

> shall on application of one of the parties stay the trial of the action until such
> arbitration has been had in accordance with the terms of the agreement,
> providing the applicant for the stay is not in default in proceeding with such
> arbitration.

9. U.S.C. § 3. Thus, pursuant to section 3 of the FAA, where a party has not waived its right

to arbitration, a district court has no discretion to deny a stay if a valid agreement to arbitrate

exists and the claims at issue come within the scope of that agreement. See ACE Capital Re.

Overseas, Ltd. v. Central United Life Ins' Co., 307 F.3d 24, 28-29 (2d Cir. 2002); see also

Milgrim v. Backroads, Inc., 142 F. Supp. 2d 471, 476 (S.D.N.Y. 2001) (holding that a court

"must stay proceedings and order parties to proceed to an arbitration" if a dispute is

arbitrable).

Hughes Hooker does not dispute that it has agreed to arbitrate upon demand by the

"defending party,"[3] and Hughes Hooker also does not argue – nor could it - that its claims

---

[2] Chapter 2 of the FAA implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and Chapter 1 of the FAA is incorporated into Chapter 2 "to the extent that [Chapter 1] is not in conflict with [Chapter 2] or the Convention." 9 U.S.C. § 208. Thus, Chapter 1, section 3, which expressly grants a district court the authority to stay the underlying litigation may be invoked here. See DaPuzzo v. Globalvest Mgmt. Co., L.P., 263 F. Supp. 2d 714, 725 (S.D.N.Y. 2003) ("Although the Convention contains no express provision concerning a stay of the underlying litigation, such authority exists both implicitly, as well as by incorporation of Chapter 1 into Chapter 2 and the Convention through 9 U.S.C. § 208.")
[3] See (Pls.' Mem. of Law in Opp. To Defs.' Renewed Mots. for Orders Staying this Action Pending Arbitration in London and in Supp. of Pls.' Conditional Cross Mot., at 1) ("Plaintiffs do not dispute that the 'defending party' has the right to demand the forum of arbitration . . .").

against the American Club fall outside the scope of that agreement.[4] Although Hughes Hooker suggests that the American Club has delayed the commencement of arbitration in this matter, the evidence does not support that contention, and regardless, delay does not result in waiver, unless there is resulting prejudice. See Leadertex v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 25 (2d Cir. 1995).

Clause 5 of the Agreement is plainly a "broad" arbitration provision, expressing the parties' "intent to have arbitration serve as the primary recourse for disputes connected to the agreement," Louis DreyfusNegoce, S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 225 (2d Cir. 2001), and it is broad enough to encompass all claims asserted against the American Club. See ACE Capital Re Overseas Ltd., 307 F.3d at 34. Clause 5 states simply that the Agreement "is subject to American or English law … either in arbitration, before a single arbitrator, or before the regular courts." It contains no words of limitation; nor does its text evince any intent by Hughes Hooker or the American Club to limit its application.

Because each of Hughes Hooker's claims rests on Hughes Hooker's interpretation of the Agreement and its allegation that pursuant to the Agreement it was an exclusive representative for the American Club, those claims clearly "touch matters" covered by that Agreement, and are therefore subject to arbitration. Genesco, 815 F.2d at 846 (internal citations omitted). Id. ("[W]hether a particular claim falls within the scope of the parties' arbitration agreement," depends upon "the factual allegations in the complaint rather than the legal causes of action asserted.") (citing Mitsubishi, 473 U.S. at 625, n.13). Moreover, the American Club correctly contends that Hughes Hooker's fraud claim does not preclude the Court from enforcing the arbitration clause because Hughes Hooker has not claimed that Clause 5 – the agreement to arbitrate – was induced by fraud. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967).

---

[4] In fact, in a declaration submitted in support of Hughes Hooker's opposition to defendants' renewed motion to stay, Bielecki asserts that Hughes Hooker has stated only a contractual claim against the American Club. (Declaration of Jacek Bielecki, at ¶ 55).

Because there is a valid agreement to arbitrate, and because it is broad enough to encompass the claims asserted against the American Club, a stay of this action as against the American Club is warranted.

## B.    The American Club's Choice of Forum Is Enforceable

The American Club contends that this action should be stayed pending arbitration in London pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201 et seq.  Unlike Chapter 1 of the FAA, which grants a district court the authority only to compel arbitration in a location within its jurisdiction, see 9 U.S.C. § 4, Chapter 2 of the FAA, which implements the Convention and governs international arbitration agreements like the one at issue here, grants a district court the authority to direct that arbitration be held in accordance with the parties' agreement at a location "within or without the United States."  See 9 U.S.C. § 206; see also Oil Basins, Ltd. v. Broken Hill Proprietary Co., 613 F. Supp. 483, 486 (S.D.N.Y. 1985) (citing cases).  This provision does not, however, give a district court the authority to direct arbitration in a particular location outside its jurisdiction where no location is provided by the parties' agreement.  See 9 U.S.C. § 206;[5] see also Oil Basins, Ltd., 613 F. Supp. at 486.  Thus, the Court must determine whether Clause 5 evinces an agreement by the parties as to the location for arbitration of this dispute.

In construing this provision, this Court must first look to the plain language of Clause 5.  Where the "'language admits of only one reasonable interpretation, the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the

---

[5] Section 206 provides in relevant part:

A court having jurisdiction under this chapter [9 USCS §§ 201 et seq.] may direct that arbitration be held in accordance with the Agreement at any place *therein provided for*, whether that place is within or without the United States.

9 U.S.C. § 206 (emphasis added).

contract's meaning.'" <u>Bear, Stearns & Co. v. Bennett</u>, 938 F.2d 31, 32 (2d Cir. 1991)

(quoting <u>American Home Prods. Corp. v. Liberty Mut. Ins. Co.</u>, 748 F.2d 760, 765 (2d Cir.

1984)). Ambiguity in a contractual clause "does not exist simply because the parties urge

different interpretations." <u>Hugo Boss Fashions, Inc. v. Federal Ins. Co.</u>, 252 F.3d 608, 616

(2d Cir. 2001).

   While Clause 5 does not dictate a single location for arbitration in the event of a

dispute, it does speak to which party can choose where the arbitration shall take place.

Hughes Hooker strenuously argues that Clause 5 grants to the defending party – here the

American Club – only the choice of arbitration or the courts, leaving the choice of the

location to the party instituting the adversary proceeding. However, the American Club

contends, and the Court agrees, that Clause 5 allows both the choice between arbitration and

the courts <u>and</u> the choice of the location between England and the United States to be made

by the "defending party."

