*Exhibit 3*

NOURSE & BOWLES, LLP
Attorneys for Defendants
One Exchange Plaza
At 55 Broadway
New York, NY 10006-3030
(212) 952-6200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                                    : DECLARATION OF
HUGHES, HOOKER & CO. AND                            : NICHOLAS GEORGE
HUGHES, HOOKER (CORRESPONDENTS) S.A.,               : PARTON IN OPPOSITION
                                                    : TO MOTION FOR ENTRY
              Plaintiffs                            : OF PARTIAL JUDGMENT
                                                    :
                                                    :
   -  against-                                      :
                                                    :
AMERICAN STEAMSHIP OWNERS MUTUAL                    :
PROTECTION AND INDEMNITY ASSOCIATION,              :
INC., SHIPOWNERS CLAIMS BUREAU INC.,               :
JOSEPH E.M.HUGHES, THOMAS J McGOWAN,               :
AND VINCENT J. SOLARINO                             :
                                                    :
              Defendants                            :
                                                    :
------------------------------------------------------X

Nicholas George Parton hereby states as follows:


1.      I am a partner in the firm Jackson Parton, London, solicitors for the defendants
the American Steamship Owners Mutual Protection and Indemnity Association, Inc. and
Shipowners Claims Bureau Inc.


2.      I have been provided with a copy of Mr Bielecki's declaration dated
March 28[th]2006 and now make this Declaration to reply to certain points contained therein
concerning the counterclaim of American Steamship Owners Mutual Protection and Indemnity
Association Inc. for attorneys' fees incurred in New York in connection with a prior motion to
stay this action.

3.    In "Defence submissions" dated November 7, 2005 (see Exhibit " A " ), in addition to denying points raised by the Plaintiffs in support of their claims in excess of five million U.S. dollars, certain counterclaims were also raised. Under English law, these counterclaims amount to defences by way of set-off to the claims of the Plaintiffs. In fact, under English law, these counterclaims could be asserted by way of a defensive set-off to claims of the Plaintiffs even though the counterclaims might otherwise be time barred, as has been claimed by the Plaintiffs. These counterclaims included a claim for the attorneys' fees in question on the grounds that they represent damages for breach of the arbitration clause by the Plaintiffs in instituting suit in New York when they had been requested by the Defendants to arbitrate in London (Exhibit "B").

4.    It may be of assistance to the Court if I explain the juridical basis, as a matter of English law, for the Counterclaim brought in London in respect of attorneys' fees incurred in New York. As I submitted in the Counterclaim, the bringing of proceedings in New York was a breach of the jurisdiction/arbitration clause in the agreement dated March 25, 1996. An English Court can do two things if a party commences proceedings in a non-contractual forum. It can, in its discretion, grant an anti-suit injunction and also it can award damages flowing from the breach of the contract providing for the contractual forum. In this case I am quite sure that the English Court would grant an anti-suit injunction restraining Mr. Bielecki and any of the entities he controls from continuing the proceedings in New York. Such an injunction would not in any way be an Order with regards to the Court in New York itself but against Mr. Bielecki and his entities. However in this matter I have not sought instructions to seek such an injunction even though, as I say, I have no doubt whatever that such an injunction would be granted. With regards to the second thing an English Court or arbitration tribunal can do in the above circumstances, to award damages for breach of the jurisdiction or arbitration clause, I can say that in my experience such damages are regularly awarded by London arbitrators. As to the Courts I refer by way of examples to the cases: (1) A/S Svendborg (2) D/S AF 1912 A/S (Bodies Corporate trading in partnership as Maersk Sealand) and Ali Hussein & others of 15 April 2003 and Union Discount Company Ltd. and Robert Zoller & others and Union Cal Ltd. of 21 November 2001. (copies attached as Exhibits " C  " and  " D " ). Under English law, the attorneys' fees in question therefore constitute a valid basis for a damage claim for breach of the

agreement in this case notwithstanding the fact that those attorneys' fees were not awardable as sanctions under the law of the place where they were incurred.

5.    In this case, the arbitration is being governed by the 2002 terms of the London Maritime Arbitration Association ("the LMAA"). Clause 10 of these rules provides:

> 10.    The jurisdiction of the tribunal shall extend to determining all disputes arising under or in connection with the transaction the subject of the reference, and each party shall have the right before the tribunal makes its award (or its last award, if more than one is made in a reference) to refer to the tribunal for determination any further dispute(s) arising subsequently to the commencement of the arbitral proceedings.

The rules become applicable by virtue of the arbitrator's acceptance of his appointment by the parties on the basis that those terms would apply [Exhibits " E ", " F ", " G ", " H " and " I " ] .It is common ground between the parties that the reference is subject to the LMAA terms 2002. Under the above quoted provision, the arbitrator, has jurisdiction to determine all disputes "under or in connection with the transaction." For this additional reason, the arbitrator unquestionably has jurisdiction to determine the issue of damages with respect to the attorneys fees in question.

I declare under penalty of perjury of the laws of the United States and under 28 U.S. Code § 1746 that the foregoing is true and correct.

Executed: 10th April , 2006

Nicholas George Parton

# Exhibit A

# JACKSON PARTON                    Solicitors

*Regulated by the Law Society*

Nils Dahl-Nielsen    Nicholas Parton

Anthony Dowling    Andrew Patrinos

Robert Fielden    Brian Roberts

David Hughes    James Roberts

Graham Jackson    John Watling

5th Floor
18 Mansell Street
London E1 8AA

Tel: 020-7702 0085
Fax: 020-7702 0858
Telex: 8812084 SEALAW G
*e-mail:* mail@jacksonparton.com

Our Ref:    NGP- 4927-1

Your Ref:

7 November 2005

Robert Gaisford Esq.,
Bramdean,
Stonegate,
Wadhurst,
East Sussex, TN5 7EP

Dear Sir

## Re: Hughes Hooker & Co, Hughes Hooker (Correspondents) SA and J.M. Bielecki v American Steamship Owners Mutual Protection & Indemnity Association Inc., and Shipowners Claims Bureau Inc

These are the Defence submissions of American Steamship Owners Mutual Protection and Indemnity Association Inc. ("the American Club"), and of Shipowners Claims Bureau Inc ("SCB").

An indexed bundle of documents is enclosed herewith. References to page numbers in that bundle are in square brackets. Any references to documents not in square brackets are to the documents served by Defence Claims Limited with the Claim submissions dated 7 July 2005.

The numbering now adopted is that used in the Claim submissions -

1. Pages 1 to 3 of the Claim submissions are a prior non-executed draft of the agreement actually signed by the parties. The signed and applicable version is at pages 144 to 146. This will hereafter be referred to as "the Agreement".

   In New York proceedings, now stayed in favour of this arbitration, it was accepted by the claimants to those and these proceedings that that was the case. Accordingly that issue is the subject of Res Judicata. [pages 1 to 13] .

2. The agreement was only between the American Club and Hughes Hooker & Co and Hughes Hooker (Correspondents) S.A. SCB was not a party to the agreement.

*A*

2

When the agreement was signed by Mr Thomas Mc Gowan he was then the President of SCB and Secretary of the American Club. It will be noted that when signing the agreement Mr Mc Gowan crossed out SHIPOWNERS CLAIMS BUREAU on the signature page and did not sign the agreement on behalf of SCB.

The Court in New York made no finding on this issue.

3. It is denied that SCB can properly be Respondents in this arbitration and an immediate declaration to that effect is sought.

4. It is denied that Mr J.M. Bielecki is a party to the Agreement in any capacity at all. Consequently he is also incapable of being a party to the arbitration clause contained in Clause 5 of the Agreement.

It is denied that Mr Bielecki, whether directly or indirectly through Defence Claims Limited or in any other manner whatever, can lawfully wind up Hughes Hooker & Co. The terms of his striking off the Solicitors' Roll explicitly forbade any such act.

It is also denied that at any material time Mr Bielecki was the sole partner of Hughes Hooker & Co. Indeed at many material times he was not a partner of the firm at all:

(a) By a partnership deed dated 24th September 1997 the firm comprised Mr Bielecki, a Mr Bower and a Ms Kirsty Scott. Ms Scott retired from the partnership on 19th June 1998.

(b) During part of 1999 and early 2000 Mr Bielecki was first suspended and then subjected to conditions by the Law Society. For some of that time, at least, Mr Bower was sole principal

(c) In December 1999 a new partnership deed was executed by Mr Bielecki, Mr Bower and a Mr Duncan Francis. Because Mr Bielecki did not emerge from his then Law Society restrictions until May 2000 it was only then that the deed officially took effect.

(d) In July 2000 Mr Bower was aggrieved by the non-payment of his salary and other matters and attempted to resign but in the end did not. Mr Francis retired from the firm on 31st January 2001.

(e) On 1st December 2000 the partners had decided that the firm would have to be dissolved but it seems that the Office for the Supervision of Solicitors then decided that Mr Bielecki should be given a further three months to find another partner. Mr Bower agreed to remain a partner until 31 March 2001.

(f) On 6th March 2001 Mr Bielecki was struck off the solicitors roll with immediate effect. However Hughes Hooker & Co continued in existence with Mr Bower as sole principal and partner until 30th March 2001 whereupon it ceased all business.

3

In the circumstances it is submitted that at that date (at the very latest) Hughes Hooker & Co was, pursuant to section 34 of the Partnership Act 1890 [page 14] in all respect dissolved by the happening of an event which made it unlawful for the business of the firm to be carried on or for the members of the firm to carry it on in partnership and that that remains the position.

It follows that it is unlawful for these proceedings to be brought by Defence Claims Limited for or on behalf of Hughes Hooker & Co and/or Mr J.M Bielecki.

As to Hughes Hooker Correspondents S.A. it is submitted that:

(g) its existence was and is in breach of section 5 of the Solicitors Separate Business Code 1994 [pages 15 and 16] because it had a "similar name to the solicitor's practice" and because no attempt was made to make the Club aware of the fact of the lack of statutory protection or of Mr Bielecki's interest in Hughes Hooker Correspondents S.A.

(h) the services sought to be provided by Hughes Hooker Correspondents S.A. were at all material times identical to the services provided by Hughes Hooker & Co and were therefore unlawfully provided by virtue of section 4 of the said code.

5.  Denied. The terms of the Agreement are those at pages 144 to 146.

6.  Clause 1 of the Agreement is correctly quoted.

7.  Denied. Clause 4 actually provided:

" 4.  This agreement shall be extended for a further period of 4 years, following the successful completion of the first probationary year referred to in paragraph 1 above, save that this agreement may be terminated by 3 months notice *by either party, or immediately* * in the event of gross negligence or other serious breach by either party."

8.  It is admitted that the Agreement was extended, subject to the termination provisions of Clause 4 thereof.

9.  Clause 2 is inaccurately quoted. It actually provided:

" 2. HUGHES HOOKER shall use their best endeavours to represent and market the AMERICAN CLUB in Greece, *subject always to the Club's direction and control*,* in order to facilitate the introduction of shipowners and charterers as potential members of the AMERICAN CLUB, and where necessary to give advice and/or handle claims as required, and to generally promote the AMERICAN CLUB in accordance with the policy and ideals of 'Vision 2000', and to act as general correspondents to the AMERICAN CLUB, and its managers."

4

* emphasis added

10. The terms of clause 3 (b) of the Agreement as quoted are admitted.

11. It is denied that the American Club has in any way breached the Agreement. It is of course denied that SCB was a party to it, but, without prejudice to that contention, it is denied they were in breach of it either.

12. It is denied that a term should be implied into the Agreement that the American Club should disclose highly confidential information relating to their members' terms of entry which entry was in most cases in no way connected to Hughes Hooker & Co or to Hughes Hooker (Correspondents) SA. As a matter of law for a term to be implied into an agreement the terms must be:

(a) reasonable and equitable
(b) it must be necessary to give business efficacy to the contract so that no term will be implied if the contract is effective without it
(c) it must be so obvious that "it goes without saying"
(d) it must be capable of clear expression
(e) it must not contradict any express term of the contract

The authority for the above is Lord Simon's judgement in the Privy Council case B.P. Refinery (Westernport) Pty. Ltd v Hastings (1978 A.L.J.R. 20 (P.C.)

Such a term as it is sought to imply is not reasonable or equitable; is not necessary to give the agreement business efficacy; does not go without saying; and does contradict the express provision that commission is to be paid on ETC (Estimated Total Calls as opposed to ATC – Actual Total Calls)

Furthermore, such a term would fall foul of Data Protection legislation then current and each member's written approval for the release of such information and documentation would have to have been sought and obtained prior to any such release.

13. The American Club has disclosed full details of the calls on fleets based or domiciled in Greece and has paid commission on all calls paid by such fleets and indeed on calls for a number of fleets with beneficial owners of Greek origin who are not domiciled in Greece but in some cases in New York and/or London. All of the details actually disclosed, it is noted, have not been exhibited to the Claims Submissions. In particular the spread sheet at page [22] was given to Mr Bielecki at a meeting in New York on 19th May 2000. The American Club also offered to have its auditors Deloitte & Touche conduct an audit of the amounts due under the agreement at its expense or to allow another independent auditor to do so on the basis that the costs be split 50/50 between the parties.

14. Full details of relevant tonnage have been disclosed to Mr Bielecki. It is denied that the American Club has been remotely "unreasonable", let alone "unlawful",

5

in their approach. On the contrary they have bent over backwards to explain the basis of the payments they have made.

15. The references to "Plaintiff" in paragraph 15 of the Claims submissions are not understood. As page [22] shows, the overwhelming majority of the commissions earned and paid under the Agreement relate to the Good Faith fleet. More seriously a number of important items of correspondence have been omitted from the documents attached to the Claim Submissions. The true facts are that the American Club at all times replied promptly, courteously and helpfully to all correspondence sent to it. The missing pages are enclosed herewith marked with original page numbers of the Defence Claims Bundle with letters added to show where they should have been inserted. Pages 93 and 95 were missing from the claims submissions as served on Richards Butler.

16. It is simply untrue to say that no reply was received to the email at pages 31 and 32. The reply is at page 33 of Defence Claims Limited's own bundle, as is the acknowledgment of its receipt! The substantive very detailed reply to the 12th August email at pages 31 and 32 is at pages 35 to 38 of the same bundle.

17. This true, correct and thorough fax at pages 35 to 38 sent by the American Club on 17th September 1999 is accurate in every respect. It demonstrates the generosity and decency with which the American Club at all material times treated Hughes Hooker & Co, Mr Bielecki, and Hughes Hooker (Correspondents) S.A. As Mr Hughes says in that fax:

"The total sums paid to Hughes Hooker over the life of our agreement amount on our calculations to \$336,639.31 or approximately 6% of the gross E.T.C. emanating from Greece since 1996- including premiums which have since turned out to be bad debts. In accordance with the calculations set out above, we owe you a further £104,185.40 which moves the percentage up to 8%. This is in addition to commissions payable to the brokers who actually place the business with us. Moreover, under clause 3.b of the agreement (and as accounted for in the above tables), the annual commissions have a maximum life of three years. Obviously, those were the terms we agreed upon originally and we will observe them without demur. But I think you will agree that they will afford you a comfortable revenue flow for some time to come."

The fax also contained a valid notice of termination under clause 4 of the Agreement.

18. The fax referred to at pages 39 to 40 plainly misrepresented the terms of clause 4 which are very clear indeed. It also requested that payment of the \$104,185.40 which the American Club had calculated as being due to a bank account of Hughes Hooker (Correspondents) S.A. Unknown by the American Club until 5 August 2005, receipt of those monies by Hughes Hooker (Correspondents) S.A. was a fraud on the creditors of Mr Bielecki who should have declared it and paid it to his then IVA trustee for the benefit of his creditors. That fact alone amounts to "gross negligence or other serious breach" of the Agreement within the meaning of clause 4 thereof.

19. Noted. The fax at page 41 should of course be read in its entirety.

6

20. Full details of the fleets in respect of which commission was due and paid under the agreement were indeed provided to Mr Bielecki. These details are at page [22] and page 92 A.

21. In February 2000 high pressure of work on the American Club, in common with all P & I Clubs, and until well after 20th February inevitably meant that it took until 26th April 2000 fully to calculate and pay a further amount of $126,882 to Hughes Hooker (Correspondents) S.A. The Tribunal is asked to read all the correspondence to establish its full terms and effect which, it is respectfully submitted, is not correctly summarised in the Claims Submissions.