   A plain reading of the clause shows that it entitles a party defending a suit arising

from the Agreement to choose both arbitration and the forum for the arbitration. Because the

term "defending party" has no definitive meaning except in the context of a litigation or an

arbitration, the only plausible construction of the forum selection provision is that the party

defending an adversary proceeding involving the Agreement – either before a court or an

arbitration panel – has the right to choose whether the dispute will be resolved in England or

the United States. It is clear that the American Club – as the party defending the litigation

instituted by Hughes Hooker – is the "defending party" for purposes of Clause 5. Thus, the

American Club's choice of England as the forum for arbitration is enforceable. <u>See</u> <u>U.S.</u>

<u>Titan,</u> 241 F.3d at 146.

C.    **A Stay of this Action Against the Remaining Defendants Pending Arbitration Is Warranted**

A stay of proceedings as to one defendant pending arbitration between that defendant and the plaintiffs may be extended to the remaining defendants pursuant to a district court's inherent power to control its docket.[6] See WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 76 (2d Cir. 1997); see also Nederlandse Erts-Tankersmaatschappij v. Isbrandtsen Company, 339 F.2d 440, 441 (2d Cir. 1964); Sea Spray Holdings Ltd. v. Pali Financial Group, Inc., 269 F. Supp. 2d 356, 366 (S.D.N.Y. 2003). To be entitled to a stay, defendants who were not party to the Agreement bear the burden of showing that Hughes Hooker will not be prejudiced by an extension of the stay to them, and that the balance of hardships and interests of judicial economy favor an extension. See Nederlandse, 339 F.2d at 441; WorldCrisa, 129 F.3d at 76; Danisco A/S v. Novo Nordisk A/S, 01 Civ. 10557, 2003 WL 282391 at *4 (S.D.N.Y. Feb. 10, 2003).

Hughes Hooker contends that extending the stay to the remaining defendants would prejudice its ability to secure timely relief. However, contrary to Hughes Hooker's allegations, there is no indication that defendants have hampered the progress of any attempt at arbitration. The defendants' previous refusal to produce discovery as requested by Hughes Hooker does not indicate an attempt by defendants to delay arbitration of this matter, and does not weigh against granting a stay of this matter pending arbitration. Plaintiffs have not shown that the information they seek is necessary to enable them to institute arbitration proceedings, and defendants have indicated that all defendants – including those not parties to

---

[6] Hughes Hooker contends that the Claims Bureau is actually a party to the Agreement even though its signature line on the Agreement is both crossed out and unsigned. The Claims Bureau maintains that it is not a party to the Agreement, and seeks a stay pursuant to the Court's inherent powers. The parties do not ask the Court to resolve this question, and in fact, the defendants have undertaken to stipulate that the question be resolved in the first instance by the London arbitrator. (Proposed Stipulation and Order ¶ 1(c), attached as Ex. 7 to Bowles Aff.). Because the Court finds that a stay of this action against all defendants is warranted in the interests of judicial economy, the Court need not resolve the issue. See WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 76 (2d Cir. 1997) (citation omitted) (finding it unnecessary to decide whether party might be subject to arbitration pursuant to agency principles because a stay was warranted pursuant to district court's inherent powers).

the Agreement – would comply with the discovery orders of a London arbitrator as though they were residents of London.  (Proposed Stipulation and Order ¶ 1(b), attached as Ex. 7 to Bowles Aff.).

Moreover, because Hughes Hooker's claims against the individual defendants center around and depend upon Hughes Hooker's interpretation of the contractual agreement that is subject to arbitration, judicial economy favors a stay of this action pending the resolution of Hughes Hooker's central breach of contract claim against the American Club.  The likelihood that a failure to extend a stay against the remaining defendants would result in duplicative discovery and create the possibility of inconsistent outcomes further weighs in favor of a stay.  See Sea Spray Holdings, 269 F. Supp. 2d at 365.

In sum, because defendants have demonstrated that extending a stay is unlikely to prejudice Hughes Hooker and is likely to further the interests of judicial economy and fairness, a stay of this action as to all defendants pending arbitration in England is appropriate.

### D.    Hughes Hooker Has Not Demonstrated that Pre-Arbitration Discovery Is Necessary

Hughes Hooker has cross moved for pre-arbitration discovery of information relating to defendants' registry of members and premiums that would allow Hughes Hooker to calculate outstanding commissions allegedly owed to Hughes Hooker.  Hughes Hooker contends that information is necessary in order to enable it to evaluate the monetary value of its claim with greater precision.  Hughes Hooker contends that this Court should order that discovery because it is not clear whether the documents sought are under the control of the American Club or the Claims Bureau, and if they are within the control of the Claims Bureau, Hughes Hooker apparently fears that the London arbitrator would lack the authority to compel the production of those documents.

However, "discovery on the subject matter of a dispute to be arbitrated should be denied in the absence of extraordinary circumstances," <u>Falcone Bros. Partnership v. Bear Stearns & Co.</u>, 699 F. Supp. 32, 35 (S.D.N.Y. 1988) (denying motion because no extraordinary circumstances had been shown); <u>see</u> <u>also</u> <u>Cotter v. Shearson Lehman Hutton, Inc.</u>, 126 F.R.D. 19, 21 (S.D.N.Y. 1989). Plaintiffs have demonstrated no reason why the requested discovery must be had immediately. Defendants correctly contend that Hughes Hooker is seeking discovery that relates to potential damages, and plaintiffs have not shown that they will be unable to formulate a claim for purposes of arbitration in England without that discovery. Hughes Hooker also has not shown that time is of the essence, as it seeks only documents, not depositions of persons who may be unavailable in the future. See <u>e.g.</u>, <u>Bergen Shipping Co. v. Japan Marine Servs. Ltd.</u>, 386 F. Supp. 430, 435, n.8 (S.D.N.Y. 1974) (pre-arbitration depositions appropriate where crew members were about to leave port and there was no expected date of return). Moreover, Hughes Hooker's contention that documents in the hands of the Claims Bureau may be unavailable in the arbitration proceeding is belied by the defendants' undertaking to submit to discovery requests as set forth above. Because Hughes Hooker has not demonstrated the sort of extraordinary circumstances that would warrant discovery prior to arbitration, Hughes Hooker's cross motion is denied.

**III.    CONCLUSION**

Finally, defendants have requested that the Court award them their costs in responding to what they characterize as a patently vexatious lawsuit and redundant motion practice. A court may require an attorney to pay costs if he "so multiplies the proceedings in any case unreasonably and vexatiously." <u>See</u> 28 U.S.C. § 1927. A court may also impose attorney's fees pursuant to its own "inherent power." <u>See</u> <u>Revson v. Cinque & Cinque</u>, 221

F.3d 71, 79 (2d Cir. 2000). However, "'[t]o impose sanctions under either authority, the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." Id. (quoting Agee v. Paramount Communications Inc., 114 F.3d 395, 398 (2d Cir. 1997)). Neither the institution of the lawsuit in this Court nor the filing of the amended complaint pursuant to the Court's order merits the imposition of costs on plaintiffs or their attorneys.