22. The Tribunal is again referred to the totality of the correspondence both attached to and omitted from the Claims Submissions for its full terms and effect.

23. The Tribunal is again referred to the totality of the correspondence.

24. Mr Hughes was unable to attend the meeting of 30th March 2000 due to sickness as explained by Mr Hughes in the lengthy fax of April 6 2000 at page 81.However the meeting was attended by Mr Hughes's colleagues Thomas Mc Gowan and Vincent Solarino and a copy of the note prepared by Mr Solarino in respect of the meeting is at page [21]. The Tribunal is again referred to the totality of the correspondence for its actual terms and effect.

25. The statement is the fax dated 26th April 2000 at pages 83 and 84 of the documents attached by Defence Claims Ltd to the Claims Submissions.

26. Complete supporting documentation was sent by Fed Ex to Hughes Hooker & Co's London address on 26th April 2000 and, it is believed, was duly received. Copies thereof are at pages [22] to [75].

27. The details sent by fax and Fed Ex on 26th April 2000 together with the fax at page 92 A it is respectfully submitted constitute complete details.

28. The Tribunal is requested to read Mr Hughes's fax of August 10th 2000 in its true context and to note that its receipt was not acknowledged until a fax dated 1st September 2000 was actually sent on 18th September (pages 104 E to 104 J) A further $22.055.07 was then remitted to a bank account in the name of Hughes Hooker (Correspondents) S.A. at Mr Bielecki's request.

29. Paragraph 28 above is repeated.

30. There was no requirement that the monies remitted of $22,055.07 be accepted in full and final settlement as the American Club made very clear in paragraph 1 of their fax of September 19 2000 which we have inserted as new pages 104 K and 104 L in the bundle attached to the Claims Submissions. The Tribunal may feel that that fax ought to have been exhibited by Defence Claims Limited when they served the submissions.

31. It is quite untrue to say that it took over 4 years to secure "at least some commission". Exhibited at pages [76] to [139] are details of all payments made

7

by the American Club to Hughes Hooker & Co and/or Hughes Hooker (Correspondents) S.A. in respect of the retainer and commission elements of the Agreement. In addition further sums were paid from time to time in respect of fees for specific cases handled which the Club covered. The first commission payment was in fact made on 7 May 1998. The invoice in respect of this payment was sent by Hughes Hooker (Correspondents) S.A. on 3 April 1998 (inserted at page 20 A). The American Club and SCB have behaved impeccably throughout.

32. This paragraph is incomplete and accordingly it is not possible to plead to it. It may be helpful to remind the Tribunal that ETC means "estimated total calls".

33. The Tribunal is requested to read the full fax message at page 67 for its true meaning and effect. There is no dispute between the parties as to the fact that 2% commission was payable for three years on the estimated total calls of shipowners or charterers 'based or domiciled in Greece or, if entered for less than three years, for the actual period of entry'.

34. The binding version of the Agreement is that at pages 144 to 146. The Hughes Hooker entities were not appointed as "exclusive" representatives or correspondents. The right to the remuneration under clause 3 of the Agreement only arose if the obligations to provide the services described in clause 2 of the Agreement were fulfilled. The obligations were "to use their best endeavours to represent and market the AMERICAN CLUB .... In order to facilitate the introduction of shipowners and charterers as potential members....to give advice and/or handle claims as required... to generally promote the AMERICAN CLUB... and to act as general correspondents..."

35. Full details of the relevant Greek entries have been provided as previously described (page 92 A and pages [22] and [23].

36. Pursuant to clause 3 a of the Agreement the Hughes Hooker entities ought to have given credit for the $10,000 per annum paid against bills rendered under clause 3 c. Accordingly on any view the American Club is entitled to reimbursement of the $37,500 paid under clause 3 a. because the payments under clause 3 a were "...to be treated as an advance or payment on account against billable time for work done at the request of the AMERICAN CLUB..." It is repeated, for the sake of good order, that all commission on ETC's due pursuant to the Agreement has been paid and accounted for in full.

37. It is agreed that such services as HH provided were provided pursuant to clause 3 c of the Agreement. It is repeated that the payments made under clause 3 a of $37,500 fell to be treated as payment on account of monies due under clause 3 c. It is to be noted that it is admitted in terms that all "3 c" invoices rendered by HH have been paid by the American Club. Accordingly, on a true construction of clause 3 a, the sum of $37,500 paid under clause 3 a is now owing and repayable to the American Club. It is denied that the American Club in any way interfered with the relationship between HH and Good Faith Shipping. The true position is evidenced by Mr Solarino's note at page [21].

38. It is submitted that, in common with all P & I and F D & D Clubs, the American Club was entitled at all material times to handle cases on behalf of all of its

8

members in accordance with the Rules of the Club. It is denied that this essential right and freedom could be or was in any way curtailed by clause 3 c of the Agreement. Without prejudice to those incontrovertible propositions, clause 2 of the Agreement provided (lines 2 and 3 thereof) that HH were to provide the services, including but not limited to those under clause 3 c., "...subject always to the Club's direction and control..." So even if, which it did not, the Club had taken the action wrongly alleged by HH, it would have been fully entitled to do so. In the light of Mr Bielecki's professional and financial history, as already demonstrated to the Tribunal, the proposition that it would be possible for the American Club to damage HH in the way alleged is preposterous in the extreme.

39. It is denied that the American Club ordered Good Faith Shipping not to use either Hughes Hooker entity – the fax from the American Club to Good Faith dated June 25 1999 at page [20] gives the lie to that suggestion. It is perhaps worth adding, however, that with the benefit of hindsight, given Hughes Hooker & Co's state in 1999, and Mr Bielecki's suspension from practice and subsequent striking off the Solicitors' Roll, the Club plainly would have had the right to do so. It will be recalled that the American Club learned of those matters for the first time in August 2005.

40. Due to the American Club's expansion, like the managers of other successful International Group Clubs, the American Club's managers, Shipowners Claims Bureau Inc, have opened an office in London and indeed also in Greece operated in both cases by subsidiary companies.

41. Shipowners Claims Ltd. in London instruct external lawyers on behalf of the American Club and/or its members when the circumstances warrant such instruction. Naturally they do not waste either the Club's and/or the members' resources by making appointments which are not strictly necessary and justified.

42. It is submitted that Hughes Hooker & Co were not lawfully in a position to provide any services under the Agreement since Mr Bielecki's suspension from practice on 2 March 1999 at which point the firm was dissolved. It has already been submitted that Hughes Hooker (Correspondents) S.A. were never lawfully entitled to provide any services or receive any remuneration under the Agreement for the reasons set out in paragraph 4 above. None of the documents referred to in paragraph 42 of the Claims Submissions indicate one way or the other the position with regard to "new claims work". In those items of correspondence Mr Bielecki was unlawfully holding himself out to be a partner of Hughes Hooker & Co, conduct which ultimately was one of the main reasons for him being struck off the Solicitors' Roll.

43. It is again denied that there was in fact any "prohibition" but again asserted that had there been, it would have been entirely appropriate in the circumstances described above.

44. Good Faith Shipping are indeed held in great esteem by the American Club. It is also agreed that they were introduced to the American Club by Mr Bielecki.

45. The position of the HH entities was never exclusive. That word was expressly deleted from an earlier draft of the agreement (page 143). It is entirely

9

commonplace for P & I Clubs to have more than one correspondent in a particular port or place and it is in fact unknown for Clubs to have exclusive agreements with correspondents.

The final revisions made to the draft Agreement were made by Mr Joseph Hughes in manuscript (pages 143 B and 143 C) and sent under cover of the fax at page 143 A. Mr Bielecki then amended the draft and the final Agreement although still bearing the date 26th March 1996 was actually signed by both parties after 22nd April 1996. As can be seen from "Hughes Hooker Solicitors" ' fax of 22 April 1996, as at that date, it had still not been signed (page 143 F).

It is also now known that on 22 July 1998 Hughes Hooker & Co were listed under the Bar Council Withdrawal of Credit Scheme with the effect that after that date Hughes Hooker & Co could only instruct Counsel on payment of fees in advance. For that reason Hughes Hooker could not realistically have handled any significant claim requiring fast advice or drafting from Counsel [page140]. In other words for this reason alone they could not in fact provide the level of service required by a P & I Club, F D & D Club and their members because any available cash in the firm was earmarked for Mr Bielecki's IVA creditors

The Tribunal has already been provided with details of Mr Bielecki's career history and financial history, none of which, as the tribunal has noted, is denied. Again the reality is that, as a result also of Mr Bielecki's increasingly serious financial proceedings and disciplinary proceedings, Hughes Hooker could not provide a service which would "... promote the AMERICAN CLUB ...". On the contrary, it was becoming apparent to the American Club (as to which Mr Hughes and others will if necessary give evidence) as time went by that the reputation of the American Club was being tarnished by its association with Mr Bielecki. That was why, despite the tactful language used in the faxed notice of September 2 1999 at page 37, the American Club gave 3 months notice of termination. At that time, of course, the Club was only aware of the tip of the iceberg. Had Mr Bielecki disclosed the matters now known to the Club they would never have entered into the Agreement or alternatively, without prejudice to that proposition would have given immediate notice to end the Agreement well before 2 September 1999.

46. Agreed.

47. Agreed so far as the quote of the extract from clause 4 in paragraph 47 of the Claims Submissions goes but the remainder of that clause is at page 145.

48. Clause 4 was as set on page 145. The notice at page 37 was perfectly valid. Reference is also made at this stage to the notice contained in Jackson Parton's fax dated 5th August 2005. For the reasons set out in that fax the American Club's primary case is that the Agreement was void ab initio. Without prejudice to that contention the Club's secondary case is that the notice at page 37 was valid and duly expired on 2 December 1999 as did the Agreement.

49. It is denied that the American Club were ever in breach of the terms of the Agreement, let alone in fundamental breach of it, although it is submitted that the reference to the concept of fundamental breach is redundant.

10

50. It can be seen from the header at the top of page 49 that Mr Hughes's fax dated 1 December 1999 was received by Hughes Hooker in Greece on 2nd December 1999 i.e. just after the 3 months notice given on 2 September 1999 expired. Even if it arrived on the 1st of December it could hardly be described as premature!

51. By 2 September 1999, as Mr Bielecki knows but neglects to mention to this Tribunal, the Club was aware of and had exchanged correspondence with Mr Bielecki concerning the disciplinary proceedings against Mr Bielecki heard on 7 January 1999. Copies of the report in the Law Society's Gazette, of a letter from Mr Hughes to Mr Bielecki of 26th April 1999 and of Mr Bielecki's reply are at pages [141] to [142]. The Club did not then know, but of course Mr Bielecki did, that when Mr Bielecki replied on 27th April 1999 pages [143] and [144] his practising certificate had been suspended with effect from 2 March 1999.

Cedric Harris died a while ago but the Tribunal will recall, as do we, that this former senior partner of Hill Taylor Dickinson was a person held in high regard as is Mr van der Wiel who is also well known and respected among the mainstream shipping law firms.

At this point the Tribunal is invited to pause to read the judgement of the Court of Appeal in Mr M Bower v Mrs C Stevens (1) and Mr R.T. Marc – pages [145] to [151] The Tribunal will note the extent to which yet another of Mr Bielecki's unfortunate partners was left carrying blame for Mr Bielecki's own dishonesty. As Lord Justice Maurice Kay quoted an Employment Tribunal saying [Mr Bielecki] was:

"...a man well practised in flaunting the norms of professional business and personal integrity in the pursuit of financial gain."

Mr Bielecki's use of Hughes Hooker Solicitors letterhead on 27th April 1999 showing himself as a Partner was unlawful and the Tribunal will note was held so to be both by Mr Justice Cresswell in the Bayridge and by the Disciplinary Tribunal which struck Mr Bielecki off the Solicitors' Roll in 2001. Copies of the Lloyds Law report in the Bayridge and of the decision of the Disciplinary Tribunal are at pages [152] to [168] and at pages [169] to [181] respectively.

When the American Club's fax and notice of 2 September 1999 was sent the senior management hoped to deal with the considerable threat they by then saw to the good reputation of the American Club and to its managers through the association with Hughes Hooker discreetly and commercially. The Tribunal is respectfully requested to read the 2 September 1999 fax in that light.

52. There were never any breaches of the Agreement by the Club and therefore there was nothing to justify and no justification was taking place in the way alleged or at all.

53. The success of the American Club in achieving its expansion into the Greek market was not due to Hughes Hooker but was in fact due to work of Mr Stuart Todd previously a senior underwriter with the UK P & I Club specialising in the

11

Greek market. Mr Todd joined the managers of the American Club on September 5 2001. It has been since then that the true expansion in Greece has occurred.

54. The Hughes Hooker Greek office had been in existence, albeit in breach of the Solicitors Separate Business Code, for a long time before the Agreement with the American Club was entered into. By 1996, unbeknownst to the American Club, Hughes Hooker's and Mr Bielecki's reputation were, at best, seriously tarnished. That state of affairs was due not least, but not only, to the decision in the DAS Legal Services case at pages [182] to [212] . The Tribunal is invited to read that judgement in its entirety.

The allegations in this paragraph of the Claims Submissions bear no relation to the truth whatever.

55. Paragraphs 55. to 61. Are denied.

## COUNTERCLAIM

62. Paragraphs 36 and 37 are repeated as if fully set out here and the sum of $37,500 hereby claimed on the basis therein set out.

63. Clause 5 of the Agreement provides:

"5. This agreement is subject to American or English law and jurisdiction either in arbitration, before a single arbitrator, or before the regular courts, at the option of the defending party"

On March 27 2000 the American Club stated clearly in a fax (page [213]):

"If you choose to litigate in New York, the Club, as the defending party, would be entitled to, and would, move to dismiss or to stay the action in favour of English law and arbitration in accordance with its rights under the agreement..."

On or about 8 March 2004 the Claimants issued court proceedings in the United States District Court, Southern District of New York pages [214] to [242].

On April 26 2004 New York attorneys Nourse and Bowles sent a formal Demand for Arbitration in London to the claimants [pages 243 – 244].

Despite the fax notice of March 27 2000 and Demand of April 26 2004 the Claimants pursued the New York court proceedings in the name of Mr Bielecki until the Opinion and Order of the District Court at pages [1] to [13].

Pursuit of the said New York proceedings was in clear breach of clause 5 of the Agreement. The American Club suffered loss and damage in the amount of US$59,950.79 in the form of the fees and expenses of their attorneys Nourse & Bowles [pages 245 – 270].

The sum of $59,950.79 is now claimed from the claimants.

12

64. Prior to the entering into of the Agreement, Mr Bielecki represented, knowing it to be false and/or reckless as to the truth, that he was a qualified solicitor of unblemished reputation and record with the Law Society. That he should be so was an actual, alternatively, an implied condition of the Agreement necessary to give it business efficacy.

In fact Mr Bielecki's reputation and his record with the Law Society were far from unblemished.

Reference is made to the facts and matters referred to in the financial and career chronologies already provided to the Tribunal and to the various judgements, the Bar Council action and Disciplinary Tribunal decisions referred to in paragraphs 45, 51 and 54 of the Defence Submissions.

Accordingly the Agreement was void ab initio and all monies paid there under fall to be reimbursed. Such monies amount to the total sum of US$ 398,712.05* which sum is now claimed from the claimants.

*[note this excludes claims handling fees and expenses paid in respect of work for members Good Faith and others]

65. Further or alternatively the American Club is entitled to Restitution of the said US$ 398,712.05.

66. Without prejudice to paragraph 64 above, and in the further alternative, the Agreement was frustrated at law on 22 July 1998 when Hughes Hooker & Co were blacklisted by the Bar Council and/or alternatively due to intervening illegality when Mr Bielecki was suspended from practice on 2 March 1999 and all and any payments due and paid after 22 July 1998 alternatively 2 March 1999 fall to be reimbursed. A calculation of the alternative sums claimed under this paragraph will be provided in due course.

67. Interest is claimed on the sums claimed under paragraphs 62, 63, 64, 65 and 66 at such amount and from such dates as the Tribunal considers fit pursuant to section 19 A of the Arbitration Act 1996.

68. The American Club and SCB reserve their right to claim their costs on the indemnity basis.

Yours faithfully,

JACKSON PARTON

*Exhibit B*

American Steamship Owners Mutual Protection and Indemnity Association, Inc.



Shipowners Claims Bureau, Inc., Manager
Five Hanover Square - 20th Floor
New York, New York 10004-2698
U.S.A.