For the reasons set forth above, the motion by all the defendants to stay the proceedings before this Court is granted; plaintiffs are directed to proceed with arbitration against the American Club in England; and plaintiffs' cross motion for discovery is denied. This action shall be placed on the suspense calendar pending the conclusion of the arbitration in England.

Dated: New York, New York
       June 9, 2005

                                        SO ORDERED:

                                        Sidney H. Stein, U.S.D.J.

**EXHIBIT 2**

# JACKSON PARTON

## Solicitors

*Regulated by the Law Society*

Nils Dahl-Nielsen      Nicholas Parton
Anthony Dowling       Andrew Patrinos
Robert Fielden         Brian Roberts
David Hughes          James Roberts
Graham Jackson        John Watling

5th Floor
18 Mansell Street
London E1 8AA

Tel: 020-7702 0085
Fax: 020-7702 0858
Telex: 8812084 SEALAW G
*e-mail:* mail@jacksonparton.com

Our Ref:      NGP- 4927-1

Your Ref:

7 November 2005

Robert Gaisford Esq.,
Bramdean,
Stonegate,
Wadhurst,
East Sussex, TN5 7EP

Dear Sir

### Re: Hughes Hooker & Co, Hughes Hooker (Correspondents) SA and J.M. Bielecki v American Steamship Owners Mutual Protection & Indemnity Association Inc., and Shipowners Claims Bureau Inc

These are the Defence submissions of American Steamship Owners Mutual Protection and Indemnity Association Inc. ("the American Club"), and of Shipowners Claims Bureau Inc ("SCB").

An indexed bundle of documents is enclosed herewith. References to page numbers in that bundle are in square brackets. Any references to documents not in square brackets are to the documents served by Defence Claims Limited with the Claim submissions dated 7 July 2005.

The numbering now adopted is that used in the Claim submissions -

1. Pages 1 to 3 of the Claim submissions are a prior non-executed draft of the agreement actually signed by the parties. The signed and applicable version is at pages 144 to 146. This will hereafter be referred to as "the Agreement".

   In New York proceedings, now stayed in favour of this arbitration, it was accepted by the claimants to those and these proceedings that that was the case. Accordingly that issue is the subject of Res Judicata. [pages 1 to 13] .

2. The agreement was only between the American Club and Hughes Hooker & Co and Hughes Hooker (Correspondents) S.A. SCB was not a party to the agreement.

When the agreement was signed by Mr Thomas Mc Gowan he was then the President of SCB and Secretary of the American Club. It will be noted that when signing the agreement Mr Mc Gowan crossed out SHIPOWNERS CLAIMS BUREAU on the signature page and did not sign the agreement on behalf of SCB.

The Court in New York made no finding on this issue.

3.  It is denied that SCB can properly be Respondents in this arbitration and an immediate declaration to that effect is sought.

4.  It is denied that Mr J.M. Bielecki is a party to the Agreement in any capacity at all. Consequently he is also incapable of being a party to the arbitration clause contained in Clause 5 of the Agreement.

    It is denied that Mr Bielecki, whether directly or indirectly through Defence Claims Limited or in any other manner whatever, can lawfully wind up Hughes Hooker & Co. The terms of his striking off the Solicitors' Roll explicitly forbade any such act.

    It is also denied that at any material time Mr Bielecki was the sole partner of Hughes Hooker & Co. Indeed at many material times he was not a partner of the firm at all:

    (a) By a partnership deed dated 24th September 1997 the firm comprised Mr Bielecki, a Mr Bower and a Ms Kirsty Scott. Ms Scott retired from the partnership on 19th June 1998.

    (b) During part of 1999 and early 2000 Mr Bielecki was first suspended and then subjected to conditions by the Law Society. For some of that time, at least, Mr Bower was sole principal

    (c) In December 1999 a new partnership deed was executed by Mr Bielecki, Mr Bower and a Mr Duncan Francis. Because Mr Bielecki did not emerge from his then Law Society restrictions until May 2000 it was only then that the deed officially took effect.

    (d) In July 2000 Mr Bower was aggrieved by the non-payment of his salary and other matters and attempted to resign but in the end did not. Mr Francis retired from the firm on 31st January 2001.

    (e) On 1st December 2000 the partners had decided that the firm would have to be dissolved but it seems that the Office for the Supervision of Solicitors then decided that Mr Bielecki should be given a further three months to find another partner. Mr Bower agreed to remain a partner until 31 March 2001.

    (f) On 6th March 2001 Mr Bielecki was struck off the solicitors roll with immediate effect. However Hughes Hooker & Co continued in existence with Mr Bower as sole principal and partner until 30th March 2001 whereupon it ceased all business.

In the circumstances it is submitted that at that date (at the very latest) Hughes Hooker & Co was, pursuant to section 34 of the Partnership Act 1890 [page 14] in all respect dissolved by the happening of an event which made it unlawful for the business of the firm to be carried on or for the members of the firm to carry it on in partnership and that that remains the position.

It follows that it is unlawful for these proceedings to be brought by Defence Claims Limited for or on behalf of Hughes Hooker & Co and/or Mr J.M Bielecki.

As to Hughes Hooker Correspondents S.A. it is submitted that:

(g) its existence was and is in breach of section 5 of the Solicitors Separate Business Code 1994 [pages 15 and 16] because it had a "similar name to the solicitor's practice" and because no attempt was made to make the Club aware of the fact of the lack of statutory protection or of Mr Bielecki's interest in Hughes Hooker Correspondents S.A.

(h) the services sought to be provided by Hughes Hooker Correspondents S.A. were at all material times identical to the services provided by Hughes Hooker & Co and were therefore unlawfully provided by virtue of section 4 of the said code.

5. Denied. The terms of the Agreement are those at pages 144 to 146.

6. Clause 1 of the Agreement is correctly quoted.

7. Denied. Clause 4 actually provided:

" 4. This agreement shall be extended for a further period of 4 years, following the successful completion of the first probationary year referred to in paragraph 1 above, save that this agreement may be terminated by 3 months notice *by either party, or immediately* * in the event of gross negligence or other serious breach by either party."