Main          +1 212-269-2350 or 908-2400
Direct Dial   +1 212-908-2442
Reply Fax     +1 212-809-9879 or 825-1391
Telex         222091 SHIPOCBR
E-Mail        jhughes@american-club.net

## TELEFAX

| **To:** | Mr. Jacek M. Bielecki | **From:** | Joseph E.M. Hughes |
|---|---|---|---|

| **Company:** | Hughes Hooker & Co. – London | | |
|---|---|---|---|

| **Fax:** | +44-171-726 2010 | **Date:** | March 27, 2000 |
|---|---|---|---|

| **Re:** | | *Agreement dated March 25, 1996* | |
|---|---|---|---|

| **Pages:** | 1 | **(In total)** | **cc:** | |
|---|---|---|---|---|

*PLEASE NOTE the information contained in this telefax is strictly confidential and for the use of the addressee only.*

Dear Jacek:

Thank you for your March 24 fax, which arrived while I was away from the office for a long weekend holiday. Since we will be meeting on 29 March, I will confine this reply to the first two points you make. Perhaps the others may be more usefully discussed when we meet.

1.      The "point" of the provision for termination on 3-months notice vis-a-vis the four year period is that, without the 3-months provision, the agreement would simply have expired of its own force at the end of the four years without further action by either party, but the 3-months provision entitled either party to terminate at any time during the four years by giving the requisite notice. We think that is very clear.

2.      If you choose to litigate in New York, the Club, as the defending party, would be entitled to, and would, move to dismiss or to stay the action in favor of English law and arbitration in accordance with its rights under the agreement. We believe such a motion would be granted. As authority we refer to such statutes and cases as: 9 U.S.C. Secs. 1-16, 201-208; Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213 (1985); Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983); Scherk v. Alberto Culver Co., 417 U.S. 506 (1974); Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985); Carnival Cruise Lines, Inc.v. Shute, 499 U.S. 585 (1991) (enforcing forum selection clause); Dale Metals Corp. v. Kiwa Chem. Industry Co., Ltd., 442 F.Supp. 78 (S.D.N.Y. 1977); CPLR Secs. 7501 et seq.; Flanagan v. Prudential-Bache Securities, 67 N.Y. 2d 500 (1986); Singer v. Jeffries, 78 N.Y. 2d 176 (1991). If you are aware of any material contrary authority, please advise, as we would be happy to examine it.

Again, I hope that our planned meeting will result in an amicable resolution.

Yours very truly,

Joseph E.M. Hughes

VAPS JEMH/JMBIELECKIFEES-CANCELLATION

B

*Exhibit C*

  print  save  email  previous  next  back to searcl

[Full Text] - Judgment Approved - 16 pages

**(1) A/S D/S SVENDBORG (2) D/S AF 1912 A/S (Bodies Corporate trading in partnership as MAERSK SEALAND) v (1) ALI HUSSEIN AKAR (2) LAMTEX (3) RAJA BEYDOUN (4) ETABLISSEMENTS RAJA BEYDOUN (5) HUSSEIN ALI AKAR (2003)**

[2003] EWHC 797 (Comm)

**QBD (Comm) (Julian Flaux QC) 15/4/2003**

SHIPPING - CONTRACTS - FRAUD

DAMAGES : EXPENSES : TEXTILES : FRAUDULENT : INFLATED : FALSE : CONTRACT OF CARRIAGE : INDEMNITY : DELAYS : COSTS : DECLARATIONS : BREACH OF CONTRACT : DECEIT

**The claimants were awarded damages consisting of costs and expenses incurred by them in investigating and defending claims brought by the defendant and for breach of the contract of carriage.**

Action by claimants ('MS') for damages incurred by them in investigating and defending claims brought by the defendants including an indemnity in respect of future costs and expenses. MS shipped two containers of textiles from China and India to Guinea on behalf of the defendants. The defendants commenced two sets of proceedings in Guinea and Hong Kong, in respect of damages for: (i) alleged non-delivery of the goods; and (ii) alleged delay in the delivery of goods. In each case the damages were far in excess of the true value of the goods. MS contended that: (i) the claims were fraudulent and inflated; and (ii) the proceedings commenced by the defendants were in breach of the terms of the contract of carriage, specifically clause 27, which was an English law jurisdiction clause.

HELD: (1) On the evidence the defendants had abstracted the goods and had made a fraudulent non-delivery claim. Therefore, MS was entitled to a declaration that the claim by the defendants for alleged non-delivery of the goods was false and fraudulent. (2) Clause 27 was an exclusive jurisdiction clause. The defendants had breached the clause. In consequence of the breach MS had suffered loss and damage, which they had incurred in investigating and defending the proceedings in Guinea and Hong Kong. (3) In accordance with Union Discount v Zoller (2002) 1 WLR 1517 MS was entitled to recover its reasonable expenses of litigating at the instigation of the defendants in the jurisdiction which the defendant had chosen in breach of an exclusive jurisdiction clause. (4) MS were entitled to damages for deceit and/or breach of contract in the sum of US$130,941.48 together with interest of US$7,414.73. MS were entitled to an indemnity from the defendants in respect of future costs and expenses incurred as a consequence of the proceedings commenced by the defendants. The defendants were liable to pay MS's costs in the sum of £140,000.

Judgment accordingly.

Ricky Diwan instructed by Stephenson Harwood for MS. The defendants were not represented.

C

£03



<u>Case No:</u> 2003 EWHC 797 [COMM]

<u>2001 Folio 954</u>

**IN THE HIGH COURT OF JUSTICE**
**QUEENS BENCH DIVISION**
**COMMERCIAL COURT**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 15 April 2003</u>

Before :

<u>MR JULIAN FLAUX Q.C. (sitting as a Deputy High Court Judge)</u>

- - - - - - - - - - - - - - - - - - - -
Between :

(1)          A/S D/S SVENDBORG
(2)          D/S af 1912 A/S
Bodies Corporate trading in partnership as "MAERSK
SEALAND"                                          Claimants
- and -
(1)          ALI HUSSEIN AKAR
(2)          LAMTEX
(3)          RAJA BEYDOUN
(4)          ETABLISSEMENTS RAJA BEYDOUN
(5)          HUSSEIN ALI AKAR                     Defendants

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

Mr Ricky Diwan (instructed by Stephenson Harwood ) for the Claimants
The Defendants were unrepresented

Hearing date: 8 April 2003
- - - - - - - - - - - - - - - - - - - -

## Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

A/S D/S Svendborg and another -v - Ali Hussein Akar and others

**Mr Julian Flaux Q.C. :**

**Introduction**

1.  The Claimants in this matter trade in partnership as Maersk Sealand, one of the largest operators of container lines in the world. The present claims are for damages consisting of costs and other losses and expenses incurred by the Claimants in defending claims brought by various of the Defendants in respect of two containers of textiles carried by the Claimants from respectively China and India to Conakry, Guinea. The Defendants are members of the Akar family, of Lebanese origin but based in Conakry, and companies established by them for their business purposes. The First Defendant is the son of the Fifth Defendant and the Third Defendant is the sister of the Fifth Defendant. Mr Paolo Ghirardani, the Claimants' solicitor, who gave evidence before me, has investigated a number of alleged shortage claims made by the Akar family over recent years. He said in his evidence that he had met both the First and the Fifth Defendants and that the Fifth Defendant was very much the patriarch of this business family, who funded and ran the operation and who was more dominant than his son. I accept that evidence. The Second Defendant is a company incorporated under the laws of Guinea through which both the First and Fifth Defendants conduct business, as is asserted on their behalf in proceedings against cargo underwriters in Hong Kong in respect of one of the containers. The Second Defendant is currently insolvent and the First Defendant is in the process of putting it into liquidation. The Fourth Defendant (as its name suggests) is a company established by the Third Defendant through which she conducts her business.

2.  In summary, the Claimants' first claim is made against the First, Second and Fifth Defendants and relates to a container said to contain 200 bales of cotton real wax shipped from Hsinkang, China to Conakry. The basis of the claim is that these Defendants fraudulently represented when they took delivery of the container in Conakry that it was empty and that its contents had been lost whilst in the Claimants' custody, whereas they or their agents had already removed the contents. These Defendants then commenced two sets of proceedings in rem against the Claimants in Hong Kong and further proceedings against the Claimants' agents Maersk Guinee in Guinea claiming damages for non-delivery of the goods of some ten times the true value of the goods. Quite apart from the fact that, as the Claimants contend, the claims are fraudulent and inflated, these proceedings are said to be in breach of the terms of the contract of carriage and/or the bailment between the Claimants and the First and/or Second and/or Fifth Defendants, specifically of the exclusive English law and jurisdiction clause at clause 27 of the Maersk bill of lading terms and of the undertaking in clause 3 of those terms not to sue servants or agents of the Claimants. The Claimants claim as damages for deceit and/or breach of the contract of carriage/bailment the costs and expenses incurred by them in investigating and defending the proceedings in Hong Kong and Guinea, together with an indemnity in respect of future such loss and expense. They also claim a declaration that the alleged claim for non-delivery of the goods is false and fraudulent.

3.  The second claim is made against the Third and Fourth Defendants and relates to a container said to contain 182 bales of cotton printed textiles shipped from India to

A/S D/S Svendborg and another -v -Ali Hussain Akar and others

Conakry.   Claims have been made by these Defendants in the Guinea courts in respect of an alleged delay in delivery of the goods.  Although the alleged delay was only for five days, these Defendants are claiming for losses suffered by virtue of that delay equivalent to US$ 75,000, seven and a half times the value of the goods.  The Claimants' pleaded claim in these proceedings is for damages for breach of the contract of carriage, specifically again the exclusive English law and jurisdiction clause at clause 27 of the Maersk bill of lading.   In their skeleton argument, the Claimants reserved the right to plead an alternative claim in deceit, but it does not seem to me either necessary or appropriate to give permission to amend.  The damages claimed are essentially as in the case of the first claim, the costs and expenses incurred by the Claimants in investigating and defending the claims in Guinea.  The Claimants also claim an indemnity in respect of future costs and expenses. On further analysis and investigation at trial it emerged that at present, the Claimants' claim is really for the indemnity, no actual expenses separately relating to the second claim having been identified.

4.      The Defendants were unrepresented at the trial of the action and, indeed, have taken no part in the proceedings, although I am satisfied that they were duly served with the proceedings and that all relevant Court documents (including translations into French of the witness statements and exhibits which form the documents before me) have also been served on the Defendants and notice given to them that this trial was to take place on 7th and 8th April 2003.  Despite  the fact that the Defendants did not take any part in the proceedings, the Claimants did not seek judgment in default but invited the Court to proceed with the trial (which the Court has power to do pursuant to CPR Part 39.3), in order to improve their prospects of successfully enforcing any judgment of this Court abroad.  I was referred by Mr Diwan of Counsel, who appeared on behalf of the Claimants, to the judgment of Mr Justice Colman in *Berliner Bank-v-Karageorgis* [1996] 1 Lloyd's Rep 426, recognising the value of proceeding with an uncontested trial for the purposes of enforcement of any judgment given.

5.      The witness evidence before me consisted of (i) the statement of Mr Paolo Ghirardani a partner in the Claimants' solicitors, Stephenson Harwood, who has the conduct of this matter and has investigated these claims and other alleged shortage claims advanced by the Akar family in recent years. He was also called as a witness and I had the opportunity to ask him a few questions by way of clarification; (ii) three other witness statements of witnesses who are beyond the seas and in respect of whom the Claimants (as they are entitled to do) had served Civil Evidence Act notices: Mr Kristian Nielsen, at the relevant time the Managing Director of Maersk Guinee, Mr Mory Keita, shipping manager of Maersk Guinee and Mr David Gossanou, a surveyor with Compagnies des Experts Maritimes de Guinée ("CEM").  In addition, I was referred to and have considered the documentary evidence which was exhibited to the various witness statements and which has been organised in a chronological bundle, Bundle C.

6.      In the circumstances, the question for me is whether as a matter of law and on the basis of the evidence, on a balance of probabilities, the Claimants have established their claims.

## The first claim

7.    The bill of lading in respect of the first claim was dated Shenzhen 3rd July 1999 and evidenced the shipment on the Claimants' vessel MAERSK ANTWERP at Hsinkang, China on that day of a container UXXU 2441852 said by the shipper to contain 200 bales of 100% cotton real wax in apparent good order and condition for carriage to Conakry. The shipper was named as Hebei Textiles Imp and Exp (Group) Corp of Shijiazhuang, China and the container was consigned to the order of the Beirut Riyad Bank SAL. The notify party was "Mr Aly Hossen Akar-Lamtex" i.e. the First and Second Defendants. The container had already been sealed by the shipper with seal number ML-CN0590345 before delivery to the Claimants' agents in China.

8.    The container was transhipped twice, first onto the SUSAN MAERSK at Hong Kong and then onto the CMBT OCEANIA at Algeciras, Spain. Whilst at Algeciras, the seal on the container was cut and the container was opened and inspected by SGS at the request of the shippers and/or the relevant Defendants in order to present to Guinean Customs a "Bordereau de Taxation" from SGS enabling the Customs to assess duty payable on importation. According to Mr Neilsen, SGS is contracted by the Government of Guinea to conduct this assessment and does so by relying on inspections by its offices in other countries. In the present case, the Bordereau de Taxation (which is dated 3rd September 1999) contains information which evidently derived from an invoice produced by the relevant Defendants to SGS. It shows the seller as Benex International Corp of Hamburg, Germany, the importer as the First Defendant and his transit agent as Sall Cheik Oumar. It also states the total value of the goods as 116,200 French Francs, with an FOB value after deduction of freight of 106,200 French Francs, equivalent to about US$15,000.

9.    It was submitted by the Claimants that Benex may not have been a genuine seller to the First and/or Second and/or Fifth Defendants but named to secure some tax benefit deriving from purchase from Europe. Some support for that submission derives from the fact that in the proceedings which the First and Fifth Defendants commenced against their cargo underwriters in Hong Kong, they identified the seller as Mantex Trading Company and no mention is made of Benex. However, as Mr Diwan accepted, whether or not Benex was a genuine seller was not of any direct relevance to the claim in deceit advanced by his clients and, accordingly, I do not have to decide that question.

10.    Inevitably, because the container was opened and inspected at Algeciras, it had to be resealed and a seal number ML-ES0500631 was placed upon the container. In fact, the Claimants' own records incorrectly recorded the number as ML-ES0500630, one digit out. Upon arrival of the vessel at Conakry on 20th August 1999, the Claimants had a cargo surveyor, Mr David Gossanou of CEM, present to inspect containers upon their discharge. The practice which the Claimants had developed apparently because of excessive numbers of claims against shipowners was that if the seal was missing on discharge or there was a discrepancy between the seal number and that recorded, the cargo surveyor would open up the container

at the ship's side and conduct a brief visual examination of the container and its contents.

11.   That is what happened in the case of this container. Because of the discrepancy between the number on the seal and that recorded by the Claimants, Mr Gossanou broke the seal and opened the container. His findings are set out in his survey report dated 23rd August 1999 and reflected in the photographs he took attached to that report and in his witness statement in the present proceedings. He found the container essentially full of bales of fancy textiles although there was what he recorded as "an important empty space" towards the roof of the container. Although inclined at one time to consider that this suggested that a small number of bales had been removed from the container at some stage, now that it has been explained to him that the capacity of this container was 220 bales whereas only 200 were shipped, he thinks that this is the most likely explanation for the empty space he saw. In the light of all the evidence, I find that is the most likely explanation.

12.   After his inspection, the container was resealed with a new seal number ML-WA0195915, applied by Mr Gossanou to the left hand lever of the right hand door. In the normal way, the container would then have been taken to the container stack in the port where it would remain until the relevant Defendants had completed customs formalities and had the necessary documentation to take delivery of the container. The procedure for taking delivery and clearing Customs is described in Mr Neilsen's witness statement and is of some importance in relation to the claim in deceit. Once the container has been loaded on a truck, it is taken to the port gates, where customs officers inspect the receiver's documentation and insist upon the container being opened for a brief visual inspection, for them to check that the goods are as described in the documentation and that the quantities are roughly correct. If they are satisfied, the container will go through the gates accompanied by one or two customs officers. As it goes though the gates, the customs officers in the office there record the details in a register or ledger which they keep. The container will then be driven to the receiver's premises, where it is unstuffed in the presence of the customs officer(s). They will note any adverse comments, for example a different type of merchandise or quantity from that declared. The empty container is then driven back to the port and stacked in an area for empty containers.