8. It is admitted that the Agreement was extended, subject to the termination provisions of Clause 4 thereof.

9. Clause 2 is inaccurately quoted. It actually provided:

" 2. HUGHES HOOKER shall use their best endeavours to represent and market the AMERICAN CLUB in Greece, *subject always to the Club's direction and control*,* in order to facilitate the introduction of shipowners and charterers as potential members of the AMERICAN CLUB, and where necessary to give advice and/or handle claims as required, and to generally promote the AMERICAN CLUB in accordance with the policy and ideals of 'Vision 2000', and to act as general correspondents to the AMERICAN CLUB, and its managers."

* emphasis added

10. The terms of clause 3 (b) of the Agreement as quoted are admitted.

11. It is denied that the American Club has in any way breached the Agreement. It is of course denied that SCB was a party to it, but, without prejudice to that contention, it is denied they were in breach of it either.

12. It is denied that a term should be implied into the Agreement that the American Club should disclose highly confidential information relating to their members' terms of entry which entry was in most cases in no way connected to Hughes Hooker & Co or to Hughes Hooker (Correspondents) SA. As a matter of law for a term to be implied into an agreement the terms must be:

    (a) reasonable and equitable
    (b) it must be necessary to give business efficacy to the contract so that no term will be implied if the contract is effective without it
    (c) it must be so obvious that "it goes without saying"
    (d) it must be capable of clear expression
    (e) it must not contradict any express term of the contract

    The authority for the above is Lord Simon's judgement in the Privy Council case B.P. Refinery (Westernport) Pty. Ltd v Hastings (1978 A.L.J.R. 20 (P.C.)

    Such a term as it is sought to imply is not reasonable or equitable; is not necessary to give the agreement business efficacy; does not go without saying; and does contradict the express provision that commission is to be paid on ETC (Estimated Total Calls as opposed to ATC – Actual Total Calls)

    Furthermore, such a term would fall foul of Data Protection legislation then current and each member's written approval for the release of such information and documentation would have to have been sought and obtained prior to any such release.

13. The American Club has disclosed full details of the calls on fleets based or domiciled in Greece and has paid commission on all calls paid by such fleets and indeed on calls for a number of fleets with beneficial owners of Greek origin who are not domiciled in Greece but in some cases in New York and/or London. All of the details actually disclosed, it is noted, have not been exhibited to the Claims Submissions. In particular the spread sheet at page [22] was given to Mr Bielecki at a meeting in New York on 19th May 2000. The American Club also offered to have its auditors Deloitte & Touche conduct an audit of the amounts due under the agreement at its expense or to allow another independent auditor to do so on the basis that the costs be split 50/50 between the parties.

14. Full details of relevant tonnage have been disclosed to Mr Bielecki. It is denied that the American Club has been remotely "unreasonable", let alone "unlawful",

in their approach. On the contrary they have bent over backwards to explain the basis of the payments they have made.

15. The references to "Plaintiff" in paragraph 15 of the Claims submissions are not understood. As page [22] shows, the overwhelming majority of the commissions earned and paid under the Agreement relate to the Good Faith fleet. More seriously a number of important items of correspondence have been omitted from the documents attached to the Claim Submissions. The true facts are that the American Club at all times replied promptly, courteously and helpfully to all correspondence sent to it. The missing pages are enclosed herewith marked with original page numbers of the Defence Claims Bundle with letters added to show where they should have been inserted. Pages 93 and 95 were missing from the claims submissions as served on Richards Butler.

16. It is simply untrue to say that no reply was received to the email at pages 31 and 32. The reply is at page 33 of Defence Claims Limited's own bundle, as is the acknowledgment of its receipt! The substantive very detailed reply to the 12th August email at pages 31 and 32 is at pages 35 to 38 of the same bundle.

17. This true, correct and thorough fax at pages 35 to 38 sent by the American Club on 17th September 1999 is accurate in every respect. It demonstrates the generosity and decency with which the American Club at all material times treated Hughes Hooker & Co, Mr Bielecki, and Hughes Hooker (Correspondents) S.A. As Mr Hughes says in that fax:

"The total sums paid to Hughes Hooker over the life of our agreement amount on our calculations to $336,639.31 or approximately 6% of the gross E.T.C. emanating from Greece since 1996- including premiums which have since turned out to be bad debts. In accordance with the calculations set out above, we owe you a further £104,185.40 which moves the percentage up to 8%. This is in addition to commissions payable to the brokers who actually place the business with us. Moreover, under clause 3.b of the agreement (and as accounted for in the above tables), the annual commissions have a maximum life of three years. Obviously, those were the terms we agreed upon originally and we will observe them without demur. But I think you will agree that they will afford you a comfortable revenue flow for some time to come."

The fax also contained a valid notice of termination under clause 4 of the Agreement.

18. The fax referred to at pages 39 to 40 plainly misrepresented the terms of clause 4 which are very clear indeed. It also requested that payment of the $104,185.40 which the American Club had calculated as being due to a bank account of Hughes Hooker (Correspondents) S.A. Unknown by the American Club until 5 August 2005, receipt of those monies by Hughes Hooker (Correspondents) S.A. was a fraud on the creditors of Mr Bielecki who should have declared it and paid it to his then IVA trustee for the benefit of his creditors. That fact alone amounts to "gross negligence or other serious breach" of the Agreement within the meaning of clause 4 thereof.

19. Noted. The fax at page 41 should of course be read in its entirety.

20. Full details of the fleets in respect of which commission was due and paid under the agreement were indeed provided to Mr Bielecki. These details are at page [22] and page 92 A.

21. In February 2000 high pressure of work on the American Club, in common with all P & I Clubs, and until well after 20th February inevitably meant that it took until 26th April 2000 fully to calculate and pay a further amount of $126,882 to Hughes Hooker (Correspondents) S.A. The Tribunal is asked to read all the correspondence to establish its full terms and effect which, it is respectfully submitted, is not correctly summarised in the Claims Submissions.

22. The Tribunal is again referred to the totality of the correspondence both attached to and omitted from the Claims Submissions for its full terms and effect.

23. The Tribunal is again referred to the totality of the correspondence.

24. Mr Hughes was unable to attend the meeting of 30th March 2000 due to sickness as explained by Mr Hughes in the lengthy fax of April 6 2000 at page 81.However the meeting was attended by Mr Hughes's colleagues Thomas Mc Gowan and Vincent Solarino and a copy of the note prepared by Mr Solarino in respect of the meeting is at page [21]. The Tribunal is again referred to the totality of the correspondence for its actual terms and effect.

25. The statement is the fax dated 26th April 2000 at pages 83 and 84 of the documents attached by Defence Claims Ltd to the Claims Submissions.

26. Complete supporting documentation was sent by Fed Ex to Hughes Hooker & Co's London address on 26th April 2000 and, it is believed, was duly received. Copies thereof are at pages [22] to [75].

27. The details sent by fax and Fed Ex on 26th April 2000 together with the fax at page 92 A it is respectfully submitted constitute complete details.