13.   So far as this particular container is concerned, the transit agent for the relevant Defendants, Mr Oumar, seems to have been responsible for submitting the relevant customs documentation. In particular, the customs declaration or Mise a la Consommation was submitted by him and officially registered by the Customs on 2nd September 1999. That document stated the FOB value of the goods as 106,200 French Francs, as had the Bordereau de Taxation. There are a number of stamps and signatures of customs officers on the document with the date 6th September 1999, being the date when the relevant Defendants came to the port to collect the container.

14.   After Mr Gossanou's inspection on 20th August 1999, the next that he or the Claimants were involved was on the afternoon of 6th September 1999 when the First Defendant contacted both Mr Gossanou and the Claimants' office in Conakry

to say that when they had come to collect the container, the fork lift truck driver lifting it from the stack found it suspiciously light. They insisted upon a survey with the Claimants and Mr Gossanou present. Mr Neilsen sent Mr Keita from the Claimants' office and he was accompanied by Mr Arzur the Claimants' manager at the port and by Mr Gossanou. Various members of the Akar family including the First Defendant appear to have been present. The survey took place at about 18.00 hours.

15. The findings made are set out in detail in Mr Gossanou's report dated 19th October 1999 and confirmed in his witness statement. The seal which he had affixed on 20th August 1999, number ML-WA0195915 was intact and the container appeared at first inspection to be in the same condition as when inspected on 20th August 1999, with none of the panels or the roof broken. The seal was cut and the doors opened. The container was empty. After further investigation as to how the container could have been opened without breaking the seal, Mr Gossanou concluded that the riveted bolt which fixed the left hand handle of the right hand door to the locking mechanism had been cut, enabling the handle to be taken away from the lock and the door opened, providing access to the container without breaking the seal. The riveted bolt had been replaced with a rusty threaded bolt and nut. There was scratching of the surface of the door in way of where the bolt was located. Mr Gossanou was able to demonstrate how the container had been entered by unscrewing the bolt, taking the handle away from the lock without breaking the seal and rotating the lock with a crowbar to open the door.

16. Mr Gossanou's view expressed in his second report was that the riveted bolt had already been replaced with the threaded bolt and nut at the time of his first inspection on 20th August 1999, although in his first report he had noted neither any scratching of the door nor any discrepancy between the various bolts, which one would have expected him to if replacement had already occurred. I suspect that his opinion was influenced by his (mistaken) assumption that a small quantity of the goods had already been removed from the container prior to 20th August 1999. I was shown the original photograph of the left hand handle of the right hand door which he took on 20th August 1999, in which the bolt does not appear to have been either rusty or any different from the other bolts. I agree with Mr Nielsen's assessment that the riveted bolt had not been removed until after 20th August 1999.

17. Thus it seems to me overwhelmingly likely that the removal of all the goods stuffed in the container in China took place at some time between the survey at the ship's side on 20th August 1999 and the second survey at 18.00 hours on 6th September 1999. However, this does not answer the question who stole the goods. The Claimants' case is that it was the Defendants themselves or at least someone at the instigation of the First and/or Fifth Defendant and that the First and/or Second and/or Fifth Defendants then made fraudulent claims for loss of the goods against their cargo insurers in Hong Kong and against the Claimants and their agents in Hong Kong and Guinea. It is the latter claims which are the foundation for the Claimants' case of deceit against those Defendants which I consider in more detail below.

18. Immediately after the container was found to be empty, the First Defendant wrote to Maersk Guinee on 8th September 1999 holding them responsible for the theft which occurred whilst the container was still their responsibility and saying, rather oddly: "I also want Maersk to give me more insurance on further containers which may arrive in the coming future". Thereafter, some months passed before the First (or possibly Fifth Defendant, the relevant Plaintiff being named as "Hussein Akar") and Second Defendants commenced two actions in rem in Hong Kong against the MAERSK ANTWERP and the SUSAN MAERSK respectively on 28th July 2000 claiming damages for the loss of the cargo. Those proceedings have not been served or otherwise pursued as yet.

19. In September 2000, the First and Fifth Defendants (stated in the Particulars of Claim to be trading in the name of Lamtex, the Second Defendant) issued a Writ against their cargo insurers, Royal & Sun Alliance Insurance (Hong Kong) Limited claiming an indemnity for a total of US$171,600 in respect of the value of the goods (including a 10% mark-up). Ultimately, on 17th May 2001, the Hong Kong court dismissed that claim for failure by the First and Fifth Defendants to provide security for costs pursuant to an earlier Order of the court.

20. In the meantime, on 2nd May 2001, the Huissier de Justice in Conakry issued a "Sommation de Payer" or demand for payment on behalf of the First and Second Defendants seeking payment from Maersk Guinee of US$174,440, alleged to be the value of the goods. The immediate response of the Claimants was to write to the First and Second Defendants the same day, 2nd May 2001, disputing the jurisdiction of the Guinea courts and referring to clause 27 of the bill of lading which confers exclusive jurisdiction on the English courts. The letter also referred to the actions in rem in Hong Kong and invited the First and Second Defendants to discontinue the proceedings in both Guinea and Hong Kong and to pursue any claim before the English courts. The relevant Defendants' response in so far as they made one was to issue a writ against the Claimants (or rather Maersk Guinee) in Guinea claiming US$174,440 alleged to be the value of the goods and an additional 100 million Guinea Francs in damages and interest.

21. Thereafter, without any prior notice to the Claimants or Maersk Guinee, the Court of First Instance of Conakry entered judgment in favour of the First and Second Defendants on 19th July 2001 for US$174,440 plus 20 million Guinea Francs in damages/costs. Thereafter, the Court ordered that the Claimants must pay 100 million Guinea Francs of the judgment sum immediately. The Claimants' bank Ecobank provided a guarantee for that amount but sought to resist paying that amount in to Court. That attempt was unsuccessful and both the Court of First Instance and the Court of Appeal ordered that sum to be paid into Court. In the meantime, the Claimants have been endeavouring to reverse the original judgment of 17th July 2001. Their appeal to the Court of Appeal of Guinea was dismissed on 11th December 2001 and that Court ordered the Claimants to pay US$174,440 (less the 100 million Guinea Francs paid already under the Ecobank guarantee) plus 175 million Guinea Francs. On 12th December 2001, the Claimants lodged an appeal against that judgment to the Supreme Court of Guinea and sought a stay of execution.

A/S D/S Svendborg and another -v -Ali Hussein Akar and others

22. On 9th January 2002, the Supreme Court of Guinea granted the Claimants a stay of execution of the judgment of the Court of Appeal. On 7th February 2002, the Claimants filed their Submissions in support of their appeal to the Supreme Court and on 25th June 2002, the First and Second Defendants filed their Submissions in response. There the matter rests and I was told by Mr Diwan at the hearing that the Claimants do not know when any hearing before the Supreme Court will take place.

23. Before considering the detail of the various ways in which the Claimants put the first claim, I should record that the present proceedings were commenced in August 2001. On 26th October 2001 (following earlier ex parte hearings) Mr Justice Toulson confirmed and made a Worldwide Freezing Order against the Defendants, effective until trial or further Order. The application for such Order by the Claimants was supported by a detailed witness statement from Mr Ghiardani and the Claimants sought (and obtained) an Order not only in respect of existing costs and expenses but in respect but of estimated future costs and expenses in the various foreign proceedings (including in relation to those commenced by the Third and Fourth Defendants to which the second claim relates). The total value of assets covered by the Worldwide Freezing Order was US$ 833,289 in the case of the First, Second and Fifth Defendants and US$ 650,434 in the case of the Third and Fourth Defendants. The Order expressly provided. by paragraphs 8 and 11 (in fact consecutive paragraphs) that if the relevant Defendants in the case of each claim discontinued the foreign proceedings, the amounts caught by the injunction would be reduced correspondingly. Neither set of Defendants has accepted this invitation from the Court. At the hearing on 8th April 2003, I ordered that the Worldwide Freezing Order as previously ordered by Mr Justice Toulson should continue in force until further Order.

### The claim in deceit

24. The Claimants' case that the Akar family stole their own goods is essentially based on four pieces of evidence. First and foremost they rely upon an entry in the Customs container register or ledger, a copy of the relevant page of which has been obtained by the Claimants. This shows the sixth entry for the 6th September 1999 as being this container with the customs number from the Mise a la Consommation. The container is recorded as containing textiles and as being taken away on behalf of the First Defendant by the transit agent Mr Oumar, ostensibly for unstuffing at the premises of SGS. On the basis that the port gates open at about 08.00 hours and that there are between 100 and 150 containers per day leaving the port and being recorded in the register, the Claimants say that this entry shows that the container was removed from the port by Mr Oumar early on 6th September 1999. The Claimants then contend that in all probability the container was taken to the Defendants' premises, the goods removed and the container returned to the port area before the First Defendant contacted the Claimants and Mr Gossanou to call for the survey later that day. The Claimants also contend that the Defendants' surprise and consternation when the container was opened and was found to be empty was no more than theatrical.

A/S D/S Svendborg and another v Ali Hussein Akar and others

25.     Second, the Claimants rely upon the conduct of the relevant Defendants in calling for the survey on the very day when they went to collect the container and ostensibly at least before it had been opened by them. Indeed, the circumstances do seem curious and I was somewhat doubtful as to whether the fork lift truck driver could in truth have detected that the container was suspiciously light. Third, the Claimants rely in essentially the same context upon the rather odd letter of 8th September 1999 from the First Defendant referred to above which Mr Diwan submitted indicated that the relevant Defendants were acting suspiciously. Fourth and finally, the Claimants rely upon previous suspicious or dishonest alleged shortage claims made by the Akar family as investigated by Mr Ghirardani and referred to in his witness statement, which is said to evidence a propensity to make fraudulent claims for shortages which the Defendants know have not in fact occurred.

26.     In evaluating this evidence I bear in mind that, even at an uncontested trial (and in one sense above all at such a trial where I have not heard any explanation or evidence from the Defendants) where fraud is alleged against the Defendants as it is here, the Court must be satisfied by cogent evidence that, on a balance of probabilities, the Claimants have proved that there was fraud by the First and/or Second and/or Fifth Defendants (see per Denning LJ in *Hornal v Neuberger Products* [1957] 1QB 247 and per Lord Nicholls in *Re H (minors)* [1996] AC 563). In considering whether there is such cogent evidence which satisfies me that the case of deceit is made out on a balance of probabilities, two matters have given me cause to pause for thought.

27.     First, one obvious problem with the Claimants' case that the Customs register demonstrates that the container was removed from the port and unstuffed at the Defendants' or other premises prior to the Defendants returning the empty container to the port and calling for the survey which took place on the evening of 6th September 1999, is that if that sequence of events took place and the normal practice referred to by Mr Nielsen as summarised in paragraph 12 above was followed, the container should have been opened at the port gates at the insistence of the Customs to check the contents. It seems to me that if that occurred, it is highly unlikely that the container would have been opened in the presence of the Customs other than by breaking the seal, which cannot explain how the seal was still intact at the time of the inspection at the Defendants' request on the evening of 6th September 1999. Equally, how the container came to be returned to the port area without any apparent record with the Customs is unexplained.

28.     The second matter is the alleged other instances of similar claims referred to by Mr Ghirardani. It seems to me that on principle, those other claims should only be admissible in evidence or, at the least, given any weight, if they are of probative value in relation to this particular claim. I have considerable doubts as to whether they are of such probative value and therefore I disregard that material in considering whether the Claimants have made out their case that the relevant Defendants abstracted the goods themselves and then made fraudulent claims.

29.     However, even disregarding that alleged "similar fact" evidence, the Court has to consider the rest of the evidence as a whole and reach a common sense conclusion as to what was really going on. In doing so, I am satisfied that, on a balance of

Approved Judgment

probabilities (and despite the Defendants not having been present to put forward any contrary explanation) the First and/or Second and/or Fifth Defendants did abstract the goods and make a fraudulent non-delivery claim. In reaching that conclusion, I am influenced in particular by two matters.

30.     First, it seems to me that the Customs register (which was inspected by Mr Nielsen and a photocopy taken of the relevant page) does provide cogent evidence that the container was removed from the port area by the First Defendant or his transit agent some time soon after 08.00 hours on 6th September 1999, in which case it is highly likely that the contents were removed at that stage. True it is that if the normal practice described by Mr Nielsen was followed, the container should have been opened and inspected by Customs prior to it leaving the port, in which case the seal should have been broken. At its most extreme, the Claimants' case was that the Customs must have been complicit in the fraud or must have connived at the Defendants opening the door of the container without breaking the seal in the manner described by Mr Gousannou. In the absence of any evidence adduced by the Claimants to implicate Guinea Customs in this way, it seems to me that it would be quite wrong to accede to this submission. However, less sinister explanations are possible, particularly that Customs allowed Mr Oumar to remove the container without insisting that it be opened up because for example they were aware of the earlier inspection on 20th August 1999. This would not involve implicating Customs in a fraud. Whilst I appreciate that this is speculation, I do consider that the register entry provides strong evidence that the container was removed from the port by or on behalf of the Defendants early on 6th September 1999, from which it seems to me that (in light of the somewhat suspicious call for a survey later that day) it is not difficult to conclude that the Defendants opened the container as Mr Gossanou postulates and removed its contents prior to returning it to the port. It does not seem to me on reflection that the doubt as to Customs' involvement (which is explicable in a non-sinister manner as discussed) displaces that strong evidence.

31.     Second, the evidence as to the inflation of the claim being made by the Defendants in Guinea seems to me to suggest very strongly that this is not a genuine claim. That evidence is quite stark. The FOB value of the goods  as declared to the Guinea customs in the Bordereau de Taxation (apparently derived from an invoice produced by the Defendants) and in the Mise a la Consommation was 106,200 French Francs, equivalent to slightly less than US$15,000, whereas the amount claimed from Maersk Guinee is US$174,440. Even if one discounts what appears to be a 10% mark-up, this is still more than ten times the declared value. It might be said that (at least according to the claim against cargo insurers in Hong Kong) the Defendants had insured the goods for a value of US$171,600 (including a 10% mark up). If that were a true value, then the Defendants must have been seeking to defraud Guinea Customs by under-declaring the value of the goods, which hardly reflects to their credit. However, in view of the other evidence, I consider it much more likely that they were over-insuring the goods with a view to pursuing precisely the sort of false claims which they have. This seems to me to be borne out by the fact that, according to their own Particulars of Claim in Hong Kong, the sum insured was increased to U.S.$171,600  (from U.S. $ 154,440) by an endorsement dated 8th September 1999, two days after the goods had been found to be stolen.

32.    Accordingly, I consider that the Claimants have established that the First and/or
Second and/or Fifth Defendants removed the goods from the container prior to the
second survey on 6th September 1999 and that the claims which they have pursued
against the Claimants and/or Maersk Guinea are fraudulent claims. In those
circumstances, their claim in deceit is made out, the relevant false representations
being, as Mr Diwan submitted, that the goods had been stolen and that they had
thereby suffered losses of US$174,440, those representations having been repeated
by the pursuit of the claims in Hong Kong and Guinea. It seems to me that to the
extent that the Claimants have incurred costs and expenses in investigating and
defending those claims, they are entitled to recover those as damages for deceit. If
support were needed for that proposition it can be found to an extent in the
judgment of Mr Justice Clarke in *Svendborg-v-Wansa* [1996] 2 Lloyd's Rep. 559
at 568 lhc, recognising (albeit only on the basis of a good arguable case for
interlocutory purposes) the recoverability of costs and expenses incurred in foreign
proceedings as damages for deceit, in circumstances very similar to those of the
present case. Furthermore, I consider that the Claimants are also entitled to the
declaration they seek that the claim by the First and/or Second and/or Fifth
Defendants for alleged non-delivery of the goods is false and fraudulent.