28. The Tribunal is requested to read Mr Hughes's fax of August 10th 2000 in its true context and to note that its receipt was not acknowledged until a fax dated 1st September 2000 was actually sent on 18th September (pages 104 E to 104 J) A further $22.055.07 was then remitted to a bank account in the name of Hughes Hooker (Correspondents) S.A. at Mr Bielecki's request.

29. Paragraph 28 above is repeated.

30. There was no requirement that the monies remitted of $22,055.07 be accepted in full and final settlement as the American Club made very clear in paragraph 1 of their fax of September 19 2000 which we have inserted as new pages 104 K and 104 L in the bundle attached to the Claims Submissions. The Tribunal may feel that that fax ought to have been exhibited by Defence Claims Limited when they served the submissions.

31. It is quite untrue to say that it took over 4 years to secure "at least some commission". Exhibited at pages [76] to [139] are details of all payments made

by the American Club to Hughes Hooker & Co and/or Hughes Hooker (Correspondents) S.A. in respect of the retainer and commission elements of the Agreement. In addition further sums were paid from time to time in respect of fees for specific cases handled which the Club covered. The first commission payment was in fact made on 7 May 1998. The invoice in respect of this payment was sent by Hughes Hooker (Correspondents) S.A. on 3 April 1998 (inserted at page 20 A). The American Club and SCB have behaved impeccably throughout.

32. This paragraph is incomplete and accordingly it is not possible to plead to it.
It may be helpful to remind the Tribunal that ETC means "estimated total calls".

33. The Tribunal is requested to read the full fax message at page 67 for its true meaning and effect. There is no dispute between the parties as to the fact that 2% commission was payable for three years on the estimated total calls of shipowners or charterers 'based or domiciled in Greece or, if entered for less than three years, for the actual period of entry'.

34. The binding version of the Agreement is that at pages 144 to 146. The Hughes Hooker entities were not appointed as "exclusive" representatives or correspondents. The right to the remuneration under clause 3 of the Agreement only arose if the obligations to provide the services described in clause 2 of the Agreement were fulfilled. The obligations were "to use their best endeavours to represent and market the AMERICAN CLUB .... In order to facilitate the introduction of shipowners and charterers as potential members....to give advice and/or handle claims as required... to generally promote the AMERICAN CLUB... and to act as general correspondents..."

35. Full details of the relevant Greek entries have been provided as previously described (page 92 A and pages [22] and [23]).

36. Pursuant to clause 3 a of the Agreement the Hughes Hooker entities ought to have given credit for the $10,000 per annum paid against bills rendered under clause 3 c. Accordingly on any view the American Club is entitled to reimbursement of the $37,500 paid under clause 3 a. because the payments under clause 3 a were "...to be treated as an advance or payment on account against billable time for work done at the request of the AMERICAN CLUB..." It is repeated, for the sake of good order, that all commission on ETC's due pursuant to the Agreement has been paid and accounted for in full.

37. It is agreed that such services as HH provided were provided pursuant to clause 3 c of the Agreement. It is repeated that the payments made under clause 3 a of $37,500 fell to be treated as payment on account of monies due under clause 3 c. It is to be noted that it is admitted in terms that all "3 c" invoices rendered by HH have been paid by the American Club. Accordingly, on a true construction of clause 3 a, the sum of $37,500 paid under clause 3 a is now owing and repayable to the American Club. It is denied that the American Club in any way interfered with the relationship between HH and Good Faith Shipping. The true position is evidenced by Mr Solarino's note at page [21].

38. It is submitted that, in common with all P & I and F D & D Clubs, the American Club was entitled at all material times to handle cases on behalf of all of its

members in accordance with the Rules of the Club. It is denied that this essential right and freedom could be or was in any way curtailed by clause 3 c of the Agreement. Without prejudice to those incontrovertible propositions, clause 2 of the Agreement provided (lines 2 and 3 thereof) that HH were to provide the services, including but not limited to those under clause 3 c., "…subject always to the Club's direction and control…" So even if, which it did not, the Club had taken the action wrongly alleged by HH, it would have been fully entitled to do so. In the light of Mr Bielecki's professional and financial history, as already demonstrated to the Tribunal, the proposition that it would be possible for the American Club to damage HH in the way alleged is preposterous in the extreme.

39. It is denied that the American Club ordered Good Faith Shipping not to use either Hughes Hooker entity – the fax from the American Club to Good Faith dated June 25 1999 at page [20] gives the lie to that suggestion. It is perhaps worth adding, however, that with the benefit of hindsight, given Hughes Hooker & Co's state in 1999, and Mr Bielecki's suspension from practice and subsequent striking off the Solicitors' Roll, the Club plainly would have had the right to do so. It will be recalled that the American Club learned of those matters for the first time in August 2005.

40. Due to the American Club's expansion, like the managers of other successful International Group Clubs, the American Club's managers, Shipowners Claims Bureau Inc, have opened an office in London and indeed also in Greece operated in both cases by subsidiary companies.

41. Shipowners Claims Ltd. in London instruct external lawyers on behalf of the American Club and/or its members when the circumstances warrant such instruction. Naturally they do not waste either the Club's and/or the members' resources by making appointments which are not strictly necessary and justified.

42. It is submitted that Hughes Hooker & Co were not lawfully in a position to provide any services under the Agreement since Mr Bielecki's suspension from practice on 2 March 1999 at which point the firm was dissolved. It has already been submitted that Hughes Hooker (Correspondents) S.A. were never lawfully entitled to provide any services or receive any remuneration under the Agreement for the reasons set out in paragraph 4 above. None of the documents referred to in paragraph 42 of the Claims Submissions indicate one way or the other the position with regard to "new claims work". In those items of correspondence Mr Bielecki was unlawfully holding himself out to be a partner of Hughes Hooker & Co, conduct which ultimately was one of the main reasons for him being struck off the Solicitors' Roll.

43. It is again denied that there was in fact any "prohibition" but again asserted that had there been, it would have been entirely appropriate in the circumstances described above.

44. Good Faith Shipping are indeed held in great esteem by the American Club. It is also agreed that they were introduced to the American Club by Mr Bielecki.

45. The position of the HH entities was never exclusive. That word was expressly deleted from an earlier draft of the agreement (page 143). It is entirely

commonplace for P & I Clubs to have more than one correspondent in a particular port or place and it is in fact unknown for Clubs to have exclusive agreements with correspondents.

The final revisions made to the draft Agreement were made by Mr Joseph Hughes in manuscript (pages 143 B and 143 C) and sent under cover of the fax at page 143 A. Mr Bielecki then amended the draft and the final Agreement although still bearing the date 26th March 1996 was actually signed by both parties after 22nd April 1996. As can be seen from "Hughes Hooker Solicitors" ' fax of 22 April 1996, as at that date, it had still not been signed (page 143 F).