**The claim for breach of the contract of carriage**

33.    The alternative claims for damages for breach of clauses 3 and 27 of the contract
of carriage contained in the bill of lading can be dealt with more shortly. An initial
question arose as to whether the Claimants could establish that the First and/or
Second Defendants and/or the Fifth Defendant, given that the Fifth Defendant
trades in the name of the Second Defendant, were parties to the contract of
carriage contained in or evidenced by the bill of lading and, hence, bound by its
terms, given that the reverse of the bill (which would show whether or not it was
endorsed to the First and/or Second Defendant, named on the face as Notify Party)
is not available. I consider that the Court can properly infer that the First and/or
Second Defendants were indeed endorsees of the bill and hence parties to the
contract it contains and bound by its terms (a) from the fact that in the in rem
proceedings in Hong Kong the Defendants positively assert that they were
consignees and/or holders and/or endorsees of the bill of lading; (b) from the
internal Maersk computerised instruction dated 9th August 1999 which states that:
"..*full sets of abv mentioned obls* [which appears to mean 'original bills of lading']
*hv been surrendered to our office and a written confirmation has been received to
deliver cargo to cnee* [consignee] *LAMTEX (MR ALY HOSSEN AKAR) without
presentation of abv obls"*. This suggests that the bank had released the bill of
lading and endorsed it to the First and/or Second Defendants; (c) the surrounding
circumstances generally including the fact that in relation to the second claim the
bill of lading was endorsed to the Third and/or Fourth Defendant.

34.    In the circumstances, it is strictly unnecessary to consider the Claimants'
alternative case that the effect of the instruction referred to in paragraph 33 (b)
above was that there was an attornment to the First and/or Second Defendants and
hence as the party or parties entitled to immediate possession of the goods they
were bound by the terms of the bailment to the Claimants, which terms were of

course the terms of the bill of lading. However, I do consider that if it were necessary for the Claimants to rely upon bailment alone rather than contract, the First and/or Second Defendants would have been bound by the terms of the bill of lading as the terms of the bailment, on the principle recently reiterated by the Court of Appeal in *East West Corporation-v-A/S D/S Svendborg* [2003] EWCA Civ. 83; [2003] 1 Lloyd's Rep 239 (see per Lord Justice Mance at paragraph 69).

35.    Clauses 3 and 27 of the Maersk bill of lading terms provide, so far as relevant, as follows:

"*3.    Sub-Contracting*

...

*The Merchant undertakes that no claims or allegations shall be made against any servant, agent, stevedore or sub-contractor of the Carrier which imposes or attempts to impose upon any of them or any vessel owned or chartered by any of them any liability whatsoever in connection with the goods, and, if any such claim or allegation should nevertheless be made to indemnify the Carrier against all consequences thereof...*

*27.    Law and Jurisdiction*

*Whenever the Carriage of Goods by Sea Act (COGSA) of the United States of America applies whether by virtue of clause 5.2 or otherwise, this contract is to be governed by United States law, and the United States Federal Court of the Southern District of New York is to have exclusive jurisdiction to hear all disputes hereunder, including any disputes relating to freight or other sums payable to the Carrier for carriage to or from the USA. In all other cases, this Bill of Lading is subject to English law and jurisdiction.*"

36.    I will consider the claim for breach of clause 27 first. No question arises of the application of US COGSA and accordingly, the contract of carriage is subject to English law and jurisdiction. Furthermore, there is no doubt that this clause is an exclusive jurisdiction and law clause. This was determined by the Court of Appeal in *Svendborg-v-Wansa* [1997] 2 Lloyd's Rep 183, where, in considering precisely the same clause, Lord Justice Staughton said (at p 186 rhc):

"I conclude that the clause does confer exclusive jurisdiction on the English courts. My reasons are in substance, first those which I stated in *Sohio Supply Co. v. Gatoil (USA) Inc* [1989] 1 Lloyd's Rep 588 at pp 591-592, and in particular that I could think of no reason why businessmen should choose to go to the trouble of saying that the English courts should have non-exclusive jurisdiction. My second reason is that the parties in the second part of the clause were plainly saying that English law was to be mandatory if the American Carriage

> of Goods by Sea Act did not apply; it seems to me that they must have
> intended English *jurisdiction* likewise to be mandatory in that event."

37.    Accordingly, there can be no doubt that in commencing and pursuing the
proceedings in Hong Kong and Guinea the First and/or Second and/or Fifth
Defendants are in breach of that exclusive jurisdiction clause. In consequence of
that breach, the Claimants have suffered loss and damage consisting of the legal
fees and other expenses they have incurred in investigating and defending those
proceedings. Any doubts there might have been as to the recoverability of costs in
foreign proceedings taken in breach of an exclusive jurisdiction clause as damages
for that breach have been laid to rest by the recent decision of the Court of Appeal
in *Union Discount-v-Zoller* [2001] EWCA Civ. 1755; [2002] 1 WLR 1517. That
case confirms the principle that the claimant is entitled to recover its reasonable
expenses of litigating at the instigation of the defendant in the jurisdiction which
the defendant has chosen in breach of an exclusive jurisdiction clause (see
paragraph 34 of the judgment). It does not seem to me that the application of that
principle is dependent upon the claimant showing that the relevant expenses are
irrecoverable in the foreign proceedings and, in any event, in the present case they
have not been recovered in the foreign proceedings and Mr Diwan confirmed that
if his clients recovered damages and an indemnity in these proceedings, they
would not seek to recover sums twice over in Hong Kong or Guinea.

38.    In the circumstances, I consider that the Claimants are entitled to recover from the
First and/or Second and/or Fifth Defendants the costs and expenses they have
incurred as damages for breach of clause 27. I will deal separately with the
quantum of those damages below. Furthermore, to the extent necessary, I conclude
that in commencing and pursuing the proceedings in Guinea against Maersk
Guinee, the Claimants' agents, these Defendants were in breach of clause 3 and
the Claimants are entitled to recover the costs and expenses they have incurred as
damages for breach of that provision. Given the continuing breaches of clauses 3
and 27, I also consider that they are entitled to the indemnity they seek in respect
of future costs and expenses incurred in the proceedings in Hong Kong and
Guinea.

**The second claim**

39.    I can deal with the facts of the second claim more briefly. The bill of lading in
respect of the second claim was dated Mumbai 17th February 2001 and evidenced
the shipment on the Claimants' vessel MAERSK TOYAMA at the Jawal Nehru
Port Terminal at Mumbai on that day of a container JHTE 210939 said by the
shipper to contain 182 bales of printed cotton textiles in apparent good order and
condition for carriage to Conakry. In the bill of lading, the container was
consigned to order. The notify party was the Third Defendant. As appears from the
reverse of the bill, it was endorsed in due course to the Third and/or Fourth
Defendants who thus became parties to the contract of carriage contained in the
bill and were bound by its terms.

40.    The container was transhipped onto the SAFMARINE ITALIA at Algeciras. At
Algeciras, in accordance with the practice referred to at Paragraph 8 above, the

Approved Judgment

container was opened and inspected by SGS on 5th March 2001. Their findings from their inspection together with information provided by or on behalf of the Third and/or Fourth Defendants are reflected in the Bordereau de Taxation dated 12th April 2001 produced to Guinea Customs. This identifies the shipper as Benex, as in the case of the first claim. The importer is identified as the Fourth Defendant. The FOB value of the goods (presumably derived from an invoice or other information produced by or on behalf of the Third and/or Fourth Defendants) is stated as 72,992 French Francs equivalent to about US\$ 10,000.

41.    The vessel carrying the container arrived in Conakry on 10th April 2001. According to Mr Nielsen's evidence, on 12th April 2001 (which was the Thursday before the Easter break), the same transit agent as in the case of the first claim, Mr Oumar, presented an original bill of lading for the container to the documentation staff of Maersk Guinee. According to Mr Nielsen, Mr Oumar did not demand delivery of the container at that time but only on the Tuesday after Easter, 17th April 2001, which is said to be evidenced by the delivery order on the Maersk Guinee form dated 17th April 2001.

42.    However, according to a "Exploit de Sommation" or Formal Demand for the release of a container issued on the same day, 17th April 2001, by the Huissier de Justice in Conakry at the behest of the Fourth Defendants, the Claimants were purporting to exercise some sort of lien over the container for sums due from a third party said to have no connection with the Fourth Defendants (subsequently alleged by the Third and/or Fourth Defendants in the Writ issued on 25th April 2001 referred to below to have been the Second Defendants). This Formal Demand alleged that the five day delay in delivery of the goods from 12th April 2001 to 17th April 2001 had caused the Fourth Defendants serious financial prejudice, assessed at not less than 5 million Guinea Francs (equivalent to about US\$2,500) a day. The Formal Demand required the Claimants to pay 25 million Guinea Francs, failing which legal proceedings would be issued. In view of the declared value of the goods of about US\$ 10,000 and the fact that the alleged detention took place over the Easter holiday, the contention that the Fourth Defendants had suffered financial prejudice in that short period in excess of the value of the goods is, to say the least, surprising.

43.    On 25th April 2001, the Third and/or Fourth Defendants issued a Writ of Summons against the Claimants for the payment of damages in the First Instance Court in Conakry. That document seeks to hold the Claimants liable in respect of the alleged five day in delivery for damages allegedly suffered of 150 million Guinea Francs, equivalent to something like US\$75,000. The amount of the alleged financial prejudice set out in the Formal Demand eight days earlier may have been surprising, but the allegation of damage incurred in just five days of some seven and a half times the value of the goods is staggering. It is fair to say that Mr Nielsen does not deal expressly in his statement with the allegation that the Claimants were exercising a lien on this container in respect of sums due from the Second Defendants and for my part I am not convinced that the delivery order shows that the Third and/or Fourth Defendants or their transit agent did not demand delivery until 17th April 2001 as opposed to that it was on that date that the Claimants issued a delivery order to release the cargo.

Approved Judgment

44.    For the purposes of the present judgment I do not have to decide whether or not the claim made by the Third and/or Fourth Defendants in these proceedings in Guinea is a genuine one, but only whether or not in bringing claim those Defendants were in breach of the exclusive jurisdiction clause in clause 27 of the bill of lading terms.   Nonetheless, if it were necessary to decide the point, irrespective of whether or not the Claimants were responsible for the five day delay in delivery, it seems to me that the size of the alleged claim is unjustifiable. However, given that there is no plea that the claim is fraudulent, I do not need to say any more than that there cannot be any doubt that by bringing this claim in Guinea, the Third and/or Fourth Defendants were in breach of clause 27.

Quantum of the claim

45.    The Claimants produced a schedule attached to Mr Nielsen's statement of losses consisting of legal and investigative fees and other expenses, together with supporting documentation. I am satisfied that on the basis of that material and Mr Nielsen's statement, the Claimants have established that they have suffered a loss currently quantified at US$ 130,941.48. Although prior to the trial, it was thought by the Claimants that this sum represented expenses incurred in respect of both claims, on closer analysis at the hearing, it emerged that this sum in fact relates only to the first claim. No separate current expenses relate to the second claim which has not been pursued further by the Third and/or Fourth Defendants since the Writ was issued in Guinea on 25th April 2001. As matters currently stand therefore, the Claimants are not claiming damages in respect of the second claim but just an indemnity.

Interest and costs

46.    The Claimants produced a schedule at trial of interest on the damages claimed under the first claim of US$ 130,941.48. The interest has been calculated for the periods since particular items of claim were expended at 1% over LIBOR. The total interest is US$ 7,414.73. I am satisfied that the Claimants are entitled to that interest.

47.    The Claimants also produced a schedule of costs of the present proceedings totalling £158,898.40 and asked the Court to assess those costs summarily in accordance with the practice for hearings of one day or less under the CPR. In assessing the costs, I noted that the hourly rates charged by the Claimants' solicitors were lower than the applicable guideline rates. I was told that this was because of a special fee arrangement with the Claimants. In considering the reasonableness of the costs claimed, I also bore in mind, as Mr Diwan invited me to, that (at least in relation to the first claim to which the bulk of the costs related) it was a case of fraud in which indemnity costs would almost certainly have been ordered in the Claimants' favour had they succeeded at a contested trial. Doing the best I can and recognising that there is an element here of the 'blunt instrument', I award the Claimants £140,000 costs.

### Conclusion

48.    Accordingly, I adjudge as follows:

In relation to the first claim, the Claimants are entitled to the following relief:

(1) A declaration that the claim by the First and/or Second and/or Fifth Defendants for alleged non-delivery of the goods is false and fraudulent;

(2) Damages against the First and/or Second and/or Fifth Defendants for deceit and/or breach of contract and/or bailment in the sum of US$130,941.48, together with interest thereon of US$ 7,414.73;

(3) A declaration that the Claimants are entitled to an indemnity from the First and/or Second and/or Fifth Defendants in respect of any future costs and expenses incurred as a consequence of the proceedings commenced by those Defendants in Guinea and Hong Kong.

In relation to the second claim, the Claimants are entitled to a declaration that they are entitled to an indemnity from the Third and/or Fourth Defendants against any costs and expenses already incurred and any future costs and expenses incurred hereafter as a consequence of the proceedings commenced by those Defendants in Guinea in breach of contract.

The Defendants are also liable to pay the Claimants' costs in the sum of £140,000. No attempt appears to have been made to apportion liability in respect of the two claims, but it seems to me that the preponderance of the costs clearly relate to the first claim. Accordingly, I adjudge that £110,000 of this figure is to be paid by the First and/or Second and/or Fifth Defendants and £30,000 by the Third and/or Fourth Defendants.

*Exhibit D*

Requested Document: Case Law                                    Page 1 of 2

     print   save   email                     go back

[Full Text] - Judgment Official

**UNION DISCOUNT CO LTD (Appellant) v ROBERT ZOLLER & ORS (Respondents/Part 20 Claimants) & UNION CAL LTD (Part 20 Defendants) (2001)**

[2001] EWCA Civ 1755

**CA (Civ Div) (Lord Phillips of Worth Matravers MR, Schiemann LJ, May LJ) 21/11/2001**

CONTRACTS - CIVIL PROCEDURE - COSTS - INTERNATIONAL LAW

COSTS INCURRED IN FOREIGN PROCEEDINGS : EXCLUSIVE JURISDICTION CLAUSES : BREACH OF CONTRACT : RECOVERY IN ENGLISH ACTION : POLICY REASONS : COMITY : RES JUDICATA : UNITY OF THE LAW

**There was no rule of law that costs incurred in foreign proceedings could not be recovered in an English action between the same parties where a separate cause of action existed in relation to those costs.**

Claimant's ('Union') appeal from an order of HH Judge Peter Heppel QC, sitting as a judge of the High Court, by which he struck out that part of its claim that sought to recover costs incurred by Union in proceedings against the defendants ('Zoller') in New York. Union and Zoller were parties to a series of contracts, each of which contained an English jurisdiction clause ('the EJC'). In 2001 Union commenced proceedings in England against Zoller for sums due under the contracts. Zoller issued proceedings in New York. Union successfully applied to strike out those proceedings as being in breach of the EJC. It was common ground that Union did not ask the New York court for its costs of that application since under the law of New York they were not recoverable. Union subsequently added a new claim ('the costs claim') to these proceedings, in which they sought to recover the costs of the New York proceedings as damages for breach of contract. The judge, relying upon the decision of Robert Goff J in The Ocean Dynamic (1982) 2 Lloyd's Rep 88, held that such costs were irrecoverable as a matter of law and accordingly struck out the costs claim.

HELD: (1) Ocean (supra) was distinguishable on the ground that Robert Goff J had not been considering a case in which, as here, the claimants had available to them a free-standing cause of action entitling them to recover the costs as damages for breach of an express term of the contract. Absent such a separate cause of action, it was undoubtedly the case that the costs of foreign proceedings could not be recovered in separate proceedings in England. (2) There were no policy reasons why Union should not be entitled to pursue its separate cause of action. In particular: (i) international comity would not be breached by permitting such recovery; (ii) there was no issue of res judicata because there was an independent cause of action and there had been no adjudication by the New York court; (iii) the principle in Henderson v Henderson (1843) 3 Hare 100 was manifestly inapplicable to the facts of the present case; and (iv) the mere fact that English courts had for many years proceeded on the presumption that such costs were not recoverable was no reason for permitting one party to a contract to escape liability for damages that he had caused by attempting to sue in a country where a different costs regime prevailed.

Requested Document: Case Law                                    Page 2 of 2

Appeal allowed.

* The petition of Robert Rice Zoller, Hans Maissen, Peter Anthony Atwood, Joseph Edward Fleming, Frederick August Lobatto, Jonathan Lobatto, Roderick Alasdair Steedman and Nancy Irene Steedman seeking leave to appeal to the House of Lords in this case was presented and referred to an Appeal Committee on 8 January 2002 for consideration.

* On 14 February 2002 upon application by Zoller and Ors it was ordered that the petition be withdrawn.

Guy Phillips instructed by Denton Wilde Sapte for Union. Mark Hubbard instructed by Haravys for the respondent.