It is also now known that on 22 July 1998 Hughes Hooker & Co were listed under the Bar Council Withdrawal of Credit Scheme with the effect that after that date Hughes Hooker & Co could only instruct Counsel on payment of fees in advance. For that reason Hughes Hooker could not realistically have handled any significant claim requiring fast advice or drafting from Counsel [page140]. In other words for this reason alone they could not in fact provide the level of service required by a P & I Club, F D & D Club and their members because any available cash in the firm was earmarked for Mr Bielecki's IVA creditors

The Tribunal has already been provided with details of Mr Bielecki's career history and financial history, none of which, as the tribunal has noted, is denied. Again the reality is that, as a result also of Mr Bielecki's increasingly serious financial proceedings and disciplinary proceedings, Hughes Hooker could not provide a service which would "… promote the AMERICAN CLUB …". On the contrary, it was becoming apparent to the American Club (as to which Mr Hughes and others will if necessary give evidence) as time went by that the reputation of the American Club was being tarnished by its association with Mr Bielecki. That was why, despite the tactful language used in the faxed notice of September 2 1999 at page 37, the American Club gave 3 months notice of termination. At that time, of course, the Club was only aware of the tip of the iceberg. Had Mr Bielecki disclosed the matters now known to the Club they would never have entered into the Agreement or alternatively, without prejudice to that proposition would have given immediate notice to end the Agreement well before 2 September 1999.

46. Agreed.

47. Agreed so far as the quote of the extract from clause 4 in paragraph 47 of the Claims Submissions goes but the remainder of that clause is at page 145.

48. Clause 4 was as set on page 145. The notice at page 37 was perfectly valid. Reference is also made at this stage to the notice contained in Jackson Parton's fax dated 5th August 2005. For the reasons set out in that fax the American Club's primary case is that the Agreement was void ab initio. Without prejudice to that contention the Club's secondary case is that the notice at page 37 was valid and duly expired on 2 December 1999 as did the Agreement.

49. It is denied that the American Club were ever in breach of the terms of the Agreement, let alone in fundamental breach of it, although it is submitted that the reference to the concept of fundamental breach is redundant.

50. It can be seen from the header at the top of page 49 that Mr Hughes's fax dated 1 December 1999 was received by Hughes Hooker in Greece on 2nd December 1999 i.e. just after the 3 months notice given on 2 September 1999 expired. Even if it arrived on the 1st of December it could hardly be described as premature!

51. By 2 September 1999, as Mr Bielecki knows but neglects to mention to this Tribunal, the Club was aware of and had exchanged correspondence with Mr Bielecki concerning the disciplinary proceedings against Mr Bielecki heard on 7 January 1999. Copies of the report in the Law Society's Gazette, of a letter from Mr Hughes to Mr Bielecki of 26th April 1999 and of Mr Bielecki's reply are at pages [141] to [142]. The Club did not then know, but of course Mr Bielecki did, that when Mr Bielecki replied on 27th April 1999 pages [143] and [144] his practising certificate had been suspended with effect from 2 March 1999.

Cedric Harris died a while ago but the Tribunal will recall, as do we, that this former senior partner of Hill Taylor Dickinson was a person held in high regard as is Mr van der Wiel who is also well known and respected among the mainstream shipping law firms.

At this point the Tribunal is invited to pause to read the judgement of the Court of Appeal in Mr M Bower v Mrs C Stevens (1) and Mr R.T. Marc – pages [145] to [151] The Tribunal will note the extent to which yet another of Mr Bielecki's unfortunate partners was left carrying blame for Mr Bielecki's own dishonesty. As Lord Justice Maurice Kay quoted an Employment Tribunal saying [Mr Bielecki] was:

"...a man well practised in flaunting the norms of professional business and personal integrity in the pursuit of financial gain."

Mr Bielecki's use of Hughes Hooker Solicitors letterhead on 27th April 1999 showing himself as a Partner was unlawful and the Tribunal will note was held so to be both by Mr Justice Cresswell in the Bayridge and by the Disciplinary Tribunal which struck Mr Bielecki off the Solicitors' Roll in 2001. Copies of the Lloyds Law report in the Bayridge and of the decision of the Disciplinary Tribunal are at pages [152] to [168] and at pages [169] to [181] respectively.

When the American Club's fax and notice of 2 September 1999 was sent the senior management hoped to deal with the considerable threat they by then saw to the good reputation of the American Club and to its managers through the association with Hughes Hooker discreetly and commercially. The Tribunal is respectfully requested to read the 2 September 1999 fax in that light.

52. There were never any breaches of the Agreement by the Club and therefore there was nothing to justify and no justification was taking place in the way alleged or at all.

53. The success of the American Club in achieving its expansion into the Greek market was not due to Hughes Hooker but was in fact due to work of Mr Stuart Todd previously a senior underwriter with the UK P & I Club specialising in the

11

Greek market. Mr Todd joined the managers of the American Club on September 5 2001. It has been since then that the true expansion in Greece has occurred.

54. The Hughes Hooker Greek office had been in existence, albeit in breach of the Solicitors Separate Business Code, for a long time before the Agreement with the American Club was entered into. By 1996, unbeknownst to the American Club, Hughes Hooker's and Mr Bielecki's reputation were, at best, seriously tarnished. That state of affairs was due not least, but not only, to the decision in the DAS Legal Services case at pages [182] to [212] . The Tribunal is invited to read that judgement in its entirety.

The allegations in this paragraph of the Claims Submissions bear no relation to the truth whatever.

55. Paragraphs 55. to 61. Are denied.

COUNTERCLAIM

62. Paragraphs 36 and 37 are repeated as if fully set out here and the sum of $37,500 hereby claimed on the basis therein set out.

63. Clause 5 of the Agreement provides:

"5. This agreement is subject to American or English law and jurisdiction either in arbitration, before a single arbitrator, or before the regular courts, at the option of the defending party"

On March 27 2000 the American Club stated clearly in a fax (page [213]):

"If you choose to litigate in New York, the Club, as the defending party, would be entitled to, and would, move to dismiss or to stay the action in favour of English law and arbitration in accordance with its rights under the agreement…"

On or about 8 March 2004 the Claimants issued court proceedings in the United States District Court, Southern District of New York pages [214] to [242].

On April 26 2004 New York attorneys Nourse and Bowles sent a formal Demand for Arbitration in London to the claimants [pages 243 – 244].

Despite the fax notice of March 27 2000 and Demand of April 26 2004 the Claimants pursued the New York court proceedings in the name of Mr Bielecki until the Opinion and Order of the District Court at pages [1] to [13].