**LTL 21/11/2001 : (2002) 1 WLR 1517 : (2002) 1 All ER 693 : Times, December 10, 2001 : Independent, November 29, 2001**

**Document No. AC0102218**

[Summary details of counsel] [Cases citing this case] [Articles citing this case]

Sweet & Maxwell is a member of The Thomson Corporation © 1998 - 2005
Reproduction of material is in accordance with Lawtel's Terms & Conditions

Neutral Citation Number: [2001] EWCA Civ 1755

IN THE SUPREME COURT OF JUDICATURE

COURT OF APPEAL (CIVIL DIVISION)

ON APPEAL FROM HH JUDGE HEPPEL Q.C.

Sitting as a Judge of the High Court

Case No: A2/2001/0944

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 21st, November 2001

B e f o r e :

LORD PHILLIPS M.R.
LORD JUSTICE SCHIEMANN
and
LORD JUSTICE MAY

- - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| UNION DISCOUNT COMPANY LTD. | Appellant |
| - and - | |
| ROBERT ZOLLER & ORS. | Respondent & part 20 Claimants |
| | |
| -and- | Respondent & Part 20 Claimants |
| UNION CAL LTD. | |

- - - - - - - - - - - - - - - - - - - -

(Transcript of the Handed Down Judgment of
Smith Bernal Reporting Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7421 4040, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

- - - - - - - - - - - - - - - - - - - - -

Guy Philipps (instructed by Denton Wilde Sapte for the Appellant)
Mark Hubbard (instructed by Harkavys for the Respondent)

- - - - - - - - - - - - - - - - - - - - -

# Judgment
## As Approved by the Court

Crown Copyright ©

Lord Justice SCHIEMANN:

1.  This is the judgement of the Court. It concerns the correctness of the Statement in Halsbury's Laws of England 4th Ed Reissue Vol. 12(1) (1988) Damages, Para 828 "Costs incurred in foreign proceedings cannot be recovered in an English action between the same parties". For this proposition the learned editors cite The Ocean Dynamic [1982] 2 Lloyd's Rep 88, a decision of Robert Goff J..

2.  Union Cal Limited ("Union Cal") entered into contracts with Robert Zoller & others to whom we shall refer collectively as Zoller. Each contract contained an Exclusive Jurisdiction Clause ("EJC") nominating England.

3.  For present purposes the complicated procedural position can be summarised as follows. Union Cal claimed that money was owing under the contract and sued Zoller in England. Zoller issued proceedings against Union Cal in New York. Union Cal successfully applied in the New York court to strike out the New York proceedings against it on the ground that, by reason of the EJC, the New York court had no jurisdiction. Thereafter Zoller served a defence and counterclaim in the English proceedings alleging misrepresentation by Union Cal. Union Cal raised a new claim ("the costs claim") in the English proceedings against Zoller. This claim was struck out by HH Judge Peter Heppel Q.C. sitting as a judge of the High Court. Union Cal, with the judge's permission, appeal the correctness of that striking out of the costs claim.

4.  The costs claim concerned Union Cal's costs incurred in the striking out proceedings in New York. In those proceedings Union Cal did not ask the New York court to award it costs because under the law of New York costs would not have been awarded in such circumstances. For the purposes of the proceedings before HHJ Peter Heppel, Zoller conceded that there were real prospects of Union Cal establishing at trial that

    1.  the EJC was effective as a contractual term breach of which sounds in damages

    2.  by issuing the US proceedings Zoller breached their contracts with Union Cal.

5.  Were this aspect of the case to proceed to trial the defendants would argue:

    1.  that the exclusive jurisdiction clause was not binding on them by reason of the provisions of the Unfair Terms in Consumer Contracts Regulations 1994,

    2.  that upon its true construction the clause did not prohibit the defendants from proceeding in the USA,

    3.  that Union Cal could have applied for and obtained an order for costs before the New York Court, and

4.    points regarding causation and mitigation of damage.

6.    The Judge below, having considered <u>The Ocean Dynamic</u> [1982] 2 Lloyd's Rep 88, <u>Walshaw v Brighouse Corporation</u> [1899] 2 Q.B. 286, <u>Berry v BTC</u> [1962]1 Q.B. 306, <u>Lonrho Plc v Fayed (No 5)</u> [1993] 1 W.L.R. 1489 and <u>Donohue v Armco Inc and others</u> [2000] Lloyd's Rep. 579 held as follows

"... no proceedings may be brought before a civil court in England to recover costs incurred by a party successfully prosecuting or defending an action in the foreign court."

7.    The written submissions, outstandingly well formulated on behalf of the appellant by Guy Phillipps, correctly identify the issue in the present appeal as follows:

"whether the defendants are right to assert (in para. 14 of the Defence to Counterclaim) that:

As a matter of law the costs of litigation can not be recovered as damages for breach of contract by one party to the said litigation against another

or whether the true principle of law is, as Union Cal asserts (in para. 12 of the Amended Reply to Defence to Counterclaim) that:

"The costs of prior proceedings between the same parties may be recovered as damages for breach of contract if (as in the present case) the party seeking to recover the costs of the prior proceedings as damages could not in the circumstances of the prior proceedings have obtained an order for the payment of those costs as costs"

8.    The appellant submits and the respondents accept that if the rule is as stated by the judge then this must be because of policy considerations. The judge proceeded on this basis but failed to identify the policy considerations in play in the present case apart from making reference to the cases to which we have already referred. The appellant submits that those cases do not identify any policy consideration which is applicable to the present case.

9.    The leading decision in this court is <u>Berry</u>. That had no foreign element. It concerned the recoverability, in civil proceedings for malicious prosecution, of costs incurred in criminal proceedings by the claimant who had been unsuccessfully prosecuted but who had been awarded some of her costs but who had not been awarded her remaining costs. This Court held she could recover the remaining costs as damages. Its approach was, first, to recognise that in subsequent civil proceedings there are policy reasons which in some cases inhibit recovery as damages of all the costs reasonably incurred in prior civil proceedings, and, then, to hold that there was no policy reason in an action for malicious prosecution for extending to costs in prior criminal proceedings the rule which applied to prior civil proceedings. That is how it came about that there was a lengthy and considered judgment by Devlin LJ (with

whom Ormerod and Danckwerts LJJ in their judgments agreed) about the reason for and nature of the rule in relation to prior civil proceedings.

10.    The reasoning process of Devlin LJ appears from the following passages

(i) "[Quartz Hill Consolidated Gold Mining Co. v Eyre (11 Q.B.D. 674] was a case in which the defendant presented a petition to wind up the plaintiff company. It was never served on the company and the defendant gave notice that he was withdrawing it, but the company nevertheless appeared to ask for its dismissal. It was dismissed by Hall V.C. without costs; I have no doubt that my brother Danckwerts was right when he said in the course of the argument, after looking at the report of the case in the Weekly Notes, that the reason why the plaintiff company was given no costs was because their appearance was considered to be unnecessary. The company brought an action for malicious prosecution and the damage they alleged was the expenditure of costs incurred in opposing the petition which they estimated at £30. The Court of Appeal held that the damage was not recoverable. Brett M.R. said: "The theory is that the costs which the losing party is bound to pay, are all that were necessarily incurred by the successful party in the litigation, and that it is right to compel him to pay those costs because they have been caused by his unjust litigation; but that those which are called "extra costs", not being necessarily incurred by the successful party in order to maintain his case, are not incurred by reason of the unjust litigation." Bowen L.J. said : "... the only costs which the law recognises, and for which it will compensate him, are the costs properly incurred in the action itself. If the judge refuses to give him costs, it is because he does not deserve them; if he deserves them, he will get them in the ordinary action; if he does not deserve them, he ought not to get them in a subsequent action." (p.319)

(ii) The rule is not easy to apply with justice because it embodies a presumption, which the law finds it convenient and maybe necessary to make; but which it has to, and does in other contexts, admit not to be in accordance with fact. (p.320)

(iii) The reason for the rule is not that the costs incurred in excess of the party and party allowance are deemed to be unreasonable; it is that what is presumed to be the same question cannot be gone into twice. The rule appears to have been first laid down by Mansfield C.J. in Hathaway v Barrow (1807) 1 Camp. 151 where he put it on the ground that "it would be incongruous to allow a person one sum as costs in one court, and a different sum for the same costs in another court. *If in the earlier case there has been no adjudication upon costs (as distinct from an adjudication that there shall be no order as to costs), a party may recover all his costs assessed on the reasonable, and not on the necessary, basis. If a party has failed to apply for costs which he would have got if he had asked for them, a subsequent claim for damages may be defeated; but that would be because in such a case his loss would be held to be due to his own fault or*

*omission. In any case in which the legal process does not permit an adjudication, the rule does not apply.*[Our emphasis]

(iv) ... if as the result of a breach of contract – see <u>Agius v Great Western Colliery Co. Ltd.</u> [1899] 1 Q.B. 413 – or a tort – see <u>The Solway Prince</u> (1914) 31 T.L.R. 56 – a person brings unsuccessfully an action against a third party or loses an action brought by a third party, he may recover against the wrongdoer who has brought his contract or committed the tort the costs of the suit; and he will get all the costs he has reasonably expended. The wrongdoer may not argue that the plaintiff is entitled only to party and party costs, notwithstanding that that is all he could or would have got from the third party if he had been successful. Thus the reason for the rule is that the law cannot permit a double adjudication upon the same point. It would be a rational rule and in accordance with the ordinary principle as to res judicata if in truth it were the same point. But it is not. (p.321)

(v) I find it difficult to see why the law should not now recognise one standard of costs as between litigants and another when those costs form a legitimate item of damage *in a separate cause of action flowing from a different and additional wrong.* [Our emphasis] ... The stringent standards that prevail in a taxation of party and party costs can be justified ... It helps to keep down extravagance in litigation and that is a benefit to all those who have to resort to the law. But the person who ought to be able to share in that benefit is the man who ex hypothesi is abusing the legal process for his own malicious ends. (p. 322) ...

(vi) If the matter were res integra, I should for myself prefer to see the abandonment of the fiction that taxed costs are the same as costs reasonably incurred and its replacement by a statement of principle that the law for reasons which it considers to be in the public interest requires a litigant to exercise a greater austerity than it exacts in the ordinary way, and which it will not relax *unless the litigant can show some additional ground for reimbursement over and above the bare fact that he has been    successful.* [Our emphasis] Without a restatement of that sort, there is undoubtedly a practical need for the rule in civil cases. Otherwise, every successful plaintiff might bring an action against the same defendant in order to recover from him as damages resulting from his original wrongdoing the costs he had failed to obtain upon taxation. ... I have not inquired into the reason for the rule because I think it open to us to reject it but because we are asked to extend it. The question is whether it should be extended to costs in criminal cases as well as costs in civil cases. (p.323)

11.    From the passages which we have emphasised it is clear that Devlin LJ considered that, in a case such as the present where there was in the earlier action no prospect of obtaining costs although there had been no fault on behalf of the successful party, there was no policy inhibition on granting him the amount of those costs as damages in a later action if he had available to him an appropriate cause of action.

12.    Further, Devlin LJ was clearly unhappy with the reasoning which had led to the rule in English civil cases even where it did apply. In our judgment, just as a malicious prosecutor should not be able to rely for his own benefit on any policy consideration which is designed to keep down the cost of litigation, so a person who starts totally unnecessary proceedings in a foreign jurisdiction in breach of an EJC should not be able to rely on such policy considerations.

13.    There is nothing in Berry which supports the view that there are policy considerations which dictate that Union Cal should be kept out of its normal award of damages.

14.    The leading case at first instance upon which the judge below relied is a decision of Goff J : The Ocean Dynamic. In the judgement Berry is not referred to. The Ocean Dynamic is apparently the only reported case in which a litigant in US proceedings has sought to recover its costs of those proceedings as damages in subsequent English proceedings. The facts of that case were very different from the facts here. The claimant commenced proceedings in England against the defendant, a US company carrying on business in Wisconsin, alleging breach of a contract of carriage by sea. The defendant disputed the jurisdiction of the English court. The claimant therefore issued a protective writ in Wisconsin. The defendant's challenge to the jurisdiction of the English Court was then dismissed. The claimant undertook to the English court to discontinue the US proceedings, which it did. The claimant then sought in the English proceedings to recover as damages for breach of the contract of carriage its costs of the abortive US proceedings in the sum of $4168.45.

15.    At the end of his unreserved judgment following the trial of the action, Robert Goff J. dismissed that minor head of claim in the following terms:

> "[The United States] proceedings were between the parties to the present action in respect of the same claim. As such, the general principle is that they [sc. the costs] cannot be recovered as damages, but can only be recovered if an order for costs was made by the appropriate Court. Indeed, there is no evidence that if the United States action had been pursued to judgment, the relevant Court would have made any order for costs in favour of the plaintiffs recovering these particular costs, and bearing in mind the practice in the Courts of that country, I certainly cannot infer that this would have been done. The plaintiffs' submission involves therefore the bizarre consequence that, having discontinued the United State proceedings, they should now be able to recover as damages costs which they would not have been awarded in the United States action if they had won it. This plainly cannot be right. I therefore reject that head of damages."

16.    Mr Phillipps does not contend that the result reached by Goff J is in any way to be criticised. He submits, and we accept, that the result was right because the costs sought to be recovered by the claimant were in no sense caused by the defendant's breach of the contract of carriage. Rather they flowed from the claimant's own decision to issue a protective Writ in the U.S.A..

17. Mr Phillipps submitted and we accept that Robert Goff J. was not considering a case in which -- as here -- the plaintiffs had available to them a free-standing cause of action entitling them to seek to recover their costs as damages. His statement of the "general principle" that "costs cannot be recovered as damages" must be read in that light. Absent a separate cause of action, there is no doubt that costs, even if irrecoverable under the procedural rules of the foreign court, cannot be recovered as damages in separate proceedings in England. The claimant has suffered damnum sine injuria.

18. It is important to emphasise that in the present case the following unusual features are all present :

   i)    The costs which the claimant seeks to recover in the English proceedings were incurred by him when he was a defendant in foreign proceedings brought by the defendant in the English proceedings.

   ii)   The claimant in the foreign proceedings brought those proceedings in breach of an express term, the EJC, which, it is assumed for present purposes, has the effect of entitling the English claimant to damages for its breach.

   iii)  The rules of the foreign forum only permitted recovery of costs in exceptional circumstances.

   iv)   The foreign court made no adjudication as to costs.

19. It is common ground that there is no binding authority which inhibits us from granting Union Cal relief in damages in the present case. That relief is predicated on the assumption, not in issue before us, that the bringing of the New York proceedings itself constituted a breach of contract which has resulted in damages which are prima facie recoverable. Thus it is common ground that the action should not have been struck out unless there are policy reasons which prevent the recovery of these damages.

20. Mark Hubbard, appearing for Zoller, put forward the following policy reasons which he submitted justified the conclusion of the judge.

21. <u>The Comity Argument</u>. He submitted that the rules of comity prevented the recovery of costs of civil proceedings in foreign jurisdictions as damages for breach of contract. The argument went as follows. Costs rules and practices in a state's jurisdiction are a matter for the state in question. One can advance policy arguments in favour of an approach, such as that which prevails in this country, that in general the successful party recovers his costs. Equally one can advance policy arguments in favour of an approach such as that which prevails in New York that in general each side pays its own costs. It would breach international comity if we sought indirectly to apply our approach to litigation which had taken place in the foreign country.

22.  We accept that policy arguments can be made in favour of either approach but we reject the notion that by allowing a party in the position of Union Cal to recover these costs we would be breaching international comity. Comity is, as the editors of the 13th edition of Dicey and Morris on Conflict of Laws point out in paragraph 1-010, a term of very elastic content. Suppose the situation were reversed. A party from a jurisdiction which had an indemnity approach to costs more generous than our own is sued here in breach of an EJC. He persuades the English courts that we had no jurisdiction. He asks for costs but only recovers, let us say, a small amount of costs because our courts thought a larger amount was disproportionate to the amount at stake. He then sues for the difference in the jurisdiction named in the EJC and recovers the difference. We can not think that such a happening would be the cause of the slightest concern to this country or its courts if indeed it ever came to their attention.

23.  There is in these cases no reason of comity why our courts should enforce a foreign jurisdiction's policy perception in preference to our own nor why they should enforce ours in preference to theirs.