Pursuit of the said New York proceedings was in clear breach of clause 5 of the Agreement. The American Club suffered loss and damage in the amount of US$59,950.79 in the form of the fees and expenses of their attorneys Nourse & Bowles [pages 245 – 270].

The sum of $59,950.79 is now claimed from the claimants.

12

64. Prior to the entering into of the Agreement, Mr Bielecki represented, knowing it to be false and/or reckless as to the truth, that he was a qualified solicitor of unblemished reputation and record with the Law Society. That he should be so was an actual, alternatively, an implied condition of the Agreement necessary to give it business efficacy.

In fact Mr Bielecki's reputation and his record with the Law Society were far from unblemished.

Reference is made to the facts and matters referred to in the financial and career chronologies already provided to the Tribunal and to the various judgements, the Bar Council action and Disciplinary Tribunal decisions referred to in paragraphs 45, 51 and 54 of the Defence Submissions.

Accordingly the Agreement was void ab initio and all monies paid there under fall to be reimbursed. Such monies amount to the total sum of US$ 398,712.05* which sum is now claimed from the claimants.

*[note this excludes claims handling fees and expenses paid in respect of work for members Good Faith and others]

65. Further or alternatively the American Club is entitled to Restitution of the said US$ 398,712.05.

66. Without prejudice to paragraph 64 above, and in the further alternative, the Agreement was frustrated at law on 22 July 1998 when Hughes Hooker & Co were blacklisted by the Bar Council and/or alternatively due to intervening illegality when Mr Bielecki was suspended from practice on 2 March 1999 and all and any payments due and paid after 22 July 1998 alternatively 2 March 1999 fall to be reimbursed. A calculation of the alternative sums claimed under this paragraph will be provided in due course.

67. Interest is claimed on the sums claimed under paragraphs 62, 63, 64, 65 and 66 at such amount and from such dates as the Tribunal considers fit pursuant to section 19 A of the Arbitration Act 1996.

68. The American Club and SCB reserve their right to claim their costs on the indemnity basis.

Yours faithfully,

JACKSON PARTON

**EXHIBIT 3**



Neutral Citation Number:  [2006] EWHC 361 (Comm)

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

St. Dunstan's House
133-137 Fetter Lane
London, EC4A 1HD

Date : Thursday, 23rd February 2006

**Before** :

**MR. JUSTICE AIKENS**

- - - - - - - - - - - - - - - - - - - -

**Between:**

| | |
|---|---|
| **AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION & INDEMNITY ASSOCIATION INC.** | **Applicant** |
| **- and -** | |
| **(1) HUGHES HOOKER & COMPANY LIMITED** | **Respondents** |
| **(2) HUGHES HOOKER CORRESPONDENTS S.A.** | |
| **(3) JACEK MACIEJ BIELECKI** | |

- - - - - - - - - - - - - - - - - - - -

**MR. NICHOLAS PARTON** of Messrs. Jackson Parton for the **Claimant**
**THE RESPONDENTS** did not appear and were not represented

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Tape Transcription by Marten Walsh Cherer Ltd.,
Midway House, 27/29 Cursitor Street, London EC4A 1LT.
Telephone No: 020 7405 5010.  Fax No: 020 7405 5026

**MR. JUSTICE AIKENS:**

1.  This is an ex parte application for a worldwide freezing injunction by American Steamship Owners Mutual Protection & Indemnity Association Inc. I will call the applicants "American Steamship". American Steamship is a non-profit mutual insurance association which provides marine indemnity insurance to shipowners and operators of merchant vessels. The applicants are the respondents in an arbitration which has been begun by the respondents to the current application.

2.  There are three respondents. The first respondent is Hughes Hooker & Company Limited. That used to be a firm of solicitors. It was, I am told, dissolved on 30th March 2001 when its sole equity partner Mr. Jacek Maciej Bielecki (who is the third respondent) was struck off the Solicitors Roll by the Law Society. Whether or not the first defendant can properly, therefore, be a respondent in the current application may be a matter of debate but I will assume, for the moment, that that entity is capable of being a respondent. The second respondent is Hughes Hooker Correspondents SA. That is a joint stock company incorporated in Panama in 1996. Mr. Bielecki is the Chairman, Director and authorised legal representative of the second respondent. That company was incorporated to act as the correspondent or Greek office of Hughes Hooker & Co.

3.  On 28th June 2001 the Greek authorities revoked the second respondent's company licence following its failure to file annual accounts and reports. Again, whether or not that entity exists and can properly be a respondent to the current application may be a matter of debate, but I will assume for the present that it is so capable.

4.  Mr. Bielecki used to be a solicitor and was on the Roll of Solicitors of England and Wales until 30th March 2001. He used to practise in the City of London and specialised in shipping and other marine matters. The affidavit of Mr. Nicholas John Parton, who is the solicitor who makes today's application, states that Mr. Bielecki now lives in the United States of America.

5.  On 13th January 2001 Mr. Bielecki incorporated Defence Claims Limited. Some time in December 2005 when Mr. Bielecki moved to the United States, Defence Claims USA was also incorporated to act as a legal consultancy. Defence Claims USA now apparently represents the respondents in the arbitration which I have mentioned.

6.  The arbitration arises out of an agreement between the applicants and the respondents. The respondents claim that the applicants' manager, Shipowners Claims Bureau Inc. was also a party to the agreement but that is in dispute. Under the agreement the applicants in the current proceedings appointed the respondents as their representatives and correspondents for Greece for an initial period of one year; although that period could be extended. The claim by Mr. Bielecki in the arbitration is that the applicants have not properly accounted to the respondents for commissions which he says are due under this agreement. Secondly, there is also a claim that the applicants interfered with the relationship between the respondents and another entity, Good Faith Shipping Company, and prohibited work being done by the respondents for that company. Thirdly, the respondents allege that the applicants opened a liaison office in London allegedly diverting work away from the respondents. That is alleged to be in breach of the agreement and caused the respondents loss and damage. Lastly it is alleged that the applicants terminated the agreement unlawfully and

prematurely on 2nd September 1999.   A sizable sum is claimed in the arbitration by the respondents to the present application.

7.    The applicants have a counterclaim in the arbitration.    In that they claim for the return of certain sums totalling US$ 37,500 under clause 3 of the agreement.   They also claim that the respondents wrongfully started proceedings against the applicants in the courts of the United States contrary to an English law and arbitration clause in clause 5 of the agreement.   The applicants therefore claim the cost of defending those proceedings which amount to some US$ 59,950.79.   Lastly, the applicants allege in the arbitration that the agreement was entered into upon the basis of fraudulent representations by the third respondent, Mr. Bielecki.   The applicants therefore claim that the agreement was void ab initio and all moneys paid thereunder, which total approximately US$ 398,712.05, should be repaid to American Steamship.