24.  If, as <u>Berry</u> demonstrates, an English civil court is prepared to give as damages in tort costs which have been refused by an English criminal court, we see no reason based on comity which would prevent an English civil court from giving as damages costs which a foreign court has not awarded. We would not expect to show a foreign court more comity than we show our own.

25.  <u>The res judicata argument.</u> The courts manifestly should avoid two adjudications on the same point. That is common ground. However in cases such as the present where there is assumed to be an independent cause of action then, as Devlin L.J. points out in the fourth passage we cite from <u>Berry</u> in paragraph 10, what is being adjudicated upon on the second occasion is not the same point.

26.  In the present case there is the additional point that in fact there was no adjudication upon costs in the New York court and so res judicata does not arise.

27.  <u>The Henderson v. Henderson point</u>. This founds on the well known passage in that case in the Vice-Chancellor's judgement in that case where he said

> "... where a given matter becomes the subject of litigation in, and of adjudication by, a Court of competent jurisdiction, the Court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have ... omitted part of their case." (p.319)

28.  We accept of course that it is important that there should be an end to litigation but that principle has no sensible application to the present case. Since it was Union Cal's contention that the New York courts had no jurisdiction to consider breaches of the contract between

Zoller and Union Cal, the latter could not in New York bring an action for damages caused to Union Cal by the bringing of the action in New York. If it wished to advance that contention it had to do so in England. The principle in <u>Henderson v Henderson</u> is manifestly inapplicable.

29.    <u>The Unity of the Law point</u>. Mr Hubbard, submitted that since the English courts have for years proceeded on the presumption referred to in the second of the quotations cited in paragraph 10 to the effect that the litigant who won the earlier proceedings will have got such costs as the law considers he deserves, the same presumption ought to apply whether those earlier proceedings were abroad or here. The law there referred to, it was implicit in his submissions, was the law of the courts in which the earlier proceedings were litigated. He submitted that either the general presumption should be abandoned or it should be kept and universally applied.

30.    While in some ways an attractive proposition, it falls at first base because it was ruled in <u>Berry</u> by this court that it should not apply in malicious prosecution cases. Therefore the unity of the law after which he strives is not available – in any event in this court.

31.    EJCs arise because the parties agree to litigate in one jurisdiction. It may be that one of the considerations which led to the adoption of the EJC in question was the costs regime in the nominated jurisdiction. We see no policy reason <u>connected with either party</u> for allowing one party to the contract to escape from liability for the damages which he has caused to the other by attempting to sue in a country where a different costs regime prevails.

32.    There remains the question whether there is a policy reason <u>for the benefit of society at large</u> which argues in favour of applying the usual rule in cases where the costs sought to be recovered as damages represent the cost of litigation abroad in breach of an EJC. In the present case we can see none unless it be a desire to keep down litigation purely involving costs – often referred to as parasitic litigation. A rationale behind the reluctance to facilitate parasitic litigation is that the state's legal resources should be devoted to central rather than parasitic questions. While this seems attractive, one must note that the amount of costs (or damages in the form of costs) at stake can be very much more than many a sum which otherwise is allowed to be recovered as damages.

33.    <u>The availability of an anti-suit injunction</u>. Mr Hubbard submitted correctly that Union Cal had the option of obtaining an anti-suit injunction in England. The fact that they did not do this but instead chose to apply to strike out the New York proceedings was a tactical decision no doubt motivated, he submitted, by the desire not to expose themselves to a costs order should they fail in the strike out application. This in substance is an argument that Union Cal should have mitigated their damages by trying to obtain an anti-suit injunction. Even if this submission be correct, which we do not have to decide and do not decide, it goes to quantum not to the principle as to whether any damages are recoverable. We confess that it seems to us unattractive for the New York claimant to submit that the English defendant should not have gone to New York to resist the proceedings which the New York claimant had, as a matter of choice, started there.

Conclusion

34.   In circumstances such as the present we do not consider that the public interest requires that the claimant should be deprived of its reasonable expenses in litigating at the instance of the defendant in a jurisdiction which the defendant chose in breach of an EJC. The proposition quoted in paragraph 1 of this judgment is too widely stated.

35.   Treading cautiously in a field not much explored in recent litigation we do not propose to go further. One can envisage more doubtful cases.

36.   Suppose, for instance, that the costs rules in Australia were broadly the same as those which apply here. Suppose an attempt to litigate there in breach of an EJC which nominated England. Assume successful proceedings there to strike out the Australian litigation. Assume that costs are awarded to the successful defendant but he only recovers two thirds of those costs although the remainder was reasonably incurred. That defendant then sues here asking to be awarded the remaining third as damages for breach of the EJC. Would our public policy prevent him from recovering?

37.   Or suppose an arbitration clause which nominates arbitration in England. One of the parties sues in the High Court. The other obtains a stay and a court order for costs which does not fully recompense him for his costs reasonably incurred.

38.   We prefer to leave such cases for the future. The present case concerns someone who in breach of an EJC litigates in a jurisdiction which save exceptionally does not award costs in strike out proceedings. Hence, no costs are asked for by the party who successfully applied for the strike out. It would have been pointless to do so. In such a case, on the assumption that to bring suit in the foreign jurisdiction amounts to a breach of contract, we consider that justice requires that he should receive the damages which he has suffered by reason of the breach. Those damages will be what he has reasonably expended on the strike out proceedings. The situation appears to us to be akin to malicious prosecution and the same rule as that established in <u>Berry</u> should prevail.

39.   This appeal is allowed.

Order:

1.   Appeal allowed with costs to be forwarded forthwith for detailed assessment.
2.   Leave to appeal to the House of Lords refused.
3.   Order in relation to assessment and costs to be stayed pending presentation and result of petition to House of Lords and if petition is granted stay will continue until hearing before House of Lords, conditional upon £20,000 being paid into court within 28 days.

(Order not part of approved judgment)

*Exhibit E*

# ROBERT GAISFORD

BRAMDEAN, STONEGATE, WADHURST, EAST SUSSEX, TN5 7EP
Phone: 01580 200910   Fax: 01580 201124

FACSIMILE

4 July 2005

To:    Defence Claims Limited
Attn:  Mr Jacek Bielecki
Fax:   01394 459929

To:    Richards Butler
Attn:  Mr Andrew Taylor
Fax:   020 7539 5056

Pages (including this page): 1

## CONFIDENTIALITY NOTICE

THIS FACSIMILE IS CONFIDENTIAL AND IS SOLELY FOR THE NAMED ADDRESSEE. IF YOU ARE NOT
THE ADDRESSEE, PLEASE TELEPHONE ME IMMEDIATELY AND DO NOT READ THE CONTENTS,
COPY IT OR DISCLOSE IT TO ANYONE.

Dear Sirs,

**Re: Hughes Hooker & Co.("HHC"), Hughes Hooker (Correspondents) SA ("HHCSA") and
J.M.Bielecki**
-v-
**American Steamship Owners Mutual Protection & Indemnity Association Inc., and
Shipowners Claims Bureau Inc. ("SCB")**

Thank you for your respective fax messages. I hereby confirm my acceptance of appointment as
sole arbitrator in this matter, my acceptance being on the LMAA Terms (2002).

This appointment is, as I understand it, without prejudice to:
(a)   the Respondents contention that SCB is not a party to the Agreement dated 25 March
      1996 and/or is not therefore a proper party to these proceedings;
(b)   the Respondents' right to challenge:
      (i) the legal existence and status of HHC and HHCSA and the authority of Mr Bielecki
      and/or Defence Claims Ltd to act on behalf of the Claimants and
      (j) the right of Mr Bielecki to claim in his own name in the arbitration.

So as to avoid any misunderstanding, I should be grateful if you would both confirm that my
appointment is on the above basis.

Yours faithfully,

04-Jul-85 18:42

E

*Exhibit F*



**Defence
Claims**
LIMITED

Unit 5, Potkins Lane, Orford, Suffolk, IP12 2SS England
Telephone: + 44 1 394 45 99 30 ❖ Fax: + 44 1 394 45 99 29
Email: defenceclaims@btconnect.com

5 JUL '05 10:49

| To | : | Robert Gaisford Esq., |
| Fax | : | 01580 201124 |
| | | |
| Cc | : | Richards Butler, London |
| Attention | : | Andrew Taylor.    Ref:ADT/RBM/1007255 |
| Fax | : | 020 7539 5056 |
| | | |
| Date | : | Tuesday, 05 July 2005 |

Dear Mr. Gaisford,

Re:  Hughes Hooker & Co., Hughes Hooker (Correspondents) SA and
J.M. Bielecki -v- American Steamship Owners Mutual Protection
& Indemnity Association Inc., and Shipowners Claims Bureau Inc.

Thank you, for your fax of 4th July 2005. We are pleased to confirm your
appointment on the terms set out in your fax.

We will be serving Claim Submissions with supporting documents in the
next few days. We await your invoice for your appointment fee.

Best Regards

Jacek Bielecki
Defence Claims Limited

Defence Claims Limited Company No 4634166

05-Jul-05 10:26A

F

*Exhibit G*



# RICHARDS BUTLER

### INTERNATIONAL LAW FIRM



Beaufort House
15 St Botolph Street
London EC3A 7EE

telephone +44 (0) 20 7247 6555
facsimile +44 (0) 20 7247 5091

e-mail adt@richardsbutler.com
web site www.richardsbutler.com
telex 949494 rblaw g

# FAX

**No of pages (including this page):** 1

6th July 2005

| To: | Robert Gaisford | **fax:** | 01580 201 124 UK | **ref:** | |
| Copy: | Jacek Bielecki Defence Claims Limited | **fax:** | 01394 459 929 UK | **ref:** | |
| from: | Andrew Taylor / Robert Melvin | **fax:** | 020 7539 5056 | **ref:** | ADT/RBM/1007255 |
| tel: | 020 7772 5881 | | | | |

**Hughes Hooker & Co / Hughes Hooker (Correspondents) SA and J M Bielecki v American Steamship Owners Mutual Protection & Indemnity Association Inc. and Shipowners Claims Bureau Inc.**

Thank you for your fax of Monday evening, and we confirm your appointment on the basis set out in your fax.

As to paragraphs 1-3 of Mr Bielecki's fax of Monday evening, we have made our position very clear in previous correspondence, and we await hearing from him as to the status of the Hughes Hooker entities and his authority to act on their behalf. Please can he now make the position on these issues clear.

Regards,

Andrew Taylor / Robert Melvin
Partner / Solicitor
SHIPPING GROUP

---

### LONDON · PARIS · BRUSSELS · PIRAEUS · ATHENS
### ABU DHABI · MUSCAT · HONG KONG · BEIJING · SÃO PAULO

In the event of TRANSMISSION DIFFICULTIES, please telephone **+44 (0) 20 7772 5979.**

This fax is confidential and may be protected by legal privilege. If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

Regulated by the Law Society. A full list of partners and their professional qualifications is available at the above address.

1007255\3359596-1

*Exhibit H*



**Defence Claims LIMITED**

Unit 5, Potkins Lane, Orford, Suffolk, IP12 2SS England
Telephone: + 44 1 394 45 99 30 ❖ Fax: + 44 1 394 45 99 29
Email: defenceclaims@btconnect.com

Richards Butler
Beaufort House,
15, Botolph Street
London, EC3A 7EE
Ref: ADT/RBM/1007255

Cc      Robert Gaisford Esq

Date        :        Thursday, 07 July 2005

Dear Sir,

Re:     <u>Hughes Hooker & Co., Hughes Hooker (Correspondents) SA and
        J.M. Bielecki –v– American Steamship Owners Mutual Protection
        & Indemnity Association Inc., and Shipowners Claims Bureau Inc.</u>

Please find enclosed by way of service the CLAIM SUBMISSIONS in this
matter together with supporting documents.

Kindly acknowledge receipt.

Best Regards

Jacek Bielecki
Defence Claims Limited

Enc.

H

*Exhibit I*



**Defence Claims** LIMITED

Unit 5, Potkins Lane, Orford, Suffolk, IP12 2SS England
Telephone: + 44 1 394 45 99 30 ✆ Fax: + 44 1 394 45 99 29
Email: defenceclaims@btconnect.com

To          :    Robert Gaisford Esq.,
Fax         :    01580 201124

Cc          :    Richards Butler, London
Attention   :    Andrew Taylor.        Ref:ADT/RBM/1007255
Fax         :    020 7539 5056

Date        :    Thursday, 07 July 2005

Dear Mr. Gaisford,

Re:   Hughes Hooker & Co., Hughes Hooker (Correspondents) SA and
      J.M. Bielecki –v– American Steamship Owners Mutual Protection
      & Indemnity Association Inc., and Shipowners Claims Bureau Inc.

We refer to your acceptance of the appointment as sole arbitrator in this
matter on LMAA terms and would be pleased if you would treat this fax
as the Claimants CLAIM SUBMISSIONS. References to page numbers
herein are references to the bundles of documents served with the CLAIM
SUBMISSIONS at pages 1 to 146 inclusive.

**The Agreement dated 25th March 1996**

1.    The dispute arises out of an Agreement dated 25th March 1996
      (pages 1 to 3) (the Agreement), Clause 5 of which, contains a
      choice of law and jurisdiction and forum clause.   The
      Respondents, being the *'defending party'* have chosen London
      arbitration as the place to resolve the disputes between the
      parties.

**The Parties**

*I*

~2~

2.     The Agreement was made between and the parties defined as:-

       *"THE SHIPOWNERS CLAIMS BUREAU INC., and THE AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., (THE AMERICAN CLUB), of the first part and HUGHES, HOOKER & CO., and HUGHES, HOOKER (CORRESPONDENTS) S.A., (HUGHES HOOKER), of the second part".*

3.     Accordingly, the Respondents herein include both the American Steamship Owners Mutual Protection and Indemnity Association, Inc, and the Shipowners Claims Bureau, collectively defined and referred to in the Agreement as *"THE AMERICAN CLUB"*, and referred to herein as the 'American Club' or 'AC'.

4.     As for the Claimants, the Agreement speaks for itself, save that Mr Jacek Bielecki was a sole-trader trading in the name of Hughes Hooker & Co., (HHC) in that he was the sole equity partner of HHC until its dissolution on about the 6th March 2001. HHC will be wound-up on completion of this and other cases with which HHC is concerned. The entities defined and referred to in the Agreement as *"HUGHES HOOKER"* will be referred to as 'HH' herein, and such description includes Mr. Bielecki.

**The Terms of the Agreement dated 25th March 1996.**

5.     Following negotiations between HH and AC, a 5-year agreement was entered into by HH with AC on the 25th March 1996 (the Agreement). The terms of the Agreement can be seen at pages 1 to 3.

6.     The Agreement provided in Clause 1 that the *"AMERICAN CLUB hereby appoints HUGHES HOOKER as it's representative and correspondent for Greece for an initial period of 1 year from the date of this agreement".*

7.     Clause 4, then provided that:-

       *"This agreement shall be extended for a further period of 4 years, following the successful completion of the first probationary year referred to in*

2

~3~

*paragraph 1 above, save that this agreement may be terminated by 3 months notice in the event of gross negligence or other serious breach by either party".*

8.  The first probationary year was completed successfully and the Agreement was therefore extended automatically for a further 4 years, that is to say, until 24th March 2001.

9.  Clause 2 of the Agreement set out the initial responsibilities of HH to AC under the Agreement, and stated that, *"HUGHES HOOKER shall use their best endeavours to represent and market the AMERICAN CLUB in Greece in order to facilitate the introduction of shipowners and charterers as potential members of the AMERICAN CLUB, and where necessary to give advice and/or handle claims as required, and to generally promote the AMERICAN CLUB in accordance with the policy and ideals of 'Vision 2000', and to act as a general correspondents to the AMERICAN CLUB and it's managers"*

10. In consideration of the duties set out in Clause 2, HH was entitled to remunerated and Clause 3(b) of the Agreement provided as follows:-

    *"in respect of the entry, after the date of this agreement, of shipowners or charterers based or domiciled in Greece, as members, a commission of 2% (two per cent) on the calls (ETC) payable to the AMERICAN CLUB by the said member, for a period of three policy years after entry or for the actual period of entry of the said member, if less than three policy years........"*

    <u>The Breaches of Contract</u>

11. The AMERICAN CLUB has been, and remain guilty of several breaches of the Agreement as follows:-

3

~4~

**Failure to Provide an Accounting**

**PARTICULARS**

12.    It was implicit in the Agreement, in order to give it business efficacy, that AC would disclose to HH full details of all entries of members with effect from 25th March 1996, *"of shipowners or charterers based or domiciled in Greece, as members"*, so as to enable HH to calculate and/or verify the correct commission due be paid to them by AC pursuant to Clause 3 b. of the Agreement.