8.    The fraudulent representation alleged is that the third respondent was a qualified solicitor of unblemished reputation and record with the Law Society.   As I have said, the agreement was entered into on 25th March 1996.   The position with regard to the history of the applicant is set out in some detail in Mr. Parton's affidavit and there is a large file of exhibits which deals with the listing of the third respondent's professional career.   It is clear that prior to the agreement being entered into there were problems, to say the least, in the practice of Mr. Bielecki.   That is clear from, amongst other things, the findings of a Solicitor's Disciplinary Tribunal against Mr. Bielecki on 17th April 2001.   In paragraph 26 that states:

> "In the practice years 1995/1996 until the Law Society's intervention into the respondent's practice, the respondent had regularly defaulted on the payment of professional indemnity contributions.    The amount written off as unrecoverable following the respondent's subsequent insolvency totalled £110,800.48."

9.    I am satisfied that the applicants have, at the least, a good arguable case in respect of the sums claimed in the arbitration under the three heads that I have mentioned.   I am equally satisfied that that is a case where the third defendant has left the jurisdiction leaving large debts. His conduct in the period at the very least since the agreement until he left the jurisdiction at the end of 2005 demonstrates that he is not a man that can be trusted and that there is a serious risk of dissipation of his assets.

10.    Accordingly, I am satisfied that, in the normal course of things if this were a court action, this would be a proper case for the grant of a worldwide freezing order with attendant orders for producing information about the whereabouts of assets and so forth.   However, the application is made in aid of an arbitration.   The arbitration has its seat in London.   Mr. Robert Gaisford, who is a well-known and highly respected arbitrator, has been appointed and the arbitration has made some progress with the service of points of claim and points of defence and counterclaim, although no further stage has been reached in the pleadings.   Mr. Gaisford has also made an order with regard to security for costs against Mr. Bielecki.

11.    The application today is made under section 44(2)(e) of the Arbitration Act 1996. That provides that:

> ".... the court has for the purposes of and in relation to arbitral
> proceedings the same power of making orders about the matters
> listed below as it has for the purpose of and in relation to legal
> proceedings".

Those matters are listed in subsection (2) and include the granting of
an interim injunction under paragraph (e).

12.    Mr. Parton submits that this is a case of urgency and therefore comes within section
       44(3). That provides:

> "If the case is one of urgency, the court may, on the application
> of a party or a proposed party to the arbitral proceedings, make
> such orders as it thinks necessary for the purpose of preserving
> evidence or assets."

13.    He submits that this is such an application because it is for the purpose of preserving
       assets.

14.    I am prepared to accept that submission. However, Mr. Parton then has to deal with
       the provision of subsection (5) of section 44. That states:

> "In any case (i.e. even if it is a case of urgency) the court shall
> act only if or to the extent that the arbitral tribunal, and any
> other arbitral or other institution or person vested by the parties
> with power in that regard, has no power or is unable for the
> time being to act effectively."

15.    Mr. Parton accepts for present purposes that Mr. Gaisford has the power to grant an
       injunction. There is no suggestion on the material before me that Mr. Gaisford, who
       is acting under the London Maritime Arbitrators Association Rules, does not have the
       power to grant an injunction. Section 48(5) paragraph (a) stipulates that an arbitral
       tribunal has the same powers as the court to order a party to do or refrain from doing
       anything. That must mean that the arbitrator has the power to make injunctions,
       including freezing injunctions of the type now sought from the court.

16.    Accordingly, the question arises whether or not this is a case where the arbitrator has
       "no power or is unable for the time being to act effectively", such that the court will
       have jurisdiction to grant an ex parte freezing injunction of a worldwide extent
       pursuant to section 44(3) and (5). Mr. Parton says that he has, of course, researched
       this point and can find no cases of any assistance. I, for my part, have in the short
       time available to me not been able to find any cases either.

17.    There is a question of construction of subsection (5) which might arise. That is,
       should one construe the last line of it as indicating that the court shall only act if or to
       the extent that the arbitral tribunal has "no power to act effectively", but also the court
       will act only if the arbitral tribunal is "unable for the time being to act effectively"?
       Alternatively, should one read that line as giving the court power to act only if or to
       the extent that the arbitral tribunal has "no power" or alternatively, is "unable, for the
       time being, to act effectively"? Those two constructions are equally possible.

18.     I must say I am inclined to the second construction but I accept that the first is arguable. Either way Mr. Parton submits that the court should act in this case because an arbitral tribunal, i.e. Mr. Gaisford, has no power to make an order which has a penal notice attached to it. Furthermore, the arbitral tribunal cannot make an order that will have an effect on third parties in the way that an order of the court will, in particular as towards banks, especially banks that are outside the jurisdiction. To that exte nt he submits that the arbitral tribunal has no power and cannot either for the time being or ever act effectively in those two regards.

19.     I am, at least for present purposes, satisfied as to that argument so that I am prepared to grant a worldwide freezing order in the terms sought subject to some minor amendments which I have made. They are minor except for one point which is that there will be a return date which is to be a week tomorrow. Even if the respondents – or the third respondent in particular -- do not appear at that return date, it will be incumbent upon Mr. Parton (or whoever turns up) to argue the point and to be prepared to deal with this question of the court's jurisdiction in case there are further cases or other materials which should be brought to the court's attention. But for the present I am sufficiently satisfied that that the court has jurisdiction and that I should grant the injunction in the terms I have indicated.

MR. PARTON: My Lord, I am much obliged. Thank you very much indeed.    It is obviously for me to get page 15.

MR. JUSTICE AIKENS: Would you please. I think the easiest thing probably is to send it as an e-mail attachment to the Registry and they can get it to me.

MR. PARTON: Yes, that is easily done.

MR. JUSTICE AIKENS: As I have said, I make those amendments to the order. I have initialled them and I will initial the front page. You will need to go, obviously, to get the matter issued in the Registry as soon as possible.

MR. PARTON: Yes, my Lord.

MR. JUSTICE AIKENS: Is there anything else I need to do?

MR. PARTON: I think not, my Lord.

MR. JUSTICE AIKENS: Thank you very much indeed.

MR. PARTON: Thank you very much indeed, my Lord.

MR. JUSTICE AIKENS: I am sorry I shall not be around a week tomorrow beca use it would be interesting to hear if you have anything further to say about it.

Thank you very much indeed.

MR. PARTON: We will have the judgment transcribed, hopefully very quickly, so that whoever hears it can have the benefit of reading it. Thank you, my Lord.

- - - - - - - - - -