13.    AC has refused to provide details of the said entries on the basis either, that it is, *"none of your business" (per Tom McGowan – former secretary of AC)*, and/or that the information is privileged or confidential. (See Joe Hughes (CEO of SCB- ('AC Hughes')) fax dated September 13, 1999, 3rd paragraph at page 41). Further, the documents that AC <u>has</u> disclosed are incomplete and prevent HH from ascertaining the amount of commission HH is entitled to be paid by AC.

14.    Due to HH's efforts it is believed that over 13 million tons of Greek *"based or domiciled"*, tonnage entered AC following the date of the Agreement. The precise number of ships and tonnage is unknown to HH, because of AC's unreasonable and unlawful refusal to disclose this information.

4

~5~

15.   On 28th June 1999, some 3 years after the commencement of the Agreement between HH and AC, no commission had been paid by AC except in connection with one fleet, namely Good Faith Shipping Company SA (GFS), accordingly, HH wrote to AC (pages 22 to 26), complaining that commissions and claims handling fees had not been paid to HH by AC. Plaintiff then estimated that a sum of perhaps, *"$60,000 or $70,000 may be due over the past 2 years"*. A reminder was sent by plaintiff to AC (page 29, and AC replied on 7th July 1999 (page 30), advising that he would respond, *"in the near future"*. Despite this promise, no response was received from AC.

16.   HH then emailed AC on 12th August 1999 (pages 31 to 32), pointing out that claims handling fees remained unpaid since March 1998, some 15 months earlier, and that commission was being withheld since at least February 1997, some 2½ years earlier. No reply was received to this email from AC.

17.   On 2nd September 1999, AC finally responded with what they represented was an accurate and honest analysis of what commission was due to HH. However, no corroborative evidence to support AC's figures was disclosed. AC's McGowan simply said *"trust me"*.

18.   On 3rd September 1999, HH replied (pages 39 to 40), to AC Hughes by stating that, *"I do not agree entirely with the position you*

5

~6~

have set out.  For example, I cannot determine which fleets are included, their tonnages and the calls charged".

19.    On September 13, 1999 (page 41, paragraph 4), AC Hughes stated as follows:- "So far as the disclosure of the premium of individual Members is concerned with the exception of Good Faith, we have a problem disclosing premium levels in respect of identified fleets where there are formal intermediaries who place the business with the Club and in respect of whom – and whose clients – it owes a duty of confidentiality.  However, we can - and will –give you details of the identity of the Greek-based fleets in respect of which commission is due. This will follow shortly"

20.    The promised, "details of the identity of the Greek-based fleets", were not supplied.  Further, no details of the promised Good Faith fleet were or have been disclosed.  Finally, an 'intermediary' was involved in the entry of the Good Faith fleet with AC.

21.    HH wrote to AC Hughes on 4th February 2000 (pages 50 to 56), again demanding a proper accounting of the commissions due, and other details requested from AC Hughes some 8 months earlier.  AC Hughes replied  (page 58), on February 14, 2000 that he would, "be in further contact with you in the near future".  Nothing was heard from AC Hughes despite his promises, and after HH threatened to sue, (see fax dated 20th March 2000 – pages 61 to 66), eventually AC Hughes replied on March 23, 2000 (pages 67 and 68), as follows:-

~7~

> "We have never resiled from the obligation to pay you commissions for the relevant years of account during the currency of the agreement. <u>You had an accounting as of early September 1999 in out telefax of September 2, 1999. I also said in that message that "I will ensure that all continuing obligations to Hughes Hooker in terms of the agreement are fulfilled in accordance with its terms". We paid you the $104,185.40 due at that point very promptly. The balance we calculate to be due to you as of February 20, 2000 will also be paid to you very soon</u>"(sic) (emphasis supplied).

22. Accordingly, on March 23, 2000, AC Hughes was maintaining that he had complied with all his accounting obligations despite the clear fact that no details of any fleets were disclosed to HH as AC Hughes had previously promised.

23. In paragraph 7, of AC Hughes fax of March 23, 2000 (page 68), HH was invited to a meeting with AC in which AC Hughes stated that, *"we are prepared to meet you next week here in New York to show you in person how the figures have been calculated by reference to all relevant documents. We are not, however, prepared to allow you to keep copies of our internal documents since they are privy to other parties..."*

24. HH's Bielecki travelled to New York for the scheduled meeting with AC Hughes on 29th March 2000, which was then postponed by AC Hughes to 30th March 2000, and then AC Hughes failed to

-8-

attend the re-scheduled meeting. HH's report dated 4th April 2000, of the meeting can be seen at pages 78 to 80, which record the abject failure of AC to disclose any meaningful accounting. AC Hughes reply dated April 6, 2000 is at pages 81 to 82, wherein he belatedly and reluctantly admits that the previous 'accounting' was not complete. AC Hughes says, *"we are again reviewing all accounts and expect within a week to be able to furnish you a more definitive statement with a full explanation of how the commissions are calculated so that you may follow the figures.(emphasis added).*

25. Such "definitive statement" was NOT supplied to HH by AC.

26. It is clear therefore that AC have not properly accounted to HH for commissions. In the event, a further sum of $126,882 was admitted by AC Hughes as being due to HH. No meaningful data or documents have been provided by AC to HH to enable HH to calculate the commissions due to it and/or to verify AC's figures.

27. In his fax of April 26, 2000 (pages 83 to 85), AC Hughes stated that AC's, *"complete supporting documentation in regard to the figures attached to this message"*, were being sent to HH. AC Hughes then declined a meeting with plaintiff that he had previously suggested should take place. The *"complete supporting documentation"*, was no such thing. So for the third time over a period of some 2 years, AC accepted that the figures

8

–9–

they had previously swore were *"complete"*, were not complete at all. Even today, AC still refuses to provide HH with proper and complete accounting.

28.    AC Hughes faxed plaintiff on August 10, 2000 (pages 93 to 99), admitting, once more that further sums were due to plaintiff, and stating the following

29.    *Please advise where you wish the total of $22,055.07 as set out above to be paid. <u>We consider acceptance of this sum by you to be full and final settlement of all sums owed by the Club to you"</u> (emphasis added).*

30.    AC Hughes attempt to blackmail the HH into accepting this final payment, *"in full and final settlement"*, was rejected by HH. The implication was that if the sum was not accepted by HH, *"in full and final settlement"*, then they would not receive the sum admitted by AC Hughes to be due to them.

31.    By this time, it had taken HH over 4 years to secure at least some payment of commission. Accordingly, AC has failed to account properly or at all to HH over a long period and such accounting is now sought through this Tribunal.

<u>Failure to Disclose 'Members'</u>

32.    HH is entitled on all, *"shipowners or charterers based or domiciled in*

9

~ 10 ~

*Greece, as members, a commission of 2% (two per cent) on the calls*
*(ETC), payable to the American Club by the said member, for a period of*
*3 policy years after entry…".* (See Clause 3(b) at page 2).

33.    AC has admitted the basis upon which commissions are payable
to HH. (See Page 67 at paragraph 3).

34.    It was not agreed between HH and AC, and the Agreement did
not require, that HH introduce such, *"shipowners or charterers"* to
AC, although HH did do so.  The role of HH was as exclusive,
*"representative and correspondent",* of AC, (See Clause 1 of contract,
at page 1), and HH was not required or permitted to act as
brokers to AC.

35.    When the Agreement between HH and AC was concluded in
March 1996, AC had no Greek tonnage entered with the Club.
Today they have over 21 million tons entered of which about 65%
are believed to be Greek. Full details of such Greek entries are
sought in order to properly calculate the commission due from
AC to HH.

## INTERFERENCE WITH CONTRACT

36.    Clause 3 (c) of the Agreement provided that HH was entitled:-

*"in respect of claims handling or advice sought by members of the*

10

–11–

*AMERICAN CLUB, the amount of time spent at the special rates set out in schedule AA as attached..."*

37.  HH was required by AC and did provide, *"claims handling or advice"*, in over 76 separate cases referred to HH by 'members' of AC.  In particular in 1996, HH had introduced Good Faith Shipping Co., SA, and their chartering arm, N.G. Moundreas Shipping, (GFS), to AC.  The business relationship between HH and GFS went back some 21 years, and HH had, prior to 1996, handled over 100 claims on behalf of GFS who operated a fleet of some 40 ships.  AC however interfered with the relationship between the HH and GFS, by unlawfully prohibiting any work to be done by HH for GFS from about May 1999 (the 'prohibition').

## PARTICULARS

38.  In a meeting on 11th May 1999, between GFS, representatives of the AC, including AC's McGowan, and HH's Bielecki, at the office of Mr Nicolas Moundreas, of GFS, it was disclosed that AC were handling a large cargo claim without the involvement or knowledge of HH, contrary to Clause 3(c) of the contract, and the established pattern of business between the HH and AC.  Such a blatant breach of contract caused HH deep embarrassment, loss of prestige and financial damage.

39.  Further, in breach of the Agreement AC ordered, on a date and

11

~ 12 ~

on terms unknown, GFS not to use HH for claims handling
thereby causing HH financial loss full particulars of which will be
provided on receipt of the account sought by HH from AC in
connection with claims handled by AC from about 1999.

40.  In May 1998, AC opened a 'liaison' office in London.  The
London office did and still does the work previously done by HH
under the Agreement.  Indeed, AC has admitted as much.  See
AC fax to HH dated 2nd September 1999 (page 37, paragraphs 2 to
4).

41.  Once AC opened their London office they systematically
breached the Agreement by diverting work away from HH
causing them loss and damage.  The then secretary of the
American Club, and chairman of SCB, Thomas McGowan,
assured HH's Bielecki at a meeting on 11th May 1999, that the
London office of the AC would only handle, *"routine matters"*,
and that HH would continue to handle the substantive claims.
AC's McGowan stated during that meeting that the treatment of
HH by AC was *"shabby"*.

42.  No new claims work has since been done by HH under the
Agreement.  Reference is made to the several documents herein,
in particular pages 31, paragraph 1; page 33; page 37; page 43,
paragraph 6; page 51, paragraph CC; page 64, paragraph 10.

43.  Despite numerous promises by AC Hughes, that HH would have

12

– 13 –

their claims handling restored, it is a fact that since the prohibition, HH have not received any new claims at all in connection with GFS or any other Greek member of AC. Prior to the prohibition in May 1999, new cases were referred to HH by Greek members, including GFS, on a daily basis.

44.  It is worth noting that a representative of GFS now sits on the Board of the American Club, demonstrating the respect and esteem with which GFS is held by AC whose introduction to AC was effected by HH.

45.  Accordingly, despite the express terms of the Agreement, in particular Clauses 2 and 3, AC has unlawfully deprived HH of remuneration they would otherwise have earned under the Agreement in connection with claims handling services. The loss sustained by such unlawful acts include not only a loss of revenue, but also permanent damage to HH business, by *inter alia*, the secret and unlawful appointment of Shipserve Inc., as the AC Piraeus correspondent, sometime in early 1999 in effective substitution of HH, contrary to the 'exclusive' nature of HH appointment. Full particulars of the losses sustained as a result of the 'prohibition' will be given following the account sought from AC.

### The Unlawful Termination of the Agreement

46.  The Preamble to the Agreement states that it is dated 25th day of

– 14 –

March 1996, and Clause 1, provides the duration of the contract is, *"for an initial period of 1 year from the date of this agreement.* (Pages 1 and 2). Clause 4 of the Agreement then went on to provide that:-

47.    *"This agreement shall be extended for a further period of 4 years following the successful completion of the first probationary year referred to in paragraph 1 above…"(emphasis added).*

48.    Accordingly, the Agreement ran and was valid until 24th March 2001. In breach of the Agreement, AC purported, by its fax dated 2nd September 1999 (pages    to    ), to cancel the contract on September 2, 1999, that is to say, some 18 months prematurely, causing HH loss and damage.

49.    However, even if, which is denied, AC was able to terminate the contract on notice, AC was already systematically breaching the contract on a regular and sustained basis and therefore in fundamental breach of contract as described in the foregoing paragraphs.

50.    Indeed, AC Hughes couldn't even wait for the termination notice he unlawfully gave, to expire. In his fax to Miss Xedona of HHCSA of 1st December 1999 (page 49, at paragraph 2), AC Hughes prohibited HH from describing itself as the *"representative"*, of AC, even though the purported termination notice was still in force. (pages 47 to 48):

–15–

51.   The reasons given by AC for its unlawful termination of the
      Agreement can be see from the statements made in the faxes sent
      by AC Hughes to HH's Bielecki, in particular those dated 2nd
      September 1999, and 23rd March 2000.  For example, in his fax of
      2nd September 1999 (Page 37, paragraph 1), AC Hughes, before
      prematurely terminating the contract, explained how much
      money HH had earned over the life of the agreement, the
      suggestion being that HH had earned enough and was therefore
      not entitled to more, irrespective of the terms of the Agreement.
      AC Hughes stated

*"The Future*

*The total sums paid to Hughes Hooker over the life of our agreement to date*
*amount on our calculations to $365,639.31or approximately 6% of the total*
*gross E.T.C. emanating from Greece since 1996 – including premiums which*
*have since turned out to be bad debt.  In accordance with the calculations set*
*out above, we owe you a further $104,185.40 which moves the percentage up to*
*nearly 8%. This is in addition to commissions payable to the brokers*
*who actually place the business with us. Moreover under Clause 3.b of*
*the agreement (and as accounted for in the above tables), the annual*
*commissions have a maximum life of three years.  Obviously, those*
*were the terms we agreed upon originally and we will observe them*
*without demur. But I think you will agree that they will afford you a*
*comfortable revenue flow for some time to come... ... ... ... ... ... ....*

~16~

*............As you know, much has changed since our relationship began. Not only has our business expanded in quantitative terms, but the Club relationship's with the markets in which its largest growth of business has taken place - notably among London brokers and their clients in Greece – has also undergone a sea change.*

*In these circumstances, we regard it as increasingly inappropriate to have a fixed relationship with any single party seeking to represent the Club in Greece on a commercial basis or otherwise. We do not believe that this is a healthy state of affairs and has the potential to damage the Club's longer term prospects".(sic)*

52.    Further, in his fax dated March 23, 2000, (Page 67, paragraph 3), AC Hughes tries to justify AC's breaches of contract and asserts as follows:-

*"You assert in paragraph 7 of your message that the agreement was 'exclusive' in the sense that you were to be the Club's sole marketing representative in Greece. This was never the case, and never agreed. You were entitled (which we have never denied) to receive a commission on entries, "based or domiciled in Greece" (Clause 3b) whether or not they entered the Club as a result of your efforts – most of which never were, hence your inability to identify the vast majority of them!(emphasis added)*

53.    The implication of these statement's, and the motive behind the AC's actions is clear. Once HH had successfully established AC's name in the Greek market, AC dispensed with the services of HH

16

~ 17 ~

as their exclusive representative.

54.   HH took all the risk, when in 1996 they made their bargain with AC. AC was happy for HH to do so because AC had no business in Greece, and therefore would have no commissions or claims handling fees to pay if no business was secured. However, once the business started to flow, then AC didn't want to pay HH what was rightfully due to them, and prematurely and unlawfully purported to terminate the Agreement.

### The Remedies Sought

55.   HH seek the following remedies against AC.

56.   An account showing all fleets insured by AC since 25th March 1996 to 24th March 2003[1], together with the names and GRT's of all vessels entered, and the rates of advance call, supplementary and release calls changed by AC in respect of P&I, FD&D and Charterers entries. HH have undertaken and hereby undertake to keep this information confidential.

57.   An account showing all claims arising for the Greek fleet from 1996 to 2003, and the sums paid by way of fees to third-parties in connection with the handling of those claims.

~ 18 ~

58.    Such further relief as may be just and proper under the circumstances of this case.

59.    Interest.

60.    Costs.

61.    Once the account is provided then HH will be able to calculate the loss and damage suffered to it by AC's breaches and will serve SUPPLEMENTARY CLAIM SUBMISSIONS.

Best Regards

Jacek Bielecki
Defence Claims Limited



Enc.

---

[1] Under Clause 3 c. of the Agreement commission is payable for 3 policy years after entry, and therefore for entries in 2001, commission continues to be payable to 2003.

